Michael I. Katz (CA State Bar No. 181728)
    mkatz@mabr.com
Charles S. Barquist (CA State Bar No. 133785)
    cbarquist@mabr.com
Jared J. Braithwaite (CA State Bar No. 288642)
    jbraithwaite@mabr.com
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, California 92618
Telephone:   (949) 202-1900
Facsimile:    (949) 453-1104

Attorneys for Defendant LITRINIUM, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **MACOM Technology Solutions Inc.**, a Delaware corporation; **Mindspeed Technologies, S.A.S.**, a French corporation, | Case No. 8:19cv-00220-JVS-JDE |
| Plaintiffs; | **Declaration of Michael I. Katz in Support of Litrinium, Inc.'s Motion for Plaintiffs' Pre-Discovery Disclosure of Their Trade Secrets** |
| v. | Motion Assigned to:   Hon. John D. Early |
| **Litrinium, Inc.**, a Delaware corporation; **Jerome Garez**, an individual; and **Does 1 through 20**, inclusive, | Hearing Date:    June 20, 2019 at 10:00 a.m. Courtroom:    6A |
| Defendants. | Discovery Cut-Off:   April 6, 2020 Pretrial Conference:   August 3, 2020 Trial Date:    August 18, 2020 |

# DECLARATION OF MICHAEL I. KATZ

I, Michael I. Katz, declare as follows:

1.     I am an attorney licensed to practice law in all courts in the State of California and am admitted to practice before the United States District Court, Central District of California. I am a shareholder in the law firm of Maschoff Brennan Laycock Gilmore Israelsen & Wright, PLLC, and one of the attorneys responsible for the representation of Defendant Litrinium, Inc. in this matter. I make this declaration of my own personal knowledge, unless the context indicates otherwise, and, if called as a witness, I could and would testify competently to the facts stated herein. This declaration is submitted in support of Litrinium Inc.'s Motion for Plaintiffs' Pre-Discovery Disclosure of Their Trade Secrets.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of the May 6, 2019 transcript from the Rule 16 case management conference before the Court.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Court's order establishing the case schedule.

4.     Attached hereto as **Exhibit 3** is a true and correct copy of Plaintiffs' Complaint, filed with the Court on February 4, 2019, Docket No. 1.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of Plaintiffs First Amended Complaint, filed with the Court on April 10, 2019, Docket No. 30.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of Defendant Litrinium Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint, filed with the Court on May 6, 2019, Docket No. 34.

7.     Attached hereto as **Exhibit 6** is a true and correct copy of Defendant Litrinium Inc.'s Motion for Protective Order Barring Plaintiffs' Discovery Absent Identification of Trade Secrets, filed with the Court on April 8, 2019, Docket No. 28.

8.     Attached hereto as **Exhibit 7** is a true and correct copy of the Court's minute order, dated April 10, 2019, Docket No. 29.

9.   Attached hereto as **Exhibit 8** is a true and correct copy of correspondence from MACOM Technology Solutions Inc.'s that has come into Litrinium Inc.'s possession through dissemination in among those in the TIA industry.

10.   I am aware that MACOM sent the letter attached as Exhibit 8 to recipients at least in the United States, China, and Japan, including to Litrinium's customers, potential customers, and others in the TIA industry.

11.   Attached hereto as **Exhibit 9** is a true and correct copy of correspondence, dated March 12, 2019, sent by me to counsel for Plaintiffs.

12.   Between March 12, 2019 and March 20, 2019, MACOM did not respond in any way to my correspondence of March 12, 2019 or Litrinium's invitation to have its and MACOM's products compared by an independent expert to resolve MACOM's concerns.

13.   Attached hereto as **Exhibit 10** is a true and correct copy of correspondence, dated March 20, 2019, by me to counsel for Plaintiffs.

14.   Attached hereto as **Exhibit 11** is a true and correct copy of a datasheet entitled "CMOS Transimpedance Amplifier with AGC for Fiber Optic Networks up to 622 Mbps," which is available from MACOM's website at the following address: https://cdn.macom.com/datasheets/M02011.pdf.

15.   Attached hereto as **Exhibit 12** is a true and correct copy of a document entitled "Optoelectronics & Photonics," which is available from MACOM's website at the following address: https://www.macom.com/files/live/sites/ma/files/pdf/OptoBrochure_2018_072518_lr.pdf.

16.   Attached hereto as **Exhibit 13** is a true and correct copy of U.S. Patent No. 5,343,160, entitled "Fully Balanced Transimpedance Amplifier with Low Noise and Wide Bandwidth," issued on August 30, 1994, and which was initially assigned to TriQuint Semiconductor, Inc.

17.   Attached hereto as **Exhibit 14** is a true and correct copy of U.S. Patent No. 5,602,510, entitled "Automatic Transimpedance Control Amplifier Having a

Variable Impedance Feedback," issued on February 11, 1997, and which was initially assigned to Anadigics, Inc.

18.   Attached hereto as **Exhibit 15** is a true and correct copy of U.S. Patent No. 5,646,573, entitled "Automatic Gain-Control Transimpedance Amplifier," issued on July 8, 1997, and which was initially assigned to Anadigics, Inc.

19.   Attached hereto as **Exhibit 16** is a true and correct copy of U.S. Patent No. 6,084,478, entitled "Transimpedance Amplifier with Automatic Gain Control," issued on July 4, 2000, and which was initially assigned to Vitesse Semiconductor Corp.

20.   Attached hereto as **Exhibit 17** is a true and correct copy of U.S. Patent No. 6,504,429, entitled "Wide Dynamic Range Transimpedance Amplifier," issued on January 7, 2003, and which was initially assigned to Sirenza Microdevices, Inc.

21.   Attached hereto as **Exhibit 18** is a true and correct copy of U.S. Patent No. 7,605,660, entitled "Linear Multi-stage Transimpedance Amplifier," issued on October 20, 2009, and which was initially assigned to RF Micro Devices, Inc.

22.   Attached hereto as **Exhibit 19** is a true and correct copy of U.S. Patent No. 8,509,629, entitled "High Sensitivity Two-Stage Amplifier," issued on August 13, 2013, and which was initially assigned to Mindspeed Technologies, Inc.

23.   Attached hereto as **Exhibit 20** is a true and correct assignment record for the U.S. Patent No. 8,509,629, attached as Exhibit 9, which shows MACOM Technology Solutions Holdings, Inc. as the current assignee, and which was retrieved by the publicly available assignment information on the website for the U.S. Patent and Trademark Office.

24.   Attached hereto as **Exhibit 21** is a true and correct copy of U.S. Patent No. 9,030,263, entitled "Transimpedance Amplifier (TIA) Circuit and Method," issued on May 12, 2015, and which was initially assigned to Avago Technologies General IP (Singapore) Pte. Ltd.

25.   Attached hereto as **Exhibit 22** is a true and correct copy of U.S. Patent No. 9,577,753, entitled "Transimpedance Amplifier," issued on February 21, 2017, and which was initially assigned to Sumitomo Electric Industries, Ltd.

26.   Attached hereto as **Exhibit 23** is a true and correct copy of U.S. Patent Application Publication No. 2004/0129862, entitled "Wideband Transimpedance Amplifier with Automatic Gain Control," which was published on July 8, 2004.

27.   Attached hereto as **Exhibit 24** is a true and correct copy of U.S. Patent Application Publication No. 2005/0200421, entitled "Transimpedance Amplifier with Differential Peak Detector," and which was published on September 15, 2005.

28.   Attached hereto as **Exhibit 25** is a true and correct copy of U.S. Patent Application Publication No. 2017/0026011, entitled "Transimpedance Amplifier with Bandwidth Extender," published on January 26, 2017, and which was initially assigned to Mindspeed Technologies, Inc.

29.   Attached hereto as **Exhibit 26** is a true and correct assignment record for the U.S. Patent Application Publication No. 2017/0026011, attached as Exhibit 13, which shows MACOM Technology Solutions Holdings, Inc. as the current assignee, and which was retrieved by the publicly available assignment information on the website for the U.S. Patent and Trademark Office.

30.   Attached hereto as **Exhibit 27** is a true and correct copy of "Plaintiffs' First Set of Requests for Production to Defendant Litrinium, Inc." served on Litrinium.

31.   Attached hereto as **Exhibit 28** is a true and correct copy of "Plaintiffs' First Set of Interrogatories to Defendant Litrinium, Inc." served on Litrinium.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on the 23rd day of May, 2019, at Irvine, California.

By: */s/Michael I. Katz*
Michael I. Katz

# EXHIBIT 1

1

```
 1

 2

 3

 4              UNITED STATES DISTRICT COURT

 5            CENTRAL DISTRICT OF CALIFORNIA

 6                  SOUTHERN DIVISION

 7                     - - -

 8     THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

 9
       M/A-COM TECHNOLOGY SOLUTIONS, )
10     INC., et al.,                 )
                         Plaintiffs, )
11         vs.                       )
                                     )  SACV-19-00220-JVS
12     LITRINIUM, INC., et al.,      )
                         Defendants. )
13     ------------------------------)

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Santa Ana, California

17                  May 6, 2019

18

19                    SHARON A. SEFFENS, RPR
                      United States Courthouse
20                    411 West 4th Street, Suite 1-1053
                      Santa Ana, CA  92701
21                    (714) 543-0870

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiffs:

 3   ANDREW P. HOLLAND
     THOITS LAW, APC
 4   400 Main Street, Suite 250
     Los Altos, CA  94022
 5   (650) 327-4200

 6   For the Defendants:

 7   MICHAEL J. KATZ
     CHARLES S. BARQUIST
 8   MASCHOFF BRENNAN LAW FIRM
     100 Spectrum Center Drive, Suite 1200
 9   Irvine, CA  92618
     (949) 202-1900
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

Exhibit 1, Page 8

3

|  | 1 | SANTA ANA, CALIFORNIA; MONDAY, MAY 6, 2019; 12:19 P.M. |
| 12:19 | 2 | THE CLERK:  Item No. 14, SACV-19-00220-JVS, |
| 12:19 | 3 | M/A-COM Technology Solutions, Inc., et al., versus |
| 12:19 | 4 | Litrinium, Inc. et al. |
| 12:19 | 5 | Counsel, please state your appearances. |
| 12:19 | 6 | MR. HOLLAND:  Good afternoon, Your Honor.  Andrew |
| 12:20 | 7 | Holland appearing for M/A-COM Technology Solutions and |
| 12:20 | 8 | Mindspeed Technologies. |
| 12:20 | 9 | MR. KATZ:  Good afternoon, Your Honor.  Michael |
| 12:20 | 10 | Katz appearing on behalf of defendant Litrinium. |
| 12:20 | 11 | MR. BARQUIST:  Good afternoon, Your Honor. |
| 12:20 | 12 | Charles Barquist also for Litrinium. |
| 12:20 | 13 | THE COURT:  Good afternoon. |
| 12:20 | 14 | What we are going to do about getting a more |
| 12:20 | 15 | definitive statement of what the trade secret is? |
| 12:20 | 16 | MR. HOLLAND:  Well, Your Honor, we think we |
| 12:20 | 17 | sufficiently addressed it in the First Amended Complaint |
| 12:20 | 18 | that this would be a discovery issue.  They have served |
| 12:20 | 19 | discovery that asks for reasonable particularity of the |
| 12:20 | 20 | trade secrets, and we will respond to that. |
| 12:20 | 21 | THE COURT:  That's not what the California statute |
| 12:20 | 22 | anticipates.  It anticipates that a detailed statement of |
| 12:20 | 23 | the trade secret be made as a condition to going forward |
| 12:21 | 24 | with discovery. |
| 12:21 | 25 | MR. HOLLAND:  Your Honor, respectfully I think |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

4

| | | |
|---|---|---|
| 12:21 | 1 | that's not well settled, and I think there is case law on |
| 12:21 | 2 | both sides of that. |
| 12:21 | 3 | THE COURT:  Not in the statute. |
| 12:21 | 4 | MR. HOLLAND:  Under 20-1910?  Is that what you are |
| 12:21 | 5 | referring to?.. |
| 12:21 | 6 | THE COURT:  Yes. |
| 12:21 | 7 | MR. HOLLAND:  Well, to the extent that we have to |
| 12:21 | 8 | meet that requirement, we'll meet that requirement, but we |
| 12:21 | 9 | think we have in our First Amended Complaint. |
| 12:21 | 10 | THE COURT:  If you are not satisfied, take it to |
| 12:21 | 11 | the magistrate judge on an expedited basis.  Indicate to the |
| 12:21 | 12 | magistrate judge that the Court suggests that the issue be |
| 12:21 | 13 | taken up on an expedited basis. |
| 12:21 | 14 | MR. KATZ:  Thank you, Your Honor. |
| 12:21 | 15 | THE COURT:  I think initial disclosures should be |
| 12:21 | 16 | made now, not wait for any further resolution of the trade |
| 12:21 | 17 | secret issue. |
| 12:22 | 18 | As to a protective order, again visit with the |
| 12:22 | 19 | magistrate judge.  There is clearly a need for a protective |
| 12:22 | 20 | order. |
| 12:22 | 21 | There is discussion of a possible disqualification |
| 12:22 | 22 | motion.  Do you want to tell me about that? |
| 12:22 | 23 | MR. HOLLAND:  Your Honor, I don't think that's |
| 12:22 | 24 | going to be an issue at this point.  That was our concern. |
| 12:22 | 25 | I think we're probably not going to proceed with that. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

5

| | | |
|---|---|---|
| 12:22 | 1 | THE COURT:  Okay.  The schedule that you propose I |
| 12:22 | 2 | think is a reasonable one, so with a couple of minor |
| 12:23 | 3 | adjustments, I am going to adopt your schedule. |
| 12:23 | 4 | The matter will proceed to trial, jury trial, on |
| 12:23 | 5 | August 18, 2020.  To the extent that we need findings of |
| 12:23 | 6 | fact and conclusions of law, they will be due August 10, |
| 12:23 | 7 | 2020.  We will do the final pretrial conference August 3, |
| 12:23 | 8 | 2020.  Pretrial papers will be due July 27, 2020.  Last for |
| 12:23 | 9 | hand-serving motions in-limine July 6, 2020.  Last for |
| 12:23 | 10 | hearing regular motions June 29, 2020.  Last for |
| 12:23 | 11 | hand-serving regular motions June 1, 2020. |
| 12:23 | 12 | The plaintiffs' and defendants' dates were all a |
| 12:23 | 13 | day off.  The defendants had the dates correctly aligned. |
| 12:23 | 14 | Nonexpert discovery cutoff, plaintiffs propose |
| 12:24 | 15 | May 5 and the defendants April 6.  Do you want to be heard |
| 12:24 | 16 | on that? |
| 12:24 | 17 | MR. HOLLAND:  We don't have a strong preference. |
| 12:24 | 18 | We just thought that there would be more time because there |
| 12:24 | 19 | is going to be discovery abroad most likely. |
| 12:24 | 20 | THE COURT:  Well, nonexpert discovery cutoff |
| 12:24 | 21 | April 6, 2020.  Similarly, on expert disclosures, I'm going |
| 12:24 | 22 | to adopt the defense dates.  Initial expert disclosures |
| 12:24 | 23 | April 13, 2020.  Rebuttal disclosures May 4, 2020.  Expert |
| 12:24 | 24 | discovery cutoff May 18, 2020.  Last for amending the |
| 12:24 | 25 | pleadings or adding parties June 24, 2019. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:24 | 1 | Last for conducting a settlement conference, I |
| 12:25 | 2 | would hope you could get to that in the first quarter of |
| 12:25 | 3 | 2020 before you get heavily into the expenses of experts. |
| 12:25 | 4 | So could you get to your settlement procedure say by the end |
| 12:25 | 5 | of February? |
| 12:25 | 6 | MR. HOLLAND:  Yes, Your Honor. |
| 12:25 | 7 | MR. KATZ:  Yes, Your Honor. |
| 12:25 | 8 | THE COURT:  Okay, let's say no later than |
| 12:25 | 9 | February 28 you will conduct your settlement procedure. |
| 12:25 | 10 | What do you want to do?  The plaintiff indicates |
| 12:25 | 11 | mediation and the defense the magistrate judge. |
| 12:25 | 12 | MR. HOLLAND:  We would prefer private mediation. |
| 12:25 | 13 | MR. KATZ:  We're okay with either form.  We think |
| 12:25 | 14 | that the involvement of an expert will cut to the chase on |
| 12:25 | 15 | that, but I suppose that's something that has to be done |
| 12:25 | 16 | collaterally. |
| 12:25 | 17 | THE COURT:  Well, I mean, you are going to get |
| 12:25 | 18 | that in private mediation.  You have the ability to find |
| 12:25 | 19 | someone who is skilled in the area and can give you some |
| 12:26 | 20 | real insight on a substantive basis. |
| 12:26 | 21 | MR. KATZ:  We have no strong view. |
| 12:26 | 22 | THE COURT:  Okay.  Then last to conduct your |
| 12:26 | 23 | mediation will be February 28, 2020.  Whenever you hold the |
| 12:26 | 24 | mediation, would you put in a joint report, please, within |
| 12:26 | 25 | seven days letting me know generally what progress you are |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
12:26    1    able to make, and if you have not resolved it, would you let
12:26    2    me know if the Court could be of any assistance.
12:26    3              MR. HOLLAND:  Certainly, Your Honor.
12:26    4              THE COURT:  My apologies for the pretrial
12:26    5    conferences that carried over.  Usually we don't have two of
12:26    6    them or at least not two of that complexity on
12:26    7    the 11:00 calendar, so I'm sorry for the long morning.
12:26    8              MR. HOLLAND:  Not at all.  Thank you.
12:26    9              MR. KATZ:  They were instructive, Your Honor.
12:26   10              THE COURT:  Any other issues you would like to
12:26   11    raise today?
12:26   12              MR. HOLLAND:  No, Your Honor.
12:26   13              MR. KATZ:  No, Your Honor.
12:26   14              THE COURT:  Okay.  Thank you.
12:26   15              (Whereupon, the proceedings were concluded.)
12:26   16                        *    *    *
12:26   17
12:26   18
12:26   19
12:26   20
12:26   21
12:26   22
12:26   23
12:26   24
12:26   25
```

8

```
12:26    1
12:26    2
12:26    3
12:26    4
12:26    5                            CERTIFICATE
12:26    6
12:26    7        I hereby certify that pursuant to Section 753,
12:26    8   Title 28, United States Code, the foregoing is a true and
12:26    9   correct transcript of the stenographically reported
12:26   10   proceedings held in the above-entitled matter and that the
12:26   11   transcript page format is in conformance with the
12:26   12   regulations of the Judicial Conference of the United States.
12:26   13
12:26   14   Date:  May 7, 2019
12:26   15
12:26   16
12:26   17                   /s/   Sharon A. Seffens  5/7/19
12:26                        _____
12:26   18                   SHARON A. SEFFENS, U.S. COURT REPORTER
12:26   19
        20
        21
        22
        23
        24
        25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 19-00220JVS(JDEx)                              Date   May 6, 2019

Title   M/A-COM Technology Solutions, Inc, et al v Litrinium, Inc, et al

Present: The
Honorable          **James V. Selna, US District Court Judge**

|  Lisa Bredahl  |  Sharon Seffens  |
|---|---|
|  Deputy Clerk  |  Court Reporter  |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Andrew Holland                                      Michael Katz
                                                         Charles Barquist

**Proceedings:**   Scheduling Conference

       Cause called and counsel make their appearances.  The Court and counsel confer.    The Court
sets the case management dates with the agreement of counsel as follows:

|  |  |
|---|---|
| **Jury Trial** | **August 18, 2020 at 8:30 a.m.** |
| File Findings of Fact and Conclusions of Law by August 10, 2020 | |
| **Final PreTrial Conference** | **August 3, 2020 at 11:00 a.m.** |
| File PreTrial Documents not later than July 27, 2020 | |
| File motions in limine not later than July 6, 2020 | |
| **Discovery Cut-off** | **April 6, 2020** |
| **Expert Discovery Cut-off** | **May 18, 2020** |
| Initial disclosure of Experts not later than **April 13, 2020** | |
| Rebuttal disclosure of Experts not later than **May 4, 2020** | |
| **Law and Motion Cut-off** | **June 29, 2020  at 1:30 p.m.** |
| Motions to be filed and served not later than **June 1, 2020** | |
| **Last Day to Amend Pleadings or Add Parties June 24, 2019** | |

       Counsel inform the Court that their selection for a settlement procedure pursuant to Local Rule
16-15 is ADR 3.   The Court orders that any settlement discussions shall be completed not later than
February 28, 2020.  Counsel shall file a Joint Report of the parties regarding outcome of settlement
discussions, the likelihood of possible further discussions and any help the Court may provide with
regard to settlement negotiations not later than seven (7) days after the settlement conference.

       Counsel may request Magistrate Judge Early to consider identifying the alleged trade secrets on
an expedited basis.

cc: ADR

|  0  |  :  |  05  |
|---|---|---|

Exhibit 2, Page 16

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   SACV 19-00220JVS(JDEx)                    Date   May 6, 2019

Title      M/A-COM Technology Solutions, Inc, et al v Litrinium, Inc, et al

Initials of Preparer          lmb

Exhibit 2, Page 17

# EXHIBIT 3

Andrew P. Holland/Bar No. 224737
aholland@thoits.com
Mark V. Boennighausen/Bar No. 142147
mboennighausen@thoits.com
Erin M. Doyle/Bar No. 233113
edoyle@thoits.com
Misasha S. Graham/Bar No. 237187
mgraham@thoits.com
**THOITS LAW**
A Professional Law Corporation
400 Main Street, Suite 250
Los Altos, California 94022
Telephone:    (650) 327-4200
Facsimile:    (650) 325-5572

**Attorneys for Plaintiffs**
**M/A-COM Technology Solutions Inc.**
**and Mindspeed Technologies, S.A.S.**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| M/A-COM TECHNOLOGY SOLUTIONS INC., a Delaware corporation; MINDSPEED TECHNOLOGIES, S.A.S., a French corporation,<br><br>                  Plaintiffs,<br><br>v.<br><br>LITRINIUM, INC., a Delaware corporation; JEROME GAREZ, an individual; and DOES 1 through 20, inclusive,<br><br>                  Defendants. | No. 8:19-cv-220<br><br>**COMPLAINT FOR:**<br><br>(1) **VIOLATION OF DEFENSE OF TRADE SECRETS ACT**<br>(2) **VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT**<br>(3) **VIOLATION OF CALIFORNIA BUS. & PROF. CODE § 17200**<br>(4) **BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs M/A-COM Technology Solutions Inc. ("MACOM") and Mindspeed Technologies, S.A.S. ("Mindspeed SAS") (MACOM and Mindspeed SAS are referred to collectively as "Plaintiffs") complain and allege as follows against Defendants Jerome Garez, Litrinium Inc. and DOES 1 through 20:

## THE PARTIES

1.     Plaintiff MACOM is a Delaware corporation with its principal place of business located at 100 Chelmsford Street, Lowell, Massachusetts. MACOM operates a design center in Santa Clara, California.    In 2013, MACOM acquired Mindspeed Technologies, Inc. ("Mindspeed"), including all of Mindspeed's foreign subsidiaries.

2.     Plaintiff Mindspeed SAS is a French corporation organized under the laws of France.  It is wholly owned by Mindspeed, which is wholly owned by MACOM.

3.     Defendant Jerome Garez ("Garez") is a former employee of Mindspeed SAS. During his time as an employee of Mindspeed SAS, he executed contracts in which he agreed to keep Mindspeed SAS's and any of its affiliated entities' information confidential.

4.     MACOM is informed and believes, and thereupon alleges, that defendant Litrinium, Inc. ("Litrinium") is a Delaware corporation with its principal place of business located in Aliso Viejo, California.  MACOM is informed and believes, and thereon alleges, that Litrinium opened an office in France, on or about March 7, 2018.

5.     DOES 1 through 20 are persons or entities responsible in whole or in part for the wrongdoing alleged herein ("Doe Defendants").  Plaintiffs are informed and believe, and based thereon, allege that each of the Doe Defendants participated in, ratified, endorsed, or was otherwise involved in the acts complained of, and that they have liability for such acts. Plaintiffs will amend this Complaint if and when the identities of such persons or entities and/or the scope of their actions become known.

6.     Jerome Garez, Litrinium, Inc. and the Doe Defendants, and their agents, affiliates, and other co-conspirators are collectively referred to as "Defendants."

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* and 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the state law claim alleged in this Complaint pursuant to 28 U.S.C. § 1367.

8.     As set forth above, at least one Defendant resides in this judicial district.  In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district. Venue therefore properly lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## BACKGROUND

9.     Plaintiffs are in the business of designing, producing and selling semiconductor technologies for optical, wireless and satellite networks.   Plaintiffs' business includes marketing and selling its products to customers across the United States and the world.

10.     Plaintiffs sell many products in highly competitive markets.  These products have short life cycles and require extensive research and development to meet market needs and demand.  Accordingly, the ability to make design decisions based on both knowing what may or may not be successful, as well as knowledge about both the likely path to the marketplace based on information received from customers and internal work is highly valuable, and crucial to Plaintiffs' commercial success.

11.     Plaintiffs take substantial steps to keep such information secret as such information is core to the success of their business.  Among the steps that Plaintiffs take, Plaintiffs require that employees agree to contractual confidentiality obligations both during and after their employment period with Plaintiffs.  Plaintiffs also have internal network security procedures to restrict access and insure that internal company information is not publically available.  Plaintiffs also carefully monitor what information about their product plans is known to the public as well as the results of their internal development product efforts.

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

12.     The technology and non-public information at issue in this litigation generally concerns transimpedence amplifier ("TIA") designs and functionality.  It is the technology that defendant Garez was principally responsible for within MACOM. A TIA, in electronics, is a current to voltage converter. TIAs are often used when setting an operational amplifier to amplify the signal from a sensor, such as a photodiode, and are often used in optical receiver applications.  This market is highly competitive and Plaintiffs have developed an expertise in the design and development of these products.  In particular, Plaintiffs developed two generations of 28 GHz TIAs that were incorporated into their products, including but not limited to MATA-03003, MATA-03006, MATA-03007 and others.

13.     While at MACOM, defendant Garez was responsible for next generation TIAs including a PAM-4 TIA, 28G Burst Mode TIA, 28G Gen1 TIA, 10G Gen2 TIA, 28G APD TIA single and quad versions, and 28G PIN TIA single and quad versions.  On information and belief, the development of these components at MACOM were of particular commercial interest to Litrinium.

14.     Plaintiffs are informed and believe that Litrinium was formed in March 2016 by a former Mindspeed SAS employee, Najabat Bajwa.

15.     Plaintiffs are informed and believe that Mr. Bajwa, after his departure from Plaintiffs' employment, continued to stay in contact with Garez and eventually recruited him to work for Litrinium.  Based on information and belief, defendant Garez used Plaintiffs' resources and developed confidential and proprietary design concepts while employed by Mindspeed SAS, which were then incorporated into Litrinium products.

16.     This confidential and proprietary information generally includes, but is not limited to, design concepts and data developed in connection with different versions of the 2nd generation design of the 28G TIA that defendant Garez was working on while employed by Mindspeed SAS, and in particular a 3rd generation 28 TIA, which was unrelated to his work at Mindspeed SAS.  On information and belief, these designs were developed during business

137224.019/1219138

Exhibit 3, Page 22

1    hours, including the time period after he had given Plaintiffs notice of his departure from

2    Mindspeed SAS.

3        17.    On information and belief, prior to his departure from Mindspeed SAS, and

4    during his regularly scheduled business trips to Plaintiffs' Newport Beach, California offices,

5    defendant Garez utilized these trips to California to visit Litrinium and/or connect with Bajwa in

6    order to coordinate defendant Garez's misappropriation of Plaintiffs' trade secrets.

7        18.    On information and belief, due to the fact that the design and development of

8    Plaintiffs' 2nd generation 28G TIA required substantial effort from multiple individuals

9    employed by Plaintiffs, and not just defendant Garez, the misappropriation of trade secrets by

10   defendant Garez is substantial, both in the amount of resources expended and scope.

11       19.    Defendant Garez tendered his resignation from Mindspeed SAS in early 2018 and

12   his employment terminated on March 6, 2018.  Litrinium established an office in France at least

13   as early as March 7, 2018.

## CLAIMS FOR RELIEF

### COUNT 1 – VIOLATION OF DEFENSE OF TRADE SECRETS ACT
### (Against All Defendants)

17       20.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

18       21.    Plaintiffs own and possess certain confidential, proprietary, and trade secret

19   information, as alleged above. Plaintiffs' trade secrets include valuable designs, data and sales

20   information related to the development of TIAs and all iterations and advancements related to

21   Plaintiffs' TIA technology, which includes all design choices made in connection with such

22   products.

23       22.    Plaintiffs' confidential, proprietary, and trade secret information relates to

24   products and services used, sold, shipped and/or ordered in, or intended to be used, sold,

25   shipped and/or ordered in, interstate and foreign commerce.

26       23.    Plaintiffs have gone to great lengths to keep such information secret and

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

137224.019/1219138

5

1   confidential.

2       24.    Plaintiffs have at all times maintained stringent security measures to preserve the

3 secrecy of Plaintiffs' trade secrets referenced herein. For example, Plaintiffs restrict access to

4 confidential and proprietary trade secret information to only those individuals who "need to

5 know." All networks hosting Plaintiffs' confidential and proprietary information have been and

6 continue to be encrypted and have at all times required passwords. Computers, tablets, and cell

7 phones provided to Plaintiffs' employees are encrypted, password protected, and subject to other

8 security measures. Plaintiffs also secure their physical facilities by restricting access and then

9 monitoring actual access with security cameras and guards.

10      25.    Plaintiffs also require employees, contractors, consultants, vendors, and

11 manufacturers to sign confidentiality agreements before any confidential or proprietary trade

12 secret information is disclosed to them.

13      26.    Due to these security measures, Plaintiffs' confidential and proprietary trade

14 secret information is not available for others in the semiconductor industry – or any other

15 industry – to use through any legitimate means.

16      27.    Plaintiffs' confidential, proprietary, and trade secret information derives

17 independent economic value from not being generally known to, and not being readily

18 ascertainable through proper means by, another person who could obtain economic value from

19 the disclosure or use of the information.

20      28.    In violation of Plaintiffs' rights, Defendants misappropriated Plaintiffs'

21 confidential, proprietary and trade secret information in the improper and unlawful manner as

22 alleged herein. Defendants' misappropriation of Plaintiffs' confidential, proprietary, and trade

23 secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

24      29.    On information and belief, if Defendants are not enjoined, Defendants will

25 continue to misappropriate and use Plaintiffs' trade secret information for their own benefit and

26 to Plaintiffs' detriment.

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

30.     As the direct and proximate result of Defendants' conduct, Plaintiffs has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and to protect other legitimate business interests. Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

31.     Plaintiffs have been damaged by all of the foregoing and are entitled to an award of exemplary damages and attorneys' fees.

WHEREFORE Plaintiffs pray for the relief specified below.

## COUNT 2 – VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT
### Cal. Civ. Code § 3426 *et seq.*
### (Against both Defendants)

32.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

33.     Plaintiffs' technical information, designs, and other "know how" related to Plaintiffs' TIA technology and implementation, as set forth above, constitute trade secrets as defined by California's Uniform Trade Secrets Act. Plaintiffs own and possess certain confidential, proprietary, and trade secret information, as alleged above.

34.     Plaintiffs have undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. These efforts include, but are not limited to, the use of passwords and encryption to protect data on Plaintiffs' computers, servers, and source code repositories, and a culture that reminds all employees' of their duties to maintain the secrecy of Plaintiffs' confidential information, and the use of confidentiality agreement, as well as the use of and non-disclosure agreements to require vendors, partners, contractors, and employees to maintain the secrecy of Plaintiffs' confidential information.

35.     Defendants knew or should have known under the circumstances that the

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

137224.019/1219138

7

COMPLAINT

1    information misappropriated by Defendants were trade secrets.

2        36.    Defendants misappropriated and threaten to further misappropriate trade secrets at

3    least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were

4    acquired by improper means, and Defendants are using and threatening to use the trade secrets

5    acquired by improper means without Plaintiffs knowledge or consent.

6        37.    As a direct and proximate result of Defendants' conduct, Plaintiffs are threatened

7    with injury and have been injured in an amount in excess of the jurisdictional minimum of this

8    Court and that will be proven at trial. Plaintiffs have also incurred, and will continue to incur,

9    additional damages, costs and expenses, including attorneys' fees, as a result of Defendants'

10   misappropriation. As a further proximate result of the misappropriation and use of Plaintiffs'

11   trade secrets, Defendants were unjustly enriched.

12       38.    The aforementioned acts of Defendants were willful, malicious and fraudulent.

13   Plaintiffs are therefore entitled to exemplary damages under California Civil Code § 3426.3(c).

14       39.    Defendants' conduct constitutes transgressions of a continuing nature for which

15   Plaintiffs have no adequate remedy at law. Unless and until enjoined and restrained by order of

16   this Court, Defendants will continue to retain and use Plaintiffs' trade secret information to

17   enrich themselves and divert business from Plaintiffs, as Defendants are currently creating,

18   marketing competing products based on the misappropriated 2nd generation 28G TIA trade

19   secrets. Pursuant to California Civil Code § 3426.2, Plaintiffs are entitled to an injunction

20   against the misappropriation and continued threatened misappropriation of trade secrets as

21   alleged herein and further asks the Court to restrain Defendants from using all trade secret

22   information misappropriated from Plaintiffs and to return all trade secret information to

23   Plaintiffs.

24       40.    Pursuant to California Civil Code § 3426.3 and related law, Plaintiffs are entitled

25   to exemplary damages for Defendants' misappropriation of trade secrets due to Defendants'

26   willful and malicious misappropriation of trade secrets in a way specifically designed to harm

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

137224.019/1219138

8

COMPLAINT

1    Plaintiffs and their business

2          41.    Pursuant to California Civil Code § 3426.4 and related law, Plaintiffs are entitled

3    to an award of attorneys' fees for Defendants' misappropriation of trade secrets due to

4    Defendants' willful and malicious misappropriation of trade secrets in a way specifically

5    designed to harm Plaintiffs and their business.

6          WHEREFORE Plaintiffs pray for the relief specified below.

7    **COUNT III – VIOLATION OF CALIFORNIA BUS. & PROF. CODE § 17200**
     **(Against All Defendants)**
8

9          42.    Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

10         43.    Defendants engaged in unlawful, unfair, and fraudulent business acts and

11   practices. Such acts and practices include, but are not limited to, misappropriating Plaintiffs'

12   confidential and proprietary information while still employed by Mindspeed SAS, conspiring to

13   defraud Plaintiffs through said misappropriation of trade secrets, and willfully and knowingly

14   doing so for months before Plaintiffs began to suspect that such theft and fraud had been

15   perpetuated.

16         44.    Defendants' business acts and practices were unlawful as described above.

17         45.    Defendants' business acts and practices were fraudulent in that a reasonable

18   person would likely be deceived by their material misrepresentations and omissions. Defendants

19   have acquired and used Plaintiffs' confidential and proprietary trade secret information through

20   material misrepresentations and omissions.

21         46.    Defendants' business acts and practices were unfair in that the substantial harm

22   suffered by Plaintiffs outweighs any justification that Defendants may have for engaging in those

23   acts and practices.

24         47.    Plaintiffs have been harmed as a result of Defendants' unlawful, unfair, and

25   fraudulent business acts and practices. Plaintiffs are entitled to (a) recover restitution, including

26   without limitation, all benefits that Defendants received as a result of their unlawful, unfair, and

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

1    fraudulent business acts and practices and (b) an injunction restraining Defendants from

2    engaging in further acts of unfair competition.

3         WHEREFORE Plaintiffs pray for the relief specified below.

4              **COUNT IV – BREACH OF CONTRACT**
               **(Against Jerome Garez)**
5

6         48.   Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

7         49.   Defendant Garez entered into a written contract with Mindspeed SAS where he

8    agreed to keep all of Plaintiffs' proprietary and non-public information confidential. The

9    obligation to keep such information confidential extended beyond the end of his employment

10   with Plaintiffs.

11        50.   Plaintiffs performed all of their obligations under the contract, or were excused

12   therefrom by Garez's conduct.

13        51.   Garez breached his obligations under the contract by disclosing and/or using

14   Plaintiffs' confidential information at Litrinium or elsewhere for his benefit, and by developing

15   technology derived from Plaintiffs' trade secrets during his employment with Plaintiffs, that he

16   misappropriated and used to directly compete with Plaintiffs while at Litrinium. Defendants'

17   business acts and practices were unfair in that the substantial harm suffered by Plaintiffs

18   outweighs any justification that Defendants may have for engaging in those acts and practices.

19        52.   Because of Garez's breach, Plaintiffs have been damaged.

20        WHEREFORE Plaintiffs pray for the relief specified below.

21                    **PRAYER FOR RELIEF**

22        1.    The Court impose a constructive trust on all individuals and entities who come in

23   possession or receive benefit from the use of Plaintiffs' trade secrets and/or confidential

24   information;

25        2.    The Court issue an injunction prohibiting Defendants and or non-parties who

26   come in receipt of Plaintiffs' confidential or trade secret information or using it in any manner

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

137224.019/1219138                    10
                              COMPLAINT

Case 8:19-cv-00220-JVS-JDE   Document 45-2   Filed 05/23/19   Page 29 of 167   Page ID
#:791
Case 8:19-cv-00220-JVS-JDE   Document 1-2   Filed 02/04/19   Page 11 of 12   Page ID #:11

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022
(650) 327-4200

1   until it is returned to Plaintiffs' possession;

2        3.      Plaintiffs be awarded damages to the full amount provided by law;

3        4.      Plaintiffs be made whole by recovery of Defendants' unjust enrichment through

4   misappropriation of Plaintiffs' trade secrets;

5        5.      Plaintiffs be awarded exemplary damages in conformity with the law;

6        6.      Plaintiffs be awarded attorneys' fees pursuant to California Civil Code § 3426.4;

7   and

8        7.      All other appropriate relief in light of the facts proven and the applicable law.

9

10   Dated:  February 4, 2019

11                                          **THOITS LAW**
                                **Attorneys for Plaintiffs M/A-COM**
12                               **Technology Solutions Inc.**
                                **and Mindspeed Technologies, S.A.S**
13

14                               */s/ Andrew P. Holland*
                                **Andrew P. Holland/Bar No. 224737**
15                               **Mark V. Boennighausen/Bar No. 142147**
                                **Erin M. Doyle/Bar No. 233113**
16                               **Misasha S. Graham/Bar No. 237187**
                                A Professional Corporation
17                               400 Main Street, Suite 250
                                Los Altos, California 94022
18                               Telephone: (650) 327-4200
                                Facsimile:  (650) 325-5572
19                               Email:     aholland@thoits.com
20                                          mboennighausen@thoits.com
                                          edoyle@thoits.com
21                                          mgraham@thoits.com

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

Case 8:19-cv-00220-JVS-JDE   Document 45-2   Filed 05/23/19   Page 30 of 167   Page ID
#:792
Case 8:19-cv-00220-JVS-JDE   Document 1-2   Filed 02/04/19   Page 12 of 12   Page ID #:12

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: February 4, 2019

**THOITS LAW**
**Attorneys for Plaintiffs M/A-COM**
**Technology Solutions Inc.**
**and Mindspeed Technologies, S.A.S**

*/s/ Andrew P. Holland*
**Andrew P. Holland/Bar No. 224737**
**Mark V. Boennighausen/Bar No. 142147**
**Erin M. Doyle/Bar No. 233113**
**Misasha S. Graham/Bar No. 237187**
A Professional Corporation
400 Main Street, Suite 250
Los Altos, California 94022
Telephone: (650) 327-4200
Facsimile:  (650) 325-5572
Email:      aholland@thoits.com
            mboennighausen@thoits.com
            edoyle@thoits.com
            mgraham@thoits.com

# EXHIBIT 4

Case 8:19-cv-00220-JVS-JDE Document 45-2 Filed 05/23/19 Page 33 of 167 Page ID
#:794
Case 8:19-cv-00220-JVS-JDE Document 35-2 Filed 04/05/19 Page 34 of 167 Page ID

Andrew P. Holland/Bar No. 224737
aholland@thoits.com
Mark V. Boennighausen/Bar No. 142147
mboennighausen@thoits.com
Erin M. Doyle/Bar No. 233113
edoyle@thoits.com
Misasha S. Graham/Bar No. 237187
mgraham@thoits.com
**THOITS LAW**
A Professional Law Corporation
400 Main Street, Suite 250
Los Altos, California 94022
Telephone:     (650) 327-4200
Facsimile:     (650) 325-5572

**Attorneys for Plaintiffs
MACOM Technology Solutions Inc.
and Mindspeed Technologies, S.A.S.**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| **MACOM TECHNOLOGY SOLUTIONS INC.**, a Delaware corporation; **MINDSPEED TECHNOLOGIES, S.A.S.**, a French corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**LITRINIUM, INC.**, a Delaware corporation; **JEROME GAREZ**, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | No. 8:19-cv-00220-JVS-JDE<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) VIOLATION OF DEFENSE OF TRADE SECRETS ACT**<br>**(2) VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT**<br>**(3) BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs MACOM Technology Solutions Inc. ("MACOM") and Mindspeed Technologies, S.A.S. ("Mindspeed SAS") (MACOM and Mindspeed SAS are referred to collectively as "Plaintiffs") complain and allege as follows against defendants Jerome Garez, Litrinium, Inc. and DOES 1 through 20:

## THE PARTIES

1.       Plaintiff MACOM[1] is a Delaware corporation with its principal place of business located at 100 Chelmsford Street, Lowell, Massachusetts. MACOM also operates design centers in Santa Clara and Newport Beach, California.  These design centers assist in developing the trade secrets that are the primary focus of this lawsuit.   In 2013, MACOM acquired Mindspeed Technologies, Inc. ("Mindspeed"), including all of Mindspeed's foreign subsidiaries.

2.       Plaintiff Mindspeed SAS is a French corporation organized under the laws of France.  It is wholly owned by Mindspeed, which is wholly owned by MACOM.

3.       Defendant Jerome Garez ("Garez") is a former employee of Mindspeed SAS. During his time as an employee of Mindspeed SAS, he executed contracts in which he agreed to keep Mindspeed SAS's and any of its affiliated entities' information confidential.

4.       Plaintiffs are informed and believe, and thereupon allege, that defendant Litrinium, Inc. ("Litrinium") is a Delaware corporation with its principal place of business located in Aliso Viejo, California.  Plaintiffs are informed and believe, and thereupon allege, that Litrinium opened an office in France, on or about March 7, 2018.

5.       DOES 1 through 20 are persons or entities responsible in whole or in part for the wrongdoing alleged herein ("Doe Defendants").   Plaintiffs are informed and believe, and thereupon allege, that each of the Doe Defendants participated in, ratified, endorsed, or was otherwise involved in the acts complained of, and that they have liability for such acts.  Plaintiffs will amend this Complaint if and when the identities of such persons or entities and/or the scope of their actions become known.

6.       Jerome Garez, Litrinium, Inc. and the Doe Defendants, and their agents, affiliates, and other co-conspirators are collectively referred to as "Defendants."

/ / /

---

[1] MACOM Technology Solutions Inc. was erroneously named in the complaint as M/A-Com Technology Solutions Inc. (Docket Document #1).

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

**JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction over the federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* and 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the state law claim alleged in this Complaint pursuant to 28 U.S.C. § 1367.

8.     As set forth above, at least one defendant resides in this judicial district.  In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district. Venue therefore properly lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

9.     Plaintiffs are further informed and believe that defendant Garez has had and continues to have contacts with the state of California concerning the subject matter of this Complaint, whereby subjecting him to federal court jurisdiction in this state comports with California Code of Civil Procedure section 410.10.  The contacts include, but are not limited to, traveling to California to attend technical conferences concerning the technology at issue in this action and having communications (including, but not limited to, face-to-face, telephone, e-mail and other electronic communications) with employee and/or agents of defendant Litrinium.  For example, in both March and September of 2016, Garez traveled to Newport Beach, California, travel for which he was reimbursed by Plaintiffs.

**BACKGROUND**

10.     Plaintiffs are in the business of designing, producing and selling semiconductor technologies for optical, wireless and satellite networks.  Plaintiffs' business includes marketing and selling its products to customers across the United States and the world.

11.     Plaintiffs sell many products in highly competitive markets.  These products have short life cycles and require extensive research and development to meet market needs and demand.  Accordingly, the ability to make design decisions based on knowing what may or may not be successful, and as knowledge about both the likely path to the marketplace based on

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

information received from customers and internal work is highly valuable, and is crucial to Plaintiffs' commercial success.

12.     Plaintiffs take substantial steps to keep such information secret as such information is at the core of the success of their business. As part of their precautions to keep their proprietary knowledge and technology secure, Plaintiffs require that employees agree to contractual confidentiality obligations both during and after their employment period with Plaintiffs. Plaintiffs also have internal network security procedures to restrict access and ensure that internal company information is not publically available. Plaintiffs also carefully monitor what information about their product plans is known to the public as well as the results of their internal development product efforts.

13.     The technology and non-public information at issue in this litigation generally concerns transimpedance amplifier ("TIA") designs and functionality. It is this technology that defendant Garez was principally responsible for within MACOM. A TIA, in electronics, is a current-to-voltage converter. TIAs are often used when setting an operational amplifier to amplify the signal from a sensor, such as a photodiode, and are often used in optical receiver applications. This market is highly competitive and Plaintiffs have developed an expertise in the design and development of these products. In particular, Plaintiffs developed two generations of 28 GHz TIAs that were incorporated into their products, including but not limited to MATA-03003, MATA-03006 and MATA-03007.

14.     At this stage of the litigation, MACOM submits the following further description of trade secrets at issue in this matter:

(1)     method for developing a transimpedance amplifier (TIA) according to customer requirements and specifications for passive optical networks (PON), including performance parameters and shortcomings based on trial and error from internal development efforts;

(2)     internal circuit design operational methodologies, including pricing on parts, production costs, test time and methodology and yields and yield improvement methods;

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

137224.019/1244207v1

4

(3)     mechanical development methodologies including: (a) Maximum die size allowable in different types of ROSAs and optimal die aspect ratio, and (b) knowledge of customer preferred PAD locations and ROSA signal integrity challenges (high-speed behavior of ROSA pin/substrate);

(4)     internally developed information about the ST Microelectronics (STM) B55 process, including performance compared to TowerJazz (TJ) SG18HX processes for high speed bipolar and CMOS transistors as well as cost, cycle time and availability, including allocation issues of STM track records of silicon delivery and benchmarks on process maturity;

(5)     design of the TIA, subject to the constraints of an integrated circuit (IC) process and photodetector (PD) packaging including performance targets for current products and potential limitations of MACOM products, as well as IC area reductions;

(6)     design for automatic gain control in the TIA to prevent overload;

(7)     design for DC offset compensation at the input of the TIA for PON; and

(8)     compilation of all trade secrets set forth above including those combined with public technology and confidential and non-confidential business information to produce MACOM products.

15.     Plaintiffs are informed and believe that Litrinium was formed in March 2016 by a former Mindspeed Technologies, LLC (f/k/a Mindspeed Technologies, Inc.) and MACOM employee, Najabat Hasnain Bajwa.

16.     Plaintiffs are informed and believe that Mr. Bajwa, after his departure from Plaintiffs' employment, stayed in contact with Garez and eventually recruited him to work for Litrinium.

17.     Plaintiffs are informed and believe that Garez used Plaintiffs' resources and developed confidential and proprietary design concepts while employed by Plaintiffs, which were then incorporated into Litrinium products.

18.     A forensic investigation of Garez's activities conducted after his departure

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

established that while still employed by Plaintiffs he was working on projects unrelated to his job duties that were hidden from Plaintiffs. These projects included a burst mode PON receiver and a 3rd generation 28G TIA. These unrelated projects included developing circuits, including running temperature sweeps and other parametric simulations to test the robustness of the designs as well as developing schematics of these designs.

19. In reconstructing work that Garez deleted prior to his departure from their employ, Plaintiffs found that some of the deleted information concerned Garez's work on a 28G TIA, including work on a peak detector circuit for a burst-mode TIA and a sophisticated offset compensation circuit. The forensic investigation established that Garez attempted to delete this work but Plaintiffs recreated back-ups of these files. Notably, this reconstruction established that Garez attempted to delete files that had last been modified on February 12, 2018, approximately three weeks before his departure.

20. A forensic analysis of the laptop and desktop computers issued to Garez by Plaintiffs was conducted shortly after his departure. Results of the analysis indicated that contemporaneous with his departure, Garez deleted technical information from his company laptop and accessed files on his work laptop using a USB device within one month of his departure. Garez never turned over this USB device to Plaintiffs despite being contractually obligated to return all company property.

21. On information and belief, prior to his departure from Plaintiffs' employ, Garez used his regularly scheduled business trips to Plaintiffs' Newport Beach, California offices to visit Litrinium and/or connect with Mr. Bajwa in order to coordinate Garez's misappropriation of Plaintiffs' trade secrets.

22. On information and belief, because the design and development of Plaintiffs' 2nd generation 28G TIA required substantial effort from multiple individuals employed by Plaintiffs and not just defendant Garez, the misappropriation of trade secrets by Garez is substantial, both in the amount of resources expended and in scope.

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

23.     While employed by Plaintiffs, Garez was responsible for next generation TIAs including a PAM-4 TIA, 28G Burst Mode TIA, 28G Gen1 TIA, 10G Gen2 TIA, 28G APD TIA single and quad versions, and 28G PIN TIA single and quad versions.  On information and belief, the development of these components at MACOM were of particular commercial interest to Litrinium.

24.     Based on their investigation, Plaintiffs are informed and believe that Garez learned certain circuit processes for product development which would provide any competitor of MACOM a competitive advantage since they could avoid the cycle time necessary to develop circuits in processes that did not work. Plaintiffs are informed and believe that given the timing of his departure from Plaintiffs' employ and his immediate employment by Litrinium, Garez used Plaintiffs' resources and time to develop technology used for Litrinium products.

25.     Garez tendered his resignation from Mindspeed SAS in early 2018 and his employment terminated on March 6, 2018.  Litrinium established an office in France to employ Mr. Garez at least as early as March 7, 2018.

26.     Plaintiffs are informed and believe that Litrinium's office located in France is just a mechanism for it to employ Garez, and that all substantive Litrinium operations are conducted through its California entity, including the use of misappropriated trade secrets and confidential information taken by Garez from Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT 1 – VIOLATION OF DEFENSE OF TRADE SECRETS ACT
### (Against All Defendants)

27.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

28.     Plaintiffs own and possess certain confidential, proprietary, and trade secret information, as alleged above. Plaintiffs' trade secrets include valuable designs, data and sales information related to the development of TIAs and all iterations and advancements related to

THOITS LAW

A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

Plaintiffs' TIA technology, including all design choices made in connection with such products.

29.     Plaintiffs' confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate and foreign commerce.

30.     Plaintiffs have gone to great lengths to keep such information secret and confidential, and have at all times maintained stringent security measures to preserve the secrecy of Plaintiffs' trade secrets referenced herein, including restriction of access to confidential and proprietary trade secret information to only those individuals who "need to know." In addition, all networks hosting Plaintiffs' confidential and proprietary information have been and continue to be encrypted and have at all times required passwords, and all computers and tablets provided to Plaintiffs' employees are encrypted, password protected, and subject to other security measures.

31.     Plaintiffs also secure their physical facilities by restricting access, and then monitoring actual access with security cameras and guards.

32.     Plaintiffs require employees, contractors, consultants, vendors, and manufacturers to sign confidentiality agreements before any confidential or proprietary trade secret information is disclosed to them.

33.     Due to these security measures, Plaintiffs' confidential and proprietary trade secret information is not available for others in the semiconductor industry – or any other industry – to use through any legitimate means.

34.     Plaintiffs' confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

35.     In violation of Plaintiffs' rights, Defendants misappropriated Plaintiffs' confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein. Defendants' misappropriation of Plaintiffs' confidential, proprietary, and trade

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

36.    On information and belief, if Defendants are not enjoined, they will continue to misappropriate and use Plaintiffs' trade secret information for their own benefit and to Plaintiffs' detriment, both in California and through interstate and international use as well.

37.    As the direct and proximate result of Defendants' conduct Plaintiffs have suffered and, if Defendants' conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at trial.  Because Plaintiffs' remedy at law is inadequate, Plaintiffs seek, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect their confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Plaintiffs' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

38.    Plaintiffs have been damaged by all of the foregoing and are entitled to an award of exemplary damages and attorneys' fees.

WHEREFORE Plaintiffs pray for the relief specified below.

### COUNT 2 – VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT
### Cal. Civ. Code § 3426 *et seq.*
### (Against All Defendants)

39.    Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

40.    Plaintiffs' technical information, designs, and other "know how" related to Plaintiffs' TIA technology and implementation, as set forth above, constitute trade secrets as defined by California's Uniform Trade Secrets Act. Plaintiffs own and possess certain confidential, proprietary, and trade secret information, as alleged above.

41.    Plaintiffs have undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. These efforts include, but are not limited to, the use of passwords and encryption to protect data on Plaintiffs' computers, servers, and source code repositories, and a culture that reminds all employees of their duties to maintain the secrecy of Plaintiffs' confidential information, and the use of confidentiality agreements and non-disclosure

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

agreements requiring vendors, partners, contractors, and employees to maintain the secrecy of Plaintiffs' confidential information.

42. Defendants knew or should have known under the circumstances that the information misappropriated by Defendants constitute trade secrets.

43. Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Plaintiffs' knowledge or consent.

44. As a direct and proximate result of Defendants' conduct, Plaintiffs are threatened with injury and have been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial. Plaintiffs have also incurred, and will continue to incur, additional damages, costs and expenses, including attorneys' fees, as a result of Defendants' misappropriation. As a further, proximate result of the misappropriation and use of Plaintiffs' trade secrets, Defendants have been unjustly enriched.

45. Defendants' conduct constitutes transgressions of a continuing nature for which Plaintiffs have no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Plaintiffs' trade secret information to enrich themselves and divert business from Plaintiffs, as Defendants are currently creating and marketing competing products based on the misappropriated 2nd generation 28G TIA trade secrets. Pursuant to California Civil Code § 3426.2, Plaintiffs are entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further ask the Court to restrain Defendants from using all trade secret information misappropriated from Plaintiffs and to order the return of all trade secret information to Plaintiffs.

46. Pursuant to California Civil Code § 3426.3 and related law, Plaintiffs are entitled to exemplary damages for Defendants' misappropriation of trade secrets due to Defendants' willful and malicious misappropriation of trade secrets in a way specifically designed to harm Plaintiffs

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

137224.019/1244207v1

10

FIRST AMENDED COMPLAINT

Exhibit 4, Page 41

and their business.

47.     Pursuant to California Civil Code § 3426.4 and related law, Plaintiffs are entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets due to Defendants' willful and malicious misappropriation of trade secrets in a way specifically designed to harm Plaintiffs and their business.

WHEREFORE Plaintiffs pray for the relief specified below.

### COUNT 3 – BREACH OF CONTRACT
### (Against Jerome Garez)

48.     Plaintiffs incorporate all of the above paragraphs as though fully set forth herein.

49.     Defendant Garez entered into a written contract with Mindspeed SAS where he agreed to keep all of Plaintiffs' proprietary and non-public information confidential. The obligation to keep such information confidential extended beyond the end of his employment with Plaintiffs.

50.     Plaintiffs performed all of their obligations under the contract, or were excused therefrom by Garez's conduct.

51.     Garez breached his obligations under the contract by disclosing and/or using Plaintiffs' confidential information at Litrinium or elsewhere for his benefit, and by developing technology derived from Plaintiffs' trade secrets during his employment with Plaintiffs that he then misappropriated and used to directly compete with Plaintiffs while at Litrinium.

52.     Because of Garez's breach, Plaintiffs have been damaged.

WHEREFORE Plaintiffs pray for the relief specified below.

### PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs request that:

1.     the Court impose a constructive trust on all individuals and entities who come into possession of or receive benefit from the use of Plaintiffs' trade secrets and/or confidential information;

2.     the Court issue an injunction prohibiting Defendants and/or non-parties who come

**FIRST AMENDED COMPLAINT**

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

1    into receipt of Plaintiffs' confidential or trade secret information from using it in any manner until

2    it is returned to Plaintiffs' possession;

3        3.      Plaintiffs be awarded damages to the fullest extent allowed by law;

4        4.      Plaintiffs be made whole by recovery of the unjust enrichment Defendants received

5    through misappropriation of Plaintiffs' trade secrets;

6        5.      Plaintiffs be awarded exemplary damages in conformity with the law;

7        6.      Plaintiffs be awarded attorneys' fees pursuant to California Civil Code § 3426.4;

8    and

9        7.      All other appropriate relief in light of the facts proven and the applicable law.

10

11    Dated: April 10, 2019

12

                                    **THOITS LAW**
13                          **Attorneys for Plaintiffs MACOM**
                             **Technology Solutions Inc.**
14                       **and Mindspeed Technologies, S.A.S**

15            By:     _/s/ Andrew P. Holland_
16                   **Andrew P. Holland/Bar No. 224737**
                  **Mark V. Boennighausen/Bar No. 142147**
17                   **Erin M. Doyle/Bar No. 233113**
                  **Misasha S. Graham/Bar No. 237187**
18                   A Professional Corporation
                  400 Main Street, Suite 250
19                   Los Altos, California 94022
                  Telephone: (650) 327-4200
20                   Facsimile: (650) 325-5572
                  Email:      aholland@thoits.com
21                             mboennighausen@thoits.com
                            edoyle@thoits.com
22                             mgraham@thoits.com

23

24

25

26

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

137224.019/1244207v1                            12

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: April 10, 2019

**THOITS LAW**
**Attorneys for Plaintiffs MACOM**
**Technology Solutions Inc.**
**and Mindspeed Technologies, S.A.S**

By:     */s/ Andrew P. Holland*
**Andrew P. Holland/Bar No. 224737**
**Mark V. Boennighausen/Bar No. 142147**
**Erin M. Doyle/Bar No. 233113**
**Misasha S. Graham/Bar No. 237187**
A Professional Corporation
400 Main Street, Suite 250
Los Altos, California 94022
Telephone: (650) 327-4200
Facsimile:  (650) 325-5572
Email:      aholland@thoits.com
                mboennighausen@thoits.com
                edoyle@thoits.com
                mgraham@thoits.com

THOITS LAW
A PROFESSIONAL LAW CORPORATION
400 MAIN STREET, SUITE 250
LOS ALTOS, CALIFORNIA 94022

137224.019/1244207v1

13

FIRST AMENDED COMPLAINT

Exhibit 4, Page 44

# EXHIBIT 5

1   Michael I. Katz (CA State Bar No. 181728)
        mkatz@mabr.com
2   Charles S. Barquist (CA State Bar No. 133785)
        cbarquist@mabr.com
3   Jared J. Braithwaite (CA State Bar No. 288642)
        jbraithwaite@mabr.com
4
5   MASCHOFF BRENNAN
    100 Spectrum Center Drive, Suite 1200
6   Irvine, California 92618
    Telephone:   (949) 202-1900
7   Facsimile:    (949) 453-1104
8
9   Attorneys for Defendant LITRINIUM, INC.

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                  SOUTHERN DIVISION

13   | **MACOM Technology Solutions Inc.**, | Case No. 8:19cv-00220-JVS-JDE |

**MACOM Technology Solutions Inc.**,
a Delaware corporation;
**Mindspeed Technologies, S.A.S.**, a
French corporation,

                    Plaintiffs;

        v.

**Litrinium, Inc.**, a Delaware corporation;
**Jerome Garez**, an individual; and
**Does 1 through 20**, inclusive,

                    Defendants.

Case No. 8:19cv-00220-JVS-JDE

**Defendant Litrinium Inc.'s
Motion to Dismiss Plaintiffs'
First Amended Complaint**

Assigned to:   Hon. James V. Selna
Trial Date:    None set
Hearing Date: June 3, 2019, 1:30 p.m.

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 3, 2019, at 1:30 p.m. in Courtroom 10C of this Court at 411 West 4th Street, Santa Ana, California, 92701, Defendant Litrinium, Inc. will and hereby does move the Court to dismiss with prejudice all claims against Litrinium asserted by Plaintiffs MACOM Technology Solutions Inc. and Mindspeed Technologies, S.A.S. in the above-captioned action under Federal Rule of Civil Procedure 12(b)(6). In their First Amended Complaint (Dkt. 30), Plaintiffs fail, as a matter of law, to state claims upon which relief can be granted against Litrinium for misappropriation. This Motion to Dismiss is based on this Notice of Motion and Memorandum of Points and Authorities submitted herewith, Litrinium's Request for Judicial Notice and supporting Declaration of Michael I. Katz submitted concurrently herewith, Plaintiffs' First Amended Complaint, and other such matters that the Court may consider.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 25, 2019.

# RELIEF SOUGHT

Litrinium seeks an order dismissing Plaintiffs' First Amended Complaint against it with prejudice.

DATED: May 6, 2019

Respectfully, Submitted,

MASCHOFF BRENNAN

By: */s/ Michael I. Katz*
_____
Michael I. Katz
Charles S. Barquist
Jared J. Braithwaite

Attorneys for Defendant LITRINIUM, INC.

Exhibit 5, Page 47

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION .................................................................. ii

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.  LEGAL STANDARDS ................................................................................ 3

III. ARGUMENT ............................................................................................... 4

    A.  Because Plaintiffs' allegations are directed to conduct in France by a French citizen employed by a French company, the FAC fails to state a claim under the CUTSA or DTSA. ................................................................... 5

    B.  Plaintiffs' vague allegations fail to plausibly allege misappropriation of any information that constitutes a trade secret. .................................................. 8

        1.  Plaintiffs' allegations stating only generic, open-ended information fail to plead plausible trade secrets. .......................................................... 9

        2.  The FAC fails to identify plausible trade secrets because the purported description expressly identifies information that, on its face, is public in nature. .......................................................................... 11

        3.  The generic categories of information identified by Plaintiffs as their trade secrets do not distinguish from what is generally known as reflected by publicly filed patents ................................................... 15

    C.  Plaintiffs fail to allege facts sufficient to show that they took reasonable steps to preserve the secrecy of the information claimed to have been misappropriated. ............................................................................................... 17

    D.  Plaintiffs fail to allege trade secret misappropriation by Litrinium. ................ 19

        1.  Plaintiffs fail to allege facts to plausibly state that Garez improperly acquired any trade secrets. ................................................................... 20

        2.  Even if Plaintiffs had alleged that Garez improperly acquired trade secrets, Plaintiffs fail to allege disclosure to Litrinium. ......................... 22

        3.  Plaintiffs also fail to plausibly allege that Garez used Plaintiffs' TIA technology at Litrinium with or without Litrinium's knowledge. ........... 24

IV.  CONCLUSION ........................................................................................... 25

Exhibit 5, Page 48

# TABLE OF AUTHORITIES

## Cases

*Arista Record LLC v. Doe*,
    604 F.3d 110 (2d Cir. 2010) .................................................................. 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................... 2, 4, 6

*Bell Atlantic Corp v. Twombly*,
    550 U.S. 544 (2007) ............................................................. 2, 4, 7, 22

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,
    2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ......................................... 5

*Citcon USA, LLC v. RiverPay Inc.*,
    2018 WL 6813211 (N.D. Cal. Dec. 27, 2018) ....................................... 21

*Delphix Corp. v. Actifo, Inc.*,
    2014 WL 4628490 (N.D. Cal. Mar. 19, 2014) ...................................... 22

*Eclectic Pros. E. v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ......................................................... 4, 24

*Emazing Lights LLC v. De Oca*,
    2016 WL 3658945 (C.D. Cal. Jan. 7, 2016) ......................................... 10

*Gamez v. Woodland Direct Inc.*,
    2017 WL 8185854 (C.D. Cal. Mar. 31, 2017) ........................................ 7

*Garmon v. Cty. of L.A.*,
    828 F.3d 837 (9th Cir. 2016) ............................................................. 4

*Henry Hope X–Ray Prods., Inc. v. Marron Carrel, Inc.*,
    674 F.2d 1336 (9th Cir. 1982) ......................................................... 15

*Human Longevity, Inc. v. J. Craig Venter Institute, Inc.*,
    2018 WL 6617633 (S.D. Cal. Dec. 18, 2018) ................................. passim

*Les Concierges, Inc. v. Robeson*,
    2009 WL 1138561 (N.D. Cal. Apr. 27, 2009) .................................. 23, 25

*Menzel v. Scholastic, Inc.*,
    2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ...................................... 20

*Mollett v. Netflix, Inc.*,
    795 F.3d 1062 (9th Cir. 2015) ........................................................... 4

*N. Alaska Salmon Co. v. Pillsbury*,
    174 Cal. 1 (1916) ......................................................................... 6

*O'Connor v. Uber Techs., Inc.*,
  58 F. Supp. 3d 989 (N.D. Cal. 2014) ................................................................. 6

*Pellerin v. Honeywell Int'l, Inc.*,
  877 F. Supp. 2d 983 (S.D. Cal. 2012) ........................................................ passim

*Physician's Surrogacy, Inc. v. German*,
  2018 WL 638229 (S.D. Cal. Jan. 31, 2018) ..................................................... 21

*Self Directed Placement Corp. v. Control Data Corp.*,
  908 F.2d 462 (9th Cir. 1990) ........................................................................... 16

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ............................................................................. 4

*Space Data Corp. v. X*,
  2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) .........................................4, 11, 14

*Synopsys, Inc. v. ATopTech, Inc.*,
  2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) .........................................11, 14

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009) ....................................................................... 15

*Vendavo, Inc. v. Price f(x) AG*,
  2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) .............................................. 5, 15

*Veronica Foods Co. v. Ecklin*,
  2017 WL 2806706 (N.D. Cal. Jun. 29, 2017) ........................................ 8, 20, 23, 25

*Vivendi SA v. T-Mobile USA, Inc.*,
  586 F.3d 689 (9th Cir. 2009) ............................................................................. 7

*Whyte v. Schlage Lock Co.*,
  101 Cal. App 4th 1443 (2002) ...................................................................... 9, 23

**Statutes**

18 U.S.C. § 1837 ...................................................................................................... 5

18 U.S.C. § 1839 ................................................................................................. 9, 19

California Civil Code § 3426 ........................................................................... 18, 19

v

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

This is Defendant Litrinium Inc.'s second 12(b)(6) motion to dismiss the trade secret claims asserted by Mindspeed SAS, a French company, and its U.S parent MACOM. Plaintiffs have also included defendant Jerome Garez, a former employee of Mindspeed SAS in France, despite waiting nearly a year after he was hired in France by Litrinium. Plaintiffs amended their Complaint before the Court could hear the first motion; Plaintiffs' First Amended Complaint does not cure the defects in the Complaint. This Motion is predicated on the following incurable defects in the pleading:[1]

**Plaintiffs' claims are outside the territorial reach of the CUTSA and DTSA**. The FAC fails to state a cognizable claim because the only wrongful conduct it alleges occurred in France, by a French citizen, employed by French Plaintiff Mindspeed SAS. Although the Complaint includes allegations of conduct in the United States, at paragraphs 9, 21, and 26, there are only conclusory legal conclusions of misappropriation, devoid of facts that would satisfy the pleading requirements set forth in *Iqbal*. The FAC does not include any specific allegations of facts that could establish acts of misappropriation in California or the United States and therefore fails to state a claim within the territorial reach of the California Uniform Trade Secrets Act ("CUTSA") and the federal Defense of Trade Secrets Act ("DTSA").

**Plaintiffs fail to allege misappropriation by Litrinium**. Plaintiffs fail to allege a single factual act of misappropriation by Litrinium. Plaintiffs assert only the conclusory allegation, on information and belief, that some unspecified trade secrets related to Plaintiffs' transimpedance amplifier ("TIA") products were incorporated into Litrinium's TIA products. Plaintiffs do not allege what trade secrets, if any, Plaintiffs have a good faith basis for asserting were incorporated into Litrinium's products. Tellingly, Plaintiffs do not allege that they conducted any analysis of Litrinium's products to make this determination prior to filing their pleading. Instead, Plaintiffs merely assume that some trade secret must have been used, based only on the fact that Garez, their former

---

[1] Defendant Jerome Garez, who is a resident and citizen of France, has not been served.

employee, was hired by Litrinium. All Plaintiffs allege, in fact, is that Litrinium met with Garez (which is typical before hiring a new employee) and that Garez accepted employment and is now working for Litrinium in France in a similar position to his employment with Mindspeed SAS. From this, Plaintiffs assume Litrinium has used their trade secrets, merely because Litrinium hired Garez and met with him before doing so. This is tantamount to saying that, purely on the basis of Garez working in a similar job, it is inevitable that Garez must have used Plaintiffs' trade secrets. This inevitable-disclosure theory of Plaintiffs' case is a doctrine California has firmly rejected. Moreover, Litrinium's meeting a potential employee prior to hiring him cannot form the basis for an inference that Litrinium misappropriated trade secrets because it is equally consistent with lawful conduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'") (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 557 (2007)).

Plaintiffs do not allege (because they cannot) that they gave Litrinium any notice of their suspicions that Garez had taken their trade secrets, even though Plaintiffs allege that they formed these suspicions when he ended his employment one year earlier. (*See* FAC ¶ 20 ("A forensic analysis of [Garez's] laptop and desktop computers issued to Garez was conducted shortly after his departure.") The failure to immediately or timely give notice to Garez, or to his new employer, Litrinium, is not the conduct of a company that is concerned that its trade secrets have been misappropriated, nor is it consistent with the requirement that a company take reasonable steps to protect its information for it to qualify as a trade secret.

**Plaintiffs fail to allege any misappropriation by Garez**. Plaintiffs' FAC also falls short of alleging facts sufficient to plead that Garez misappropriated any trade secrets. Plaintiffs allege that Garez supposedly deleted (not took) unspecified information "unrelated to his job duties." (FAC ¶ 18.) They further allege that this unrelated work had to do with designs for a PON (Passive Optical Network) receiver. (*Id.*) Notably, Plaintiffs,

even after amending their pleading, do not allege that Litrinium has a PON component product like the one that Garez was working on in activities "unrelated" to his job duties at Mindspeed SAS. Nor is it clear that any information set forth at paragraph 14 of the FAC, which purports to describe the alleged trade secrets, relate in any way to Garez's "unrelated work." Plaintiffs also allege that Garez accessed a USB device using his work computer, but the FAC includes no allegation stating whether the USB device relates in any way to Plaintiffs' purported trade secrets, or even whether the act of attaching a USB device to a work computer was prohibited or commonplace at Mindspeed SAS.

**Plaintiffs vague descriptions in the Complaint fail to give notice of the alleged trade secrets at issue**. The FAC fails to notify Litrinium with any specificity of the trade secrets at issue. Plaintiffs, in their initial Complaint, vaguely referred to data, designs, components, and processes. (Dkt. 1 at ¶ 16.) The FAC, at paragraph 14, is equally vague, but now uses expansive language instead. The FAC describes the purported trade secrets at issue generically to include every aspect of TIA design and process imaginable, without specificity that could put Litrinium on notice of what the trade secrets actually are. As explained below in Section III.B, Plaintiffs (and numerous other market participants) have disclosed the design and processes of numerous TIA products in published patents, references, articles and datasheets. A representative sample of patents is attached to the Declaration of Michael I. Katz, filed concurrently herewith, as Exhibits 3–16. Litrinium disclosed these patents to Plaintiffs as exhibits to the original motion to dismiss. Plaintiffs made no effort, in the month-long period they took to amend their pleading, to describe their trade secrets in a way that would distinguish them from these published references in the public domain. Plaintiffs come nowhere near identifying their trade secrets with sufficient particularity to distinguish them from what is in the public domain or known in the art, as would be required to plead a plausible claim.

## II.  LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief

that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," and facts that are "merely consistent" with liability but are also consistent with nonliability fall short of "plausibility." *Iqbal*, 556 U.S. at 678; *Eclectic Pros. E. v. Marcus & Millichap Co.*, 751 F.3d 990, 996–97 (9th Cir. 2014) (plausibility requires alleging "facts tending to exclude the possibility" that the defendant's "alternative explanation is true," which means that "establishing only a 'possible' entitlement to relief . . . [does] not support further proceedings").

Furthermore, on a motion to dismiss, while courts accept a plaintiff's well-pleaded facts as true, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 555). "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. And where a plaintiff has failed to state a plausible claim for relief and any attempts by the plaintiff to amend its pleading would be futile, the court should dismiss the complaint with prejudice, and without leave to amend. *Garmon v. Cty. of L.A.*, 828 F.3d 837, 842 (9th Cir. 2016).

**III. ARGUMENT**

Plaintiffs assert two claims for trade secret misappropriation: (1) a federal claim under the DTSA and (2) a California law claim under CUTSA. To state a claim for misappropriation under either statute, Plaintiffs must allege that (1) they owned a trade secret; (2) defendants misappropriated the trade secret; and (3) Plaintiffs suffered damages from the misappropriation. *Space Data Corp. v. X*, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017) (noting that the "elements of misappropriation under the DTSA are similar to those under the CUTSA"); *see also Vendavo, Inc. v. Price f(x) AG*, 2018

Exhibit 5, Page 54

WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018) (applying California decisions interpreting the CUTSA to DTSA claims because the "elements of a trade secret misappropriation claim under the DTSA are substantially similar" to the CUTSA).

Both misappropriation claims suffer from the same legal deficiencies: Neither is tied to any supposed misconduct within the applicable territorial scope. Plaintiffs fail to plead facts indicating that the information at issue is a trade secret. And Plaintiffs fail to plead facts plausibly establishing misappropriation. Plaintiffs also fail to distinguish between Litrinium and Garez and, as such, have not alleged any conduct specifically attributable to Litrinium that gives rise to a plausible misappropriation claim. Accordingly, both claims for misappropriation fail as a matter of law, and the FAC should be dismissed.

### A. Because Plaintiffs' allegations are directed to conduct in France by a French citizen employed by a French company, the FAC fails to state a claim under the CUTSA or DTSA.

Plaintiffs' FAC makes specific factual allegations about conduct *in France*, by Mr. Garez, as a French citizen employed under the laws of France. The FAC fails, however, to include allegations plausibly stating acts of alleged misappropriation in California or even the United States. As a result, the FAC fails to plausibly set forth claims within the territorial scope of the DTSA or CUTSA.

Both the DTSA and the CUTSA are geographically limited, and thus cannot reach the foreign conduct of Garez. The DTSA applies to conduct outside the United States only if "the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof" or if "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837. Garez is neither a citizen nor a permanent resident alien of the United States. (*See* FAC ¶¶ 2–3.) The CUTSA also is geographically limited—it is subject to the general presumption against extraterritoriality of California statutes. *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 WL 1436044, at *6 (N.D. Cal. Apr. 24, 2017) (dismissing CUTSA claim because "[n]o legislative

1    history suggests the [CUTSA] was intended to have extraterritorial effect" and the
2    "presumption [against extraterritoriality] is not rebutted here"); *see also O'Connor v.*
3    *Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1004 (N.D. Cal. 2014) ("[T]he California Supreme
4    Court has made clear that [extraterritoriality] limitations are *presumed to be present*
5    unless the legislature's contrary intention 'is clearly expressed or reasonably to be
6    inferred from the language of the act or from its purpose, subject matter or history.'"); *N.*
7    *Alaska Salmon Co. v. Pillsbury*, 174 Cal. 1, 4 (1916) ("Ordinarily, the statutes of a state
8    have no force beyond its boundaries."). Again, Plaintiffs have not alleged any conduct
9    specific to Litrinium, much less actionable conduct that occurred in California.

10         Accordingly, to survive dismissal, the FAC must contain allegations of fact, as
11    opposed to conclusory legal assertions, that satisfy *Iqbal* for purposes of plausibly
12    alleging misappropriation in California or the United States. *Iqbal*, 556 U.S. at 679
13    ("While legal conclusions can provide the framework of a complaint, they must be
14    supported by factual allegations."). But there are no specific allegations in the FAC, as
15    required under *Iqbal*, of any potentially wrongful conduct amounting to acts of
16    misappropriation by Litrinium at all—and none against either defendant with respect to
17    California or anywhere in the United States.

18         Plaintiffs specific and non-conclusory factual allegations relate entirely to France.
19    Plaintiffs allege that Garez, while employed by Mindspeed SAS in France, "used
20    Plaintiffs' resources and developed confidential and proprietary design concepts . . ."
21    (FAC ¶ 17.) They further allege that "[a] forensic investigation of Garez's activities
22    conducted after his departure established that while still employed by Plaintiffs [Garez]
23    was working on projects unrelated to his job duties that were hidden from Plaintiffs.
24    These projects included a burst mode PON receiver and a 3rd generation 28G TIA. These
25    unrelated projects included developing circuits, including running temperature sweeps
26    and other parametric simulations to test the robustness of the designs as well as
27    developing schematics of these designs." (FAC ¶ 18.) The FAC at paragraph 20 alleges
28    that a forensic analysis of Mr. Garez's computers conducted "shortly after his departure"

Exhibit 5, Page 56

showed that he "deleted technical information from his company laptop" and "accessed files on his work laptop using a USB device within one month of his departure." The FAC does not state what files were deleted or what was accessed—whether personal or related to any alleged trade secrets—so when push comes to shove, the allegations in the FAC of Garez's conduct even in France fall short of stating any act of misappropriation.

The only act alleged to have been taken by Garez in the United States is set forth in paragraph 21 of the FAC, as follows:

> "On information and belief, prior to his departure from Plaintiffs' employ, Garez used his regularly scheduled business trips to Plaintiffs' Newport Beach, California offices to visit Litrinium and/or connect with Bajwa in order to coordinate defendant Garez's misappropriation of Plaintiffs' trade secrets."[2]

The statement, made solely on information and belief, that Garez visited Litrinium and a Litrinium executive "in order to coordinate defendant Garez's misappropriation of Plaintiffs' trade secrets" is exactly the kind of legal conclusion dressed up as a fact that falls short of stating a plausible claim. *See Twombly*, 550 U.S. at 557 (finding bare allegations of conspiracy conclusory without pleading of underlying facts); *see also Vivendi SA v. T-Mobile USA, Inc.*, 586 F.3d 689, 694, (9th Cir. 2009); *Gamez v. Woodland Direct Inc.*, 2017 WL 8185854, at *2 (C.D. Cal. Mar. 31, 2017) ("If the factual allegations based on "information and belief" are made without further facts, the allegations do not survive a motion to dismiss.").

The FAC is devoid of a single, specific allegation of any act of misappropriation that occurred in the United States. Moreover, it is devoid of any allegation of an act of misappropriation by Litrinium. What is clear, moreover, is that Mr. Garez, after resigning from Mindspeed SAS, went to work for Litrinium in an office "in France." (FAC ¶ 25.)

---

[2] Elsewhere in the FAC, these "regularly scheduled business trips" are exposed as only two business trips in March and September of 2016, 1½ to 2 years before Garez left Mindspeed SAS and completely divorced from Plaintiffs' misappropriation allegations.

Also conclusory and failing the requirement of *Iqbal* is the allegation, at paragraph 26 of the FAC, that "Plaintiffs are informed and believe that Litrinium's office located in France is just a mechanism to employ Garez, and that all substantive Litrinium operations are conducted through its California entity, including the use of misappropriated trade secrets and confidential information taken by Garez from Plaintiffs." The phrase "the use of misappropriated trade secrets and confidential information taken by Garez" is again no more than a legal conclusion, not a statement of fact that could satisfy *Iqbal*. *See Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, *14 (N.D. Cal. Jun. 29, 2017) (finding allegations of use without underlying facts to be "'naked assertions' and 'conclusions' [that] are not the sort of factual allegations that the Court must accept as true at the pleading stage"). Notably, Plaintiffs do not purport to have inspected any of Litrinium's products to confirm that any trade secrets are incorporated in them. In fact, the FAC does not identify a single Litrinium product purportedly relevant to Plaintiffs' allegations, by name or otherwise.

Despite being notified previously of this deficiency through the parties' conference regarding Plaintiffs' original Complaint and through Litrinium's first motion to dismiss, Plaintiffs' FAC fails to include any alleged *facts* tying the alleged misconduct to California or the United States. Quite the opposite, the allegations of Plaintiffs' FAC on their face are tied to France, and Plaintiffs seek to form a nexus to California or the United States by inserting legal conclusions made on information and belief, which fail to satisfy the requirements under *Iqbal*. Plaintiffs' trade-secret claims against Litrinium should be accordingly dismissed.

**B. Plaintiffs' vague allegations fail to plausibly allege misappropriation of any information that constitutes a trade secret.**

The FAC should be dismissed because Plaintiffs fail to plausibly allege that the information purportedly misappropriated by Defendants constitutes a trade secret.

To survive a motion to dismiss, a plaintiff alleging violations of the DTSA and the CUTSA must describe the trade secret that it contends has been misappropriated "'with

sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Trade secrets have specific characteristics under federal and California law, *see* 18 U.S.C. § 1839(3); *Whyte v. Schlage Lock Co.*, 101 Cal. App 4th 1443, 1454 (2002) ("The test for trade secrets is whether the matter sought to be protected is information (1) which is valuable because it is unknown to others and (2) which the owner has attempted to keep secret."), and a trade secret plaintiff must plead those specific characteristics to state a plausible claim for relief.

Plaintiffs purport to identify their trade secrets at paragraph 14 of the FAC. Plaintiffs fail to identify any of their technology with the specificity required under *Iqbal*, to distinguish what is claimed from what is known in the art and in the public domain, including MACOM's own publications and patents. Litrinium attached a good number of U.S. patent documents in support of its first motion to dismiss. Plaintiffs have made no attempt in amending their pleading to describe the alleged trade secrets in a manner that distinguishes them from this public domain material, which is again submitted in support of this motion. (*See* Katz Decl., Exs. 3–16.) Five months into this litigation, Plaintiffs continue to identify broadly worded, generic information as their trade secrets. The defects, discussed below, fall into three, overlapping categories: (1) the putative "trade secrets" are generic and open-ended, (2) the putative trade secrets identify categories of information that on their face are not secret, and (3) the alleged trade secrets are not described in sufficient detail to distinguish them from what is generally known.

### 1. Plaintiffs' allegations stating only generic, open-ended information fail to plead plausible trade secrets.

One of the primary amendments in the FAC is the replacement and repackaging of Plaintiffs' prior vague trade-secret description with a more extensive, but equally vague, description in eight categories set forth at paragraph 14 of the FAC. Six of those eight

categories are open-ended, using the word "including" as a means of avoiding identifying the metes and bounds of what is claimed as a trade secret, as follows:

1. "method for developing a transimpedance amplifier (TIA) according to customer requirements and specifications for passive optical networks (PON), including …"

2. "internal circuit design operational methodologies, including …"

3. "mechanical development methodologies, including …"

4. "internally developed information about the ST Microelectronics (STM) B55 process, including …"

5. "design of the TIA, subject to the constraints of an integrated circuit (IC) process and photodetector (PD) packaging including …"

8. "compilation of all trade secrets set forth above including …"

(FAC ¶ 14.) Plaintiffs' use of the open-ended term "including" in paragraph 14(1)–(5) and 14(8) ensnares publicly available information and makes the purported definitions so expansive as to render them practically meaningless, and Plaintiffs' formulation fails to set forth a plausible trade secret claim. *See Emazing Lights LLC v. De Oca*, 2016 WL 3658945, *2 (C.D. Cal. Jan. 7, 2016) (finding insufficient a trade secret definition that " 'include[s], but [is] not limited to,' the enumerated items [because any] piece of information could potentially be labeled a trade secret under this definition.").

Paragraph 14(8) of the FAC exemplifies the FAC's open-ended description of purported trade secrets, as follows:

"compilation of all trade secrets set forth above including those combined with public technology and confidential and non-confidential business information to produce MACOM products."

Effectively, this is an everything-but-the-kitchen-sink identification that has no metes or bounds. Plaintiffs contend that all non-confidential and public-domain technology is part of their trade secrets, if used or combined—whatever that means—to produce MACOM products.

This defect epitomizes the failure to meet the requirements under *Iqbal*. The FAC "is too sweeping and vague for Defendant[s] to be on notice of what trade secrets are at issue and where the boundary between those secrets and general knowledge might lie." *Synopsys, Inc. v. ATopTech, Inc.*, 2013 WL 5770542, *6 (N.D. Cal. Oct. 24, 2013). Courts routinely dismiss overbroad trade-secret definitions like Plaintiffs'. *See*, *e.g.*, *Space Data Corp.*, 2017 WL 5013363, at *2 ("vague references to an enormous array of potential sources do not suffice to survive Defendant's motion to dismiss"); *Human Longevity, Inc. v. J. Craig Venter Institute, Inc.*, 2018 WL 6617633, *5 (S.D. Cal. Dec. 18, 2018) (dismissing complaint where "allegations of [trade secret technology] are expansive and lack particularity").

## 2. The FAC fails to identify plausible trade secrets because the purported description expressly identifies information that, on its face, is public in nature.

The inclusion in paragraph 14(8) of public technology and non-confidential business information highlights a second, related defect in the pleading. Not only is the identification open-ended, but it claims as Plaintiffs' trade secrets information that, on its face, is public in nature. This same defect is apparent in the first four categories of information identified in FAC paragraph 14 as Plaintiffs' trade secrets.

### a) Those in the TIA industry develop TIAs according to customer requirements and specifications.

Paragraph 14(1) of the FAC purports to identify, as a misappropriated trade secret, a "method for developing a transimpedance amplifier (TIA) according to customer requirements and specifications for passive optical networks (PON), including performance parameters and shortcomings based on trial and error from internal development efforts." This fails to identify the metes and bounds of any conceivable trade secret. Simply replace "transimpedance amplifier" in this description with any other product, and this conclusion is obvious: whether it be a "method" for developing a boat,

Exhibit 5, Page 61

car, or a cell phone, one would be hard pressed to assert that "developing [a product] according to customer requirements and specifications" is a trade secret.

> **b)** **Any designer of TIA circuits considers pricing on parts, production costs, testing, and yields.**

Paragraph 14(2) of the FAC is another generic statement of a "design methodology" that is nothing more than a statement that, in designing a TIA, one considers the price of parts, production costs, testing and yields. Again, any manufacturer, whether it be of a consumer item or any widget sold for any purpose, will consider such basic elements in developing a product that is competitive in the market. This is not a plausible identification of a trade secret compliant with *Iqbal*.

> **c)** **Those in the TIA industry develop TIAs according to mechanical size restrictions and customer preferences.**

Paragraph 14(3) of the FAC again identifies a broad category of information, "mechanical development methodologies," which is a fancy way to say the physical dimensions and placement of a product. But the appearance and size of a product are not trade secrets.

Plaintiffs' example of "[m]aximum die size allowable in different types of ROSAs and optimal die aspect ratio" is easily shown to be publicly available to any entity manufacturing TIAs.[3] For example, the figures below from Plaintiffs' own TIA datasheet show the die size allowable for connectors on an optical sub-assembly as well as the exact die size and placement of the TIA. (Katz Decl., Ex. 1 at pp. 2 and 15.)

---

[3] ROSA is an acronym for receiver optical sub-assembly. These devices, when purchased, can easily be opened up, and the die size and die aspect ratios easily observed.



**MACOM Published Diagram
of Optical Receiver Assembly**



**MACOM Published Pad Configuration**

    The second example of paragraph 14(3) is "knowledge of customer preferred PAD locations and ROSA signal integrity challenges (high speed behavior of ROSA pin/substrate)." The FAC includes no allegation explaining how "customer preferred PAD locations" can possibly be a trade secret. Nowhere do Plaintiffs allege that a *customer's* specifications are a secret owned by *Plaintiffs*. Customers, when testing competing TIAs for inclusion in their optical networking equipment, necessarily tell each TIA vendor what their preferred PAD locations are so that they can test competing TIAs to compare their performance. Nowhere does the FAC allege that "customer preferred PAD locations" are not communicated to all TIA suppliers responding to requests for proposal.

    **d)   Those in the TIA industry generally gather information about cost, manufacturing time, and availability from major global manufacturers, like STMicroelectronics and TowerJazz.**

    Paragraph 14(4) of the FAC is yet another broad description of general-industry information. STMicroelectronics (STM) and TowerJazz (TJ) are third-party chip manufacturers. Both STM and TowerJazz provide customers with all of the information identified by Plaintiffs as "internally developed information." Rather than belabor each detail, one need only point out that cost is obviously an item communicated to the market by each manufacturer, and cycle time and availability is again by its nature something that changes in real time depending on the present use and capacity of each

<div align="center">13</div>

manufacturer's production facilities. A customer need only call STM or TowerJazz and ask how long it will take to fulfill the order, what the turnaround time is, and the price.

### e) Those in the TIA industry, by necessity, design TIAs subject to the constraints of integrated circuits and photodetectors.

With respect to paragraph 14(5), once again, the "design of the TIA" would apply to any design of TIAs. The performance targets and limitations of current MACOM products are actually listed on Plaintiff MACOM's own website, a screen shot of which appears below. (Katz Decl., Ex. 2 at p. 13.)

| Transimpedance Amplifiers (TIA) (continued) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Differential Transimpedance Gain (kOhms) | Small Signal Bandwidth (GHz) | Input Overload Current (mA) | Input Referred Noise (IRN, RMS nA) (nA) |
| | | | * * * | | | | |
| MATA-03003 | 28 Gbps Quad Channel Transimpedance Amplifier | C,D,G,I | 28 | 3.8 | 21 | 4 | 1400 |

All of the above "descriptions," while offering a veneer of technical jargon, could encompass *anything* related to Plaintiffs'—or anyone else's—TIA products and business. The definitions are extremely broad and, as such, do not give notice of any specific information that Plaintiffs could possibly claim as trade secret. Plaintiffs do not even attempt to allege *how* any of this information warrants protection as trade secrets. *Synopsys*, 2013 WL 5770542, at *6 ("Materials are not trade secrets just because Plaintiff says they are.").

Plaintiffs' allegations based on this broad definition are insufficient because "they do not even give the Court or Defendants notice of the boundaries of this case," as a complaint must to survive a motion to dismiss. *Space Data Corp.*, 2017 WL 5013363, at *2. In *Vendavo*, for example, the plaintiff alleged its purported trade secrets in similarly broad terms to include "source code, customer lists and customer related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, 'negative knowhow' learned through the course of

research and development, and other information related to the development of its price-optimization software, including ideas and plans for product enhancements." *Vendavo*, 2018 WL 1456697, at *3. The court deemed these "conclusory and generalized allegations [] insufficient" because the plaintiff "set out its purported trade secrets in broad, categorical terms, more descriptive of the types of information that generally may qualify as protectable trade secrets than as any kind of listing of particular trade secrets [the plaintiff] has a basis to believe actually were misappropriated." *Id.* That is precisely what Plaintiffs have done here, and precisely why Plaintiffs' allegations cannot survive this Motion.

### 3. The generic categories of information identified by Plaintiffs as their trade secrets do not distinguish from what is generally known as reflected by publicly filed patents

Plaintiffs' and others in the TIA-technology space own patents that show many aspects of TIA design, components, and know-how. (*See* Katz Decl., Exs. 3–16.) Plaintiffs and others also make other information about their products publicly available by publishing it on the Internet. Plaintiffs fail to plead facts in the FAC to distinguish what they claim as trade secrets from what is disclosed in other references in the public domain. "[I]t is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (citation omitted); *see also Henry Hope X–Ray Prods., Inc. v. Marron Carrel, Inc.*, 674 F.2d 1336, 1342 (9th Cir. 1982) ("Matters disclosed in a patent publication destroy any trade secret contained therein.").

For example, Patent Publication No. US 2017/0026011 is one of Plaintiffs' own published patent applications regarding a "Transimpedance Amplifier." This publication shows Plaintiffs' TIA designs and electronic environments for using the TIAs. (*See* Katz Decl., Exs. 15–16.) Similarly, Plaintiffs' U.S. Patent No. 8,509,629 is also directed to "a

<div align="center">15</div>

transimpedance amplifier for high rate applications," and its figures also show a circuit diagram for the disclosed TIA. (Katz Decl., Exs. 9–10.) Additionally, patent filings by others with respect to TIAs show that TIA designs and processes are not uniquely Plaintiffs'. (*See* Katz Decl., Exs. 3–8, 11–13.) Plaintiffs' nebulous description of their trade secrets overlaps with Plaintiffs' own patent filings as well as what is disclosed in patent filings by numerous others in the TIA industry. *See Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 465 (9th Cir. 1990) ("matter[s] of common public knowledge" cannot be a trade secret); Cal. Civ. Code § 3426.1 Legis. Comm. Cmts. ("Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market.").

Below we discuss in detail a few of the purported "trade secrets" in paragraph 14 of the FAC, showing in more detail how what is described in the FAC is shown in public patents. Bear in mind, this is a small representative sample of the public references in this area. Plaintiffs have made no attempt to distinguish these or any other such references.

### a)   A "design for automatic gain control in the TIA to prevent overload" is generic and in the public domain.

Paragraph 14(6) of the FAC claims as a trade secret a "design for automatic gain control in the TIA to prevent overload." This is nothing more than the statement of a generic, public-domain design involving a generic function which can be found in multiple U.S. patents. *See* U.S. Patent No. 9,030,263, entitled "Transimpedance Amplifier (TIA) Circuit and Method," (Katz Decl., Ex. 11 at Abstract ("A TIA circuit and method are provided that merge the automatic gain control function with the bandwidth adjustment function to allow the TIA circuit to operate over a wide dynamic range at multiple data rates."); *see also* U.S. Patent No. 6,084,478, entitled "Transimpedance Amplifier with Automatic Gain Control," Katz Decl., Ex. 7; U.S. Patent No. 5,646,573, entitled "Automatic Gain Control Transimpedance Amplifier," Katz Decl., Ex. 6.)

Exhibit 5, Page 66

With so many publicly available examples of TIA designs for automatic gain control, paragraph 14(6) is overly broad and does not plausibly set forth a trade secret "'"with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Pellerin*, 877 F. Supp. 2d at 988.

> **b)  A "design of DC offset compensation at the input of a TIA for PON" is generic and in the Public Domain.**

Paragraph 14(7) of the FAC is also a generic statement of a well-known TIA design found in the public, including U.S. Patent No. 9,577,753, entitled "Transimpedance Amplifier." In that patent, "FIG. 1A is a block diagram illustrating a PON System."[4] (Katz. Decl., Ex. 13 at Fig. 1A, col. 2, ln. 3.) And Figure 3 shows a DC offset compensation at the input of a disclosed embodiment of a TIA.



This public example of a design of DC offset at the input of the TIA shows that paragraph 14(7) is overly broad and does not plausibly set forth a trade secret that could form a basis of Plaintiffs' trade-secret allegations. *Pellerin*, 877 F. Supp. 2d at 988.

> **C.  Plaintiffs fail to allege facts sufficient to show that they took reasonable steps to preserve the secrecy of the information claimed to have been misappropriated.**

Plaintiffs fail to plausibly set forth trade secrets at paragraph 14 of the FAC for yet another reason. Plaintiffs do not allege that either of them took reasonable steps to maintain the secrecy of any of the categories of information alleged as trade secret in

---

[4] PON is an acronym for Passive Optical Network. (Katz Decl., Ex. 13 at col. 2, ln. 28.)

Exhibit 5, Page 67

paragraph 14. *See* Cal. Civ. Code § 3426.1(d) (a "trade secret" must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

Plaintiffs address the measures they take to keep information secret in paragraph 12 of the FAC, which, purports to identify the "substantial steps" Plaintiffs take to keep confidential the information "at the core of the success of their business." However, paragraph 12 does not refer to paragraph 14 of the FAC. The only information as to which Plaintiffs' specifically allege taking "substantial steps" to preserve secrecy in paragraph 12 is identified in paragraph 11 of the FAC, as "the ability to make design decisions based on knowing what may or may not be successful, as well as the knowledge about both the likely path to the marketplace based on information received from customer and internal work." (The FAC, at paragraph 12, states that Plaintiffs take "substantial steps to keep *such information* secret." (Emphasis added).) With respect to other information, such as that identified as Garez's work product, the FAC identifies facts that tend to confirm that Plaintiffs' failed to take steps to preserve the confidentiality of that information. Plaintiffs did nothing, for an entire year, after purportedly conducting a forensic examination of Garez' work computers and finding information they now allege to be some evidence of improper conduct giving rise to a claim. (FAC ¶¶ 20, 25.)

What is entirely unstated in the FAC, however, is what steps, if any, were taken to preserve the confidentiality and secrecy of each category of information in paragraph 14. Nor could Plaintiffs do so because much of the information called "secret" in paragraph 14 constitutes third-party customer preferences, third-party manufacturer capabilities, easily observable physical sizes and similar product characteristics, information in Plaintiffs' own patent documents, and other public information. Plaintiffs, in short, dodge the pleading requirement that they make specific allegations of facts establishing the existence of plausible trade secrets, including factual allegations of steps taken to preserve the secrecy of the information that is allegedly a trade secret.

Exhibit 5, Page 68

### D. **Plaintiffs fail to allege trade secret misappropriation by Litrinium.**

Plaintiffs' FAC should also be dismissed as to Litrinium on the independent ground that MACOM fails to plausibly allege misappropriation by Litrinium.

To state a claim for misappropriation under the DTSA or the CUTSA, a plaintiff must plead that the information at issue was "acquired by improper means." 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b). Under the DTSA, "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," and expressly excludes any "lawful means of acquisition." 18 U.S.C. § 1839(6). Likewise, "improper means" under the CUTSA refers to "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." Cal. Civ. Code § 3426.1(a).

No such conduct by Litrinium has been pled by Plaintiffs. *See Pellerin*, 877 F. Supp. 2d at 989–90 ("the standard on a motion to dismiss is 'whether the plaintiff has pled enough facts raising a plausible claim that the defendant misappropriated those trade secrets'") (citation omitted). Plaintiffs failed to even allege misappropriation by Garez.

Plaintiffs' sole allegation against Litrinium is that it recruited and then hired Mr. Garez to work in France. (FAC ¶¶ 16, 25.) There is not a single allegation of fact, as opposed to legal conclusions, that Litrinium knew, or had reason to know, of any misappropriation of trade secrets by Mr. Garez. The closest the FAC comes is at paragraph 21, in which Plaintiffs allege, on information and belief without any supporting facts:

> "On information and belief, prior to his departure from Plaintiffs' employ, Garez used his regularly scheduled business trips to Plaintiffs' Newport Beach, California offices to visit Litrinium and/or connect with Bajwa in order to coordinate defendant Garez's misappropriation of Plaintiffs' trade secrets."

What's missing are pleaded facts about the information that supposedly leads Plaintiffs to the conclusory belief that Litrinium misappropriated trade secrets. "[C]onclusory

allegation based on information and belief remains insufficient under *Iqbal/Twombly*." *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, *2 (N.D. Cal. Mar. 19, 2018) (citing *Arista Record LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010)). Thus, despite Plaintiffs' failure to describe plausible trade secrets, Plaintiffs also fail to plausibly allege that Litrinium misappropriated any of those trade secrets. *See Veronica Foods*, 2017 WL 2806706, at *14. (finding allegations of use without underlying facts to be ""'naked assertions' and 'conclusions' [that] are not the sort of factual allegations that the Court must accept as true at the pleading stage").

### 1. Plaintiffs fail to allege facts to plausibly state that Garez improperly acquired any trade secrets.

Plaintiffs fail to allege that Garez gained access to the purported trade-secret information supposedly at issue, such as the categories of information set forth in paragraph 14 of the FAC. Plaintiffs, therefore, fail to properly allege that Garez even *could* improperly disclose that information to Litrinium.

Plaintiffs allege that they maintain internal network security procedures to restrict access and ensure that internal company information is not publicly available, and that Plaintiffs carefully monitor the results of their internal product efforts. (FAC ¶ 12.) Nowhere does the FAC allege that Garez was able to access or take the information in the categories of paragraph 14 to be able to even show that information to someone outside of MACOM or Mindspeed SAS.

In lieu of facts, Plaintiffs allege, in a conclusory and unsupported fashion, that Garez was "responsible for" certain TIA products of MACOM. (FAC ¶ 13.) But this amounts to nothing more than a bare accusation that by virtue of being a Mindspeed SAS employee, Garez (and, in turn, every other employee of Plaintiffs) may have had an *opportunity to access* the technology at issue.

Such generalized allegations of *potential access* to trade secret information are routinely rejected by courts at the pleadings stage as "insufficient to establish misappropriation." *Pellerin*, 877 F. Supp. 2d at 989 (granting motion to dismiss where the

Exhibit 5, Page 70

claimant failed to "allege any facts in support of the legal conclusion that [the accused] . . . 'acquired and/or used'" trade secrets). In *Citcon USA, LLC v. RiverPay Inc.*, for example, the plaintiff alleged, in support of its DTSA and CUTSA claims, that its former employee "maintain[ed] his login and password" to a specific "MySQL database" after taking a new job with a competitor. 2018 WL 6813211, at *6 (N.D. Cal. Dec. 27, 2018). But the plaintiff failed to plausibly allege "how, or when [the defendant] took advantage of the access to log into the database. . . . In other words, [the plaintiff] essentially allege[d] that [the defendant] kept a key to a locked room but [did] not allege that [he] ever unlocked the room to access its contents." *Id.* The court reasoned that without the allegations that the room had been unlocked to access its contents, plaintiff had failed to state a plausible claim of misappropriation and dismissed the complaint accordingly. Courts in this circuit routinely dismiss misappropriation complaints that allege the potential for access, as opposed to actual access. *See also, e.g.*, *Physician's Surrogacy, Inc. v. German*, 2018 WL 638229, at *8 (S.D. Cal. Jan. 31, 2018) (allegations that defendants used a third-party email address to misappropriate plaintiff's trade secrets deemed insufficient without allegations of *when* the email address purportedly was used). Plaintiffs' misappropriation claims against Garez fail on this basis alone.

Plaintiffs do allege that Garez used a "USB device" at some point during the last month of his employment. (*See* FAC ¶ 20.) But this allegation does not plausibly state a claim for misappropriation or even imply one. There is no allegation that use of USB devices at Mindspeed SAS or MACOM was uncommon and would not be expected for any of Plaintiffs' employees within any particular 30-day window. There are also no allegations that Garez used this alleged USB device in any improper way or that Garez used it to misappropriate trade secrets. Plaintiffs' allegation is carefully worded and simply states that Garez used a USB device, which is not a plausible, factual underpinning for claims of misappropriation. Given that Plaintiffs state that they performed a "forensic investigation" into Garez's activities, their failure to identify any actual deletion, copying, disclosure or use of any alleged trade secret speaks volumes.

Exhibit 5, Page 71

Accordingly, Plaintiffs rely entirely on the assumption that Garez accessed and then took their *trade secrets* based on the mere fact that Litrinium also sells TIA products. (FAC ¶ 23 ("On information and belief, the development of these components at MACOM were of particular commercial interest to Litrinium").) There is no basis to infer from the mere fact that Litrinium and MACOM compete in the same space that Garez retained or improperly accessed the purported trade secret information either before or following his departure from MACOM. *See Human Longevity, Inc.*, 2018 WL 6617633, at \*6 (granting motion to dismiss where alleged facts were "not adequate to infer that Defendant . . . improperly acquired new or different information after [he] left his employment with" plaintiff).

## 2. Even if Plaintiffs had alleged that Garez improperly acquired trade secrets, Plaintiffs fail to allege disclosure to Litrinium.

Plaintiffs' FAC is also devoid of any allegation of fact that Garez disclosed any of Plaintiffs' trade secrets to Litrinium. The closest the FAC comes is to allege based on "information and belief," that Garez "used Plaintiffs' resources and developed confidential and proprietary design concepts while employed by Plaintiffs, which were then incorporated into Litrinium products." (FAC ¶¶ 17, 24.) This suggestion, yet again made "[o]n information and belief," is entirely speculative, does not allege any link to the alleged secrets in paragraph 14, and is thus insufficient to survive this motion. *See Delphix Corp. v. Actifo, Inc.*, 2014 WL 4628490, at \*2 (N.D. Cal. Mar. 19, 2014) (dismissing complaint in part because allegation made "on information and belief" gives rise to "a reasonable inference [] that it is intended as caveat, to provide additional protection should plaintiff be unable to prove any of the factual allegations" and "creates a further inference that plaintiff . . . is [] engaging in speculation to an undue degree").

Plaintiffs also fail to allege the when or how of Garez's purported disclosure to Litrinium. With no information provided as to the foundation of Plaintiffs' "information and belief," this statement is the epitome of a conclusory allegation (*see Twombly*, 550 U.S. at 555 (stating a claim for relief "requires more than labels and conclusions, and a

Exhibit 5, Page 72

formulaic recitation of the elements of a cause of action will not do")), and is inadequate to support the inference that Garez improperly disclosed information or that Litrinium had any knowledge that it was receiving or using any trade-secret information, within the meaning of the DTSA or the CUTSA. *See Human Longevity, Inc.*, 2018 WL 6617633, at *6 (deeming allegation "inadequate to support the inference that [defendant] improperly disclosed information" despite allegations that defendant forwarded emails containing plaintiff's alleged trade secrets, when precise "nature of the alleged [emails] is unclear"); *Veronica Foods*, 2017 WL 2806706, at *14 (dismissing allegations of misappropriation of specific documents such as customer lists and supplier lists as based on "naked assertions" and "conclusions").

Plaintiffs' misappropriation claims are entirely predicated on a legally impermissible assumption. And California has explicitly rejected the doctrine of "inevitable disclosure." *Whyte*, 101 Cal. App. 4th at 1463 ("Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete."). That means that, under the CUTSA, "a party cannot prove trade secret misappropriation by speculating that a former employee's new employment will inevitably lead the former employee to rely on the former employee's trade secrets." *Pellerin*, 877 F. Supp. 2d at 989; *see also*, *e.g.*, *Les Concierges, Inc. v. Robeson*, 2009 WL 1138561, at *2 (N.D. Cal. Apr. 27, 2009) ("[A] threat of misappropriation cannot, as a matter of California law, be inferred from the fact [the defendant-employee], upon voluntarily terminating his employment with [the plaintiff-employer], immediately began working for a direct competitor and appears to be performing for his new employer the same or similar job duties he performed while employed by [the plaintiff-employer]."). District Courts in California have rejected DTSA claims predicated on a similar theory—that a defendant who had access to trade-secret information while employed by the plaintiff must have disclosed that information

23

when he started working at a competitor and "beginning development of a program to compete with" his former employer.[5] *Human Longevity*, 2018 WL 6617633, at *6.

For all these reasons, Plaintiffs fail to allege facts giving rise to a plausible inference of misappropriation by Garez or Litrinium within the meaning of the DTSA or CUTSA, and Plaintiffs' claims against Litrinium should be dismissed accordingly.

### 3. Plaintiffs also fail to plausibly allege that Garez used Plaintiffs' TIA technology at Litrinium with or without Litrinium's knowledge.

Plaintiffs' FAC contains only vague allegations that "on information and belief" that "Garez used Plaintiffs' resources and developed confidential and proprietary design concepts while employed by Plaintiffs, which were then incorporated into Litrinium products." (FAC ¶ 17.) The FAC is silent as to any wrongful conduct by Litrinium, and the FAC does not say that any of this allegedly incorporated information relates to the information set forth at paragraph 14 and its various subparts. Plaintiffs are also careful not to say "which Litrinium then incorporated," but use the passive "which were then incorporated." Here, Plaintiffs accuse Litrinium of trade-secret misappropriation merely by virtue of Litrinium hiring a former MACOM employee.[6] And again, Plaintiffs do not

---

[5] Plaintiffs' theory of misappropriation is particularly speculative since the FAC lacks allegations that Litrinium could not have independently developed its product features, and thus that it could only have done so by obtaining alleged trade secrets through improper means. *See, e.g.*, *Eclectic Properties East*, 751 F.3d at 996–97 (requiring complaint to allege "facts tending to exclude the possibility" that an "alternative explanation is true," and holding that "establishing only a 'possible' entitlement to relief . . . [does] not support further proceedings").

[6] To the extent Plaintiffs' claims against Litrinium alternatively are predicated on the allegation that Litrinium received its technology from Garez, the claim also fails for the reasons discussed *supra* in Part IV.D.1. The claim similarly fails to the extent predicated on the allegation that Litrinium somehow induced Garez to breach any duty, because the Complaint is devoid of any allegations of actions taken by Litrinium to induce a breach of that duty.

allege that they conducted an inspection or analysis of a single Litrinium TIA product to verify this assumption.

Plaintiffs offer only this conclusory allegation that Litrinium used any of Plaintiffs' alleged trade secrets. Plaintiffs do not allege the specific trade secrets purportedly used, how they were used, or when they were used. Courts have declined to infer misappropriation from competition. To the contrary, courts have held that competition is "to be expected," and that allegations of competition, without more, are insufficient to survive a pleading challenge to a misappropriation claim. *Veronica Foods*, 2017 WL 2806706, at *14 (holding that any such allegation of competition must be coupled with "allege[d] facts that are not 'merely consistent with' both a theory of innocent market entry and [misappropriation], but rather '*tend[ ] to exclude*' an innocent explanation" to survive a motion to dismiss) (emphasis added).

Courts have gone further and stated that the mere act of a competitor developing a competing product or service—even if the competitor employs the plaintiff's former employees—cannot carry a trade secret misappropriation claim beyond the pleadings stage. *See, e.g.*, *Human Longevity*, 2018 WL 6617633, at *6 (granting motion to dismiss because "development of a program to compete" with plaintiff does not "giv[e] rise to a plausible inference of misappropriation" or "plausibly suggest an entitlement to relief"); *Les Concierges*, 2009 WL 1138561, at *2 (a trade secret plaintiff "must submit evidence beyond its former employee's knowledge of trade secrets and subsequent change of employers"); *see also Veronica Foods*, 2017 WL 2806706, at *14 (where defendants are alleged to have developed a product to compete in a previously under-competitive market, it "increases the need for specific allegations showing that Defendants used trade secret knowledge" because competing products and services are "to be expected from a new [competitor] entering the market").

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' First Amended Complaint should be dismissed with prejudice.

DATED: May 6, 2019

Respectfully, Submitted,

MASCHOFF BRENNAN

By: */s/ Michael I. Katz*

Michael I. Katz
Charles S. Barquist
Jared J. Braithwaite

Attorneys for Defendant LITRINIUM, INC.

# EXHIBIT 6

1   Michael I. Katz (CA State Bar No. 181728)
        mkatz@mabr.com
2   Charles S. Barquist (CA State Bar No. 133785)
        cbarquist@mabr.com
3   Jared J. Braithwaite (CA State Bar No. 288642)
        jbraithwaite@mabr.com
4   MASCHOFF BRENNAN
5   100 Spectrum Center Drive, Suite 1200
    Irvine, California 92618
6   Telephone:  (949) 202-1900
7   Facsimile:   (949) 453-1104
8
9   Attorneys for Defendant LITRINIUM, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| **M/A-COM Technology Solutions Inc.**, a Delaware corporation; **Mindspeed Technologies, S.A.S.**, a French corporation, <br><br> Plaintiffs; <br><br> v. <br><br> **Litrinium, Inc.**, a Delaware corporation; **Jerome Garez**, an individual; and **Does 1 through 20**, inclusive, <br><br> Defendants. | Case No. 8:19cv-00220-JVS-JDE <br><br> **Defendant Litrinium Inc.'s Motion for Protective Order Barring Plaintiffs' Discovery Absent Identification of Trade Secrets** <br><br> HON. JAMES V. SELNA <br> UNITED STATES DISTRICT JUDGE <br> SANTA ANA, COURTROOM 10C <br><br> Assigned to:   James V. Selna <br> Trial Date:     None set <br> Hearing Date: May 6, 2019, 1:30 p.m. |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on **Monday, May 6, 2019 at 1:30 p.m.**, or at such other date and time that the Court may determine, before the Honorable James V. Selna, United States District Judge, Defendant Litrinium, Inc. ("Litrinium") does—and hereby shall—move the Court, under Federal Rules of Civil Procedure 16 and 26(c), for a protective order barring Plaintiffs M/A-COM Technology Solutions Inc. and Mindspeed Technologies, S.A.S. (collectively, "Plaintiffs" or "MACOM") from obtaining discovery until it identifies its asserted trade secrets with reasonable particularity.

MACOM filed its Complaint on February 4, 2019, alleging trade secret misappropriation. MACOM's Complaint vaguely describes MACOM's trade secrets as "designs, data and sales information related to the development of TIAs . . . ." but does not provide any description about what information is supposedly trade secret as opposed to non-secret information about its TIAs (transimpedance amplifiers) to allow Litrinium to determine what it is accused of misappropriating. Accordingly, Litrinium raised this deficiency, among others, to MACOM, and MACOM nominally agreed to amend its Complaint. Rather than file an amended complaint, however, MACOM opted to weaponize its deficient Complaint to publicize its false allegations of trade-secret theft for anticompetitive purposes. Litrinium, thus, filed its motion to dismiss the Complaint. (ECF No. 25.) MACOM has continued to withhold and hide the nature of its alleged trade secrets and has stated that it intends to delay the identification of its alleged trade secrets in the Complaint until the last possible day for MACOM to amend its Complaint without leave of the Court.

In light of MACOM's conduct thus far, MACOM will likely continue to hide the nature of its allegations. Accordingly, Litrinium brings this Motion to avoid litigation abuses, including abuses of the discovery process, by requiring MACOM to identify its alleged trade secrets with reasonable particularly before it is allowed to proceed in this case.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on April 1, 2019, and is based upon the following memorandum of points and authorities, the declarations of Michael I. Katz and Jared J. Braithwaite filed concurrently herewith, the pleadings and records on file in this action, and such further evidence and argument as may be presented at the hearing on, or in connection with the Court's determination of, the Motion.

<div align="center">

**RELIEF SOUGHT**

</div>

Litrinium seeks a protective order barring MACOM from obtaining discovery until it identifies its asserted trade secrets with reasonable particularity.

DATED: April 8, 2019                                   Respectfully, Submitted,

MASCHOFF BRENNAN

By:   */s/ Michael I. Katz*

Michael I. Katz
Charles S. Barquist
Jared J. Braithwaite

Attorneys for Defendant LITRINIUM, INC.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................. ii

TABLE OF AUTHORITIES ........................................................................ v

I.    INTRODUCTION ......................................................................... 1

II.   ARGUMENT ............................................................................. 2

    A.    California Code of Civil Procedure § 2019.210 would require MACOM
        to identify their trade secrets with reasonable particularity before
        obtaining discovery ................................................................ 3

    B.    Federal case law requires MACOM to identify trade secrets with
        reasonable particularity before obtaining discovery. ......................... 4

    C.    MACOM's weaponization of this lawsuit, its delay in amending its
        complaint, its refusal to submit the matter to a neutral expert, and its
        refusal to identify the trade secrets at issue reinforce the need for an order
        barring MACOM's discovery absent disclosure of its trade secrets with
        particularity ......................................................................... 7

III.  CONCLUSION .......................................................................... 10

Exhibit 6, Page 81

# TABLE OF AUTHORITIES

**Cases**

*Activerain Corp. v. Move, Inc.*,
    2008 WL 11343023 (C.D. Cal. Apr. 29, 2008).........................................................4

*Advanced Modular Sputtering, Inc. v. Superior Court*,
    132 Cal. App. 4th 826 (2005) ..................................................................................3

*Advante International Corp. v. Mintel Learning Technology*,
    2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) ........................................................4

*Applied Materials, Inc. v. Adv. Micro-Fabrication Equip. (Shanghai) Co.*,
    2008 WL 183520 (N.D. Cal. Jan. 18, 2008)...........................................................6

*Excelligence Learning Corp. v. Oriental Trading Co., Inc.*,
    2004 WL 2452834 (N.D. Cal. June 14, 2004).........................................................4

*Gabriel Technologies Corp. v. Qualcomm Inc.*,
    2012 WL 849167 (S.D. Cal. March 13, 2012) ........................................................4

*Hilderman v. Enea TekSci, Inc.*,
    2010 WL 143440 (S.D. Cal. Jan. 8, 2010) ..............................................................4

*Little v. City of Seattle*,
    863 F.2d 681 (9th Cir. 1988)....................................................................................5

*Porous Media Corp. v. Midland Brake Inc.*,
    187 F.R.D. 598 (D. Minn. 1999)...........................................................................5, 6

*SMC Networks, Inc. v. Hitron Tech., Inc.*,
    2013 WL 12136372 (C.D. Cal. Mar. 15, 2013)....................................................4, 5

*Social Apps, LLC v. Zynga, Inc.*,
    2012 WL 2203063 (N.D. Cal. Jun. 14, 2012)..........................................................4

*Vesta Corp. v. Amdocs Mgt. Ltd.*,
    147 F. Supp. 3d 1147 (D. Or. 2015).........................................................................5

**Statutes**

California Code of Civil Procedure § 2019.210 ................................................................3

**Rules**

Federal Rule of Civil Procedure 16 ..................................................................................4

Federal Rule of Civil Procedure 26 ..................................................................................4

Exhibit 6, Page 82

## I.   INTRODUCTION

This motion seeks entry of a protective order requiring Plaintiffs—who assert two causes of action for trade secret misappropriation under the Defense of Trade Secrets Act ("DTSA") and California's Uniform Trade Secrets Act ("CUTSA")—to identify with reasonable particularity those trade secrets that they have a good faith basis to believe Defendants misappropriated, prior to commencing discovery related to the claims. All that the Complaint currently discloses is that the alleged trade secrets have something to do with transimpedance amplifiers ("TIAs"), a component used in high speed optical networks.

Plaintiffs are Mindspeed S.A.S., a French company, and M/A-Com Technology Solutions, Inc., a Delaware company with its headquarters in Massachusetts, (collectively "MACOM"). Litrinium is a startup company based in Orange County, California. MACOM has also sued Jerome Garez, a citizen and resident of France. As far as Litrinium is aware, MACOM has made no effort to serve Garez with the Complaint.

MACOM has steadfastly resisted identifying the purported trade secrets at issue since filing its Complaint in early February 2019. After being served, Litrinium offered to submit its TIA technology to an independent expert to confirm that (1) none of MACOM's design or purported trade secrets had been used, and (2) Litrinium's TIA designs are markedly different than MACOM's. This would have required MACOM to identify and disclose its trade secrets—at least to an independent expert. MACOM refused to resolve its trade-secret allegations quickly. Instead, MACOM spent the last three months indiscriminately disseminating its vague and conclusory Complaint in the global market, accusing Litrinium of trade-secret theft. MACOM's obvious purpose was to disrupt Litrinium from selling its TIA products, after Litrinium had competed and prevailed in multiple head-to-head competitions against MACOM.

Plaintiffs again refused Litrinium's request to identify its trade secrets in the parties' meet-and-confer regarding the deficiencies in MACOM's Complaint. Among other defects—including failing to identify a territorial basis for asserting a violation of the

DTSA or CUSTA—MACOM's Complaint failed to satisfy *Iqbal* by pleading the trade secrets sufficiently to state a claim. MACOM acknowledged the deficiency. But it refused to amend its Complaint for over two months, stating it would not amend until April 10, 2019—the last day to do so without leave of the Court. Having received no amendment, Defendants filed a motion to dismiss. As of the date this Motion, MACOM has refused to state how it will amend the Complaint, including how it intends to define the meets and bounds of its trade secrets to meet even the *Iqbal* requirements.

MACOM yet again refused to disclose its trade secrets during the parties' preparations for the Court's Rule 16 Scheduling Conference. In the meet-and-confer on the form of a protective order, MACOM rejected any requirement that it identify its trade secrets with reasonable particularity before commencing discovery. Counsel for MACOM asserted that this was a state-law rule that federal courts had rejected. MACOM further took the position that they would not be providing a statement of their trade secrets as part of the Rule 26 disclosures. How can the parties have a meaningful Rule 26 conference identifying witnesses, the scope of discovery, relevant documents, etc., if MACOM will not identify its trade secrets?

Defendants seek the protection of the Court. Defendants make a reasonable request, that as part of the discovery rules to be applied in this trade-secret case, the Court issue a protective order protecting Litrinium against the litany of abuses posed by trade-secret litigation in which the Plaintiffs make broad, conclusory assertions of trade-secret theft, but then refuse to say what trade secrets they credibly believe have been stolen.

## II.  ARGUMENT

Both California and federal law support requiring MACOM to disclose its trade secrets with reasonable particularity before advancing the case through the discovery process. MACOM's conduct so far reinforces the need for such a restriction.

### A. California Code of Civil Procedure § 2019.210 would require MACOM to identify their trade secrets with reasonable particularity before obtaining discovery.

Plaintiffs sued under California's Uniform Trade Secret Act (the "CUTSA"), and California Code of Civil Procedure § 2019.210 requires a party alleging trade secret misappropriation to "identify the trade secret with reasonable particularity" before commencing discovery relating to the trade secret. The purpose of § 2019.210 is to (1) "promote well-investigated claims and dissuade[] the filing of meritless trade secret complaints"; (2) "prevent[] plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets"; (3) "assist the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope"; and (4) "enable[] defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation." *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 833–34 (2005) (quoting *Computer Economics, Inc. v. Gartner Group Inc.*, 50 F.Supp.2d 980, 985 (S.D. Cal. 1999)).

Whether § 2019.210 is a state statute that applies under the *Erie* Doctrine is an open question in the Ninth Circuit; decisions in the District Courts of California go either way

1  or avoid the issue.[1] But the purposes and policy of § 2019.210 are generally applicable.

2  Federal courts apply the early-disclosure principles behind § 2019.210 because these

3  same principles govern the federal discovery rules. *Activerain Corp. v. Move, Inc.*, 2008

4  WL 11343023, *2 (C.D. Cal. Apr. 29, 2008) ("the general policies behind the specific

5  disclosure requirement of § 2019.210 are consistent with the liberal policies behind the

6  federal discovery rules" citing *Hickman v. Taylor*, 329 U.S. 495, 501, 507 (1947)); *see*

7  *also Advante International Corp. v. Mintel Learning Technology*, 2006 WL 3371576 at *3

8  n. 4 (N.D. Cal. Nov. 21, 2006) (not reaching a conclusion as to whether § 2019.210 is

9  mandatory in federal court proceedings, but finding that "the statute provides an

10 appropriate guide in the absence of specific provisions in the federal rules governing

11 trade secret discovery").

### B.   Federal case law requires MACOM to identify trade secrets with reasonable particularity before obtaining discovery.

14         Federal Rule of Civil Procedure 16 permits the Court to "modify the extent of

15 discovery" and to issue orders "controlling and scheduling discovery, including orders

16 affecting disclosures and discovery under Rule 26 and Rules 29 through 37" as part of a

17 Rule 16 scheduling conference. *See* Fed. R. Civ P. 16(b)(3)(ii) and 16(c)(2)(F). And

18 Federal Rule of Civil Procedure 26(c) permits the Court to issue a protective order to,

---

[1] *See*, *e.g.*, *Social Apps, LLC v. Zynga, Inc.*, 2012 WL 2203063, *2 (N.D. Cal. June 14, 2012) (holding § 2019.210 applicable in federal cases); *Excelligence Learning Corp. v. Oriental Trading Co., Inc.*, 2004 WL 2452834, n. 3 (N.D. Cal. June 14, 2004) (finding § 2019.210 not binding, but applying it because there was no parallel trade secret discovery provision in Federal Rules of Civil Procedure). *Advante International Corp. v. Mintel Learning Technology*, 2006 WL 3371576, n. 4 (N.D. Cal. Nov. 21, 2006) (declining to decide applicability of § 2019.210 in federal cases but using it as guide); *SMC Networks, Inc. v. Hitron Tech., Inc.*, 2013 WL 12136372, *3 (C.D. Cal. Mar. 15, 2013) (finding § 2019.210 not binding on federal courts but noting strong policy reasons for federal protective orders that implement its purpose); *Gabriel Technologies Corp. v. Qualcomm Inc.*, 2012 WL 849167, *4 (S.D. Cal. March 13, 2012) (applying *Erie* to find that § 2019.210 should be applied because it does not conflict with any federal rule and avoids undesirable forum shopping); *Hilderman v. Enea TekSci, Inc.*, 2010 WL 143440, *2 (S.D. Cal. Jan. 8, 2010) (holding that § 2019.210 conflicts with Rule 26).

among other things, "protect a party . . . from annoyance, embarrassment, oppression, or undue burden or expense" by forbidding, specifying terms for, or limiting the scope of discovery.

Courts have "wide discretion in controlling discovery." *See Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Accordingly, and consistent with California Code of Civil Procedure § 2019.210, federal courts recognize a requirement for plaintiffs bringing claims of trade-secret misappropriation to identify those trade secrets with reasonable particularity before obtaining discovery. *Vesta Corp. v. Amdocs Mgt. Ltd.*, 147 F. Supp. 3d 1147, 1153 (D. Or. 2015) (noting that "the Court recognizes the 'growing consensus' of courts from around the country who have applied the "reasonable particularity" standard to determine whether a party alleging a claim for misappropriation of trade secrets has sufficiently identified its trade secrets before it may compel discovery of its adversary's trade secrets."); *Porous Media Corp. v. Midland Brake Inc.*, 187 F.R.D. 598, 600 (D. Minn. 1999) ("Ordering the listing of trade secrets at the outset of the litigation is a common requirement."). Even those court opinions that have held that California Code of Civil Procedure § 2019.210 does not bind federal courts under *Erie* recognize that there are still independent and "strong policy reasons for requiring plaintiffs to identify with particularity allegedly misappropriated trade secrets before seeking discovery." *SMC Networks, Inc. v. Hitron Tech., Inc.*, 2013 WL 12136372, *3 n. 1 (C.D. Cal. Mar. 15, 2013).

Courts have independent authority to require the identification of trade secrets before discovery and "'the "reasonable particularity' standard reflects the Court's authority, pursuant to the Federal Rule of Civil Procedure 26 requirements of early disclosure of evidence, and the Court's authority to control the timing and sequencing of discovery in the interests of justice." *Vesta Corp*, 147 F. Supp. 3d at 1153.

The court in *Vesta*, identified four "strong practical and policy reasons" for requiring plaintiffs "to make pre-discovery disclosures of its alleged misappropriated trade secrets." *Vesta Corp.*, 147 F. Supp. 3d at 1153. First, this requirement would

"assist[] this Court in "in determining relevancy and the scope of discovery." *Id.* (internal citations omitted.) Second, it would "prevent[] a 'fishing' expedition into Defendants' trade secrets." *Id.* (internal citations omitted.) Third, it "denies Plaintiff the opportunity to craft a trade secret claim to fit the evidence from the Defendants." *Id.* (internal citations omitted.) Finally, "the requirement prevents 'needless exposure of the defendant's trade secrets . . . and allows well-investigated claims to proceed while discouraging meritless trade secret claims." *Id.* (internal citations omitted); *see also Applied Materials, Inc. v. Adv. Micro-Fabrication Equip. (Shanghai) Co.*, 2008 WL 183520, *1 (N.D. Cal. Jan. 18, 2008) (reciting the same policy reasons).

Requiring MACOM to identify its trade secrets with reasonable particularity would assist the Court in determining relevancy and the scope of discovery. *Porous Media*, 187 F.R.D. at 600 ("Adequate discovery cannot be conducted in the absence of the specific disclosure . . . ."). This consideration is even more important since the 2015 amendments to the Federal Rules of Civil Procedure directed toward "proportional" discovery considerations. *See* Fed. R. Civ. P. 26(b)(1). There is no way to determine what is "proportional to the needs of the case" without knowing what trade secrets this case is about. And an undefined and disproportional scope to discovery improperly promotes a "fishing expedition," to craft claims to discovery. This puts the cart before the horse because it is discovery that should be tailored to the parties' claims and defenses. The best way to set appropriate limits and give a reasonable scope to discovery in this case is for MACOM to identify its alleged trade secrets with reasonable particularity from the outset.

Here, there is no indication that MACOM intends to identify its trade secrets with particularity. Rather, the facts so far indicate that MACOM intends to delay any description of its trade secrets, whether with particularity or even as a threshold issue to state a claim in its Complaint. (*See* Braithwaite Decl. at ¶¶ 3–6.)

The final policy reason for early disclosure of MACOM's trade secrets—to allow well-investigated claims to proceed while discouraging meritless trade secret claims—is

6

also important here as well. After being served with the Complaint, Litrinium offered to submit its products for comparison with MACOM's by a neutral expert to show that MACOM's claims lack merit. (Katz Decl. at Ex. 2.) MACOM refused because it has no idea whether, let alone what, trade secrets have been misappropriated. MACOM's lawsuit is a shoot-first-ask-questions-later approach, where MACOM is likely to seek discovery about what Litrinium is doing, and after the fact, claim that as MACOM's trade secret.

Additionally, in the last year, Litrinium, a new market entrant, has won head to head competitions out-performing MACOM and other competitors. MACOM may also seek to discover what Litrinium is doing so it can copy Litrinium and take Litrinium's trade secrets, claiming them as its own.

As of the date of this Motion, due to a deficient Complaint and MACOM's stated intent to avoid amending the Complaint as long as possible, MACOM's claims appear to be neither well-investigated nor based in fact. (*See* Katz Decl. at Ex. 2.) If a plaintiff cannot identify its trade secrets that were allegedly misappropriated, then its case is revealed to be meritless from the start. This is an early test to separate the wheat—a case that has merit—from the chaff—this case, filed without any basis and for anti-competitive purposes. Early required disclosure will expose MACOM's claims for what they are—meritless and asserted for anti-competitive purposes to crush an innovative startup, as opposed to a legitimate plea for relief from the Court. (*See id.* at Exs. 1–2.)

**C.  MACOM's weaponization of this lawsuit, its delay in amending its complaint, its refusal to submit the matter to a neutral expert, and its refusal to identify the trade secrets at issue reinforce the need for an order barring MACOM's discovery absent disclosure of its trade secrets with particularity.**

MACOM filed its Complaint on February 4, 2019. Litrinium responded on February 20, 2019 by letter stating the deficiencies of MACOM's Complaint, including its failure to identify the trade secrets at issue. (Braithwaite Decl. at Ex. 1.) While MACOM nominally agreed to amend its Complaint, MACOM would not identify the

Exhibit 6, Page 89

1   trade secrets during the meet-and-confer. And despite MACOM's agreement to amend its

2   Complaint, MACOM's counsel would not say when or how, and no amended Complaint

3   was forthcoming. (*Id.* at ¶¶ 3–4.) What did happen, almost immediately, was that

4   MACOM in a letter disseminated widely to companies worldwide, accused Litrinium of

5   trade secret theft, identifying the Complaint it had filed in federal court as substantiating

6   this unfounded accusation. (*See* Katz. Decl. at Ex. 1.)

7       On March 12, 2019, Litrinium sent a detailed letter to MACOM disclosing facts that

8   show MACOM's theft allegations were wrong. (Katz Decl. at Ex. 2.) Mindspeed S.A.S.

9   simply assumed that its former French employee, Jerome Garez, used its purported trade

10  secrets to help Litrinium design a competing TIA when Garez left Mindspeed in

11  early 2018. That assumption, predicated on the 'inevitable disclosure" doctrine, which is

12  discredited in California, was further debunked in a letter dated March 12, 2019. The

13  March 12, 2019 letter explained that Litrinium had already completed the design of its

14  own TIA more than 15 months before Mr. Garez started to work for Litrinium and were

15  designed without any involvement by or input from Mr. Garez. (*Id.*)

16      In its March 12, 2019 letter, Litrinium offered to have both parties' TIA designs

17  submitted for a complete review by a neutral expert, in ten days' time, to resolve the

18  issue. (*Id.*) MACOM failed to respond to the letter. In a letter dated March 20, 2019,

19  Litrinium repeated the offer. (*Id.* at ¶ 5.) But MACOM finally declined Litrinium's

20  invitation.

21      During this time, instead of pursuing an early resolution, MACOM's Associate

22  General Counsel, John Donnelly, authored and circulated a letter to customers and

23  potential customers indiscriminately and worldwide, stating that MACOM had sued

24  Litrinium for trade-secret theft. A copy of that letter is attached to the Declaration of

25  Michael Katz as Exhibit 1. The letter defames Litrinium and its engineers, stating

26  "MACOM believes that, at a minimum, Mr. Garez worked on Litrinium projects while

27  still employed by MACOM and that Defendants misappropriated valuable design

28  information to develop a competing line of products." (*Id*.) Mr. Donnelly concludes his

letter by warning all companies not to do business with Litrinium as MACOM would enforce its intellectual property rights. (*Id.* at Ex. 1; *Id.* at ¶¶ 2–3.)

By refusing to submit to a neutral expert, and refusing to identify the trade secrets at issue, and at the same time engaging in an extensive smear campaign, MACOM has revealed its true purpose in filing this lawsuit: to prevent Litrinium, an Orange County-based start-up company, from succeeding in the global market. Tellingly, MACOM waited a year after Mr. Garez left, and just as Litrinium had initiated an investment round, to initiate this lawsuit. By the time the merits are ever addressed, and MACOM's baseless claims rejected, Litrinium will have lost countless contracts notwithstanding that it prevailed in head to head competition by offering a superior product. The idea that this is an anti-competitive lawsuit is obvious. But do not take Litrinium's word for it because MACOM's Senior Vice President and General Manager, Preet Virk, said as much. Specifically, he told departing MACOM employees that MACOM would not be shy of suing Litrinium for no more than hiring a former employee, if for nothing else than to slow Litrinium down and intimidate its investors. (*See* Katz Decl. Ex. 2.)

Because no amended complaint was forthcoming after the February 25, 2019 meet-and-confer, Litrinium repeatedly inquired about whether MACOM actually intended to file its promised amended complaint. (Braithwaite Decl. at ¶ 4.) This should not take an entire month. If MACOM had conducted an adequate prefiling investigation, it should already be able to identify its trade secrets with particularity before it initiated suit. If MACOM's Assistant General Counsel is confident enough in his theft allegations to circulate a letter under his own name, then MACOM should be able to identify the trade secrets it alleges have been stolen. The extensive delay, and refusal to commit to a date certain, made it clear MACOM's agreement to amend its complaint could not be relied upon. Litrinium was forced to file its motion to dismiss. (ECF No. 25.)

MACOM did not oppose Litrinium's motion to dismiss, which remains pending, or dispute the deficiency of its Complaint. (ECF. No. 27.) Instead, MACOM told the Court, essentially, that it intended to delay this matter further, by filing a Statement on

April 1, 2019, stating that it would file an amended compliant no sooner than April 10th—the very last date it could do so without the Court's permission, and over two months since filing its Complaint. (*See also* Braithwaite Decl. at ¶ 8.)

Litrinium raised the need for a protective order early in this case, consistent with the need to address discovery early and in connection with the Court's Rule 16 Scheduling Conference. (Braithwaite Decl. at Ex. 2.) Litrinium requested a conference with MACOM's counsel for disclosure of MACOM's trade secrets or the need for a protective order precluding MACOM's discovery absent identification of its alleged trade secrets with particularity. (*Id.*) MACOM took the position it that it was not obligated to identify its trade secrets with particularity and rejected out of hand any pre-discovery requirement to identify the trade secrets with reasonable particularity. (*Id.* at Ex. 3.) MACOM's counsel even refused to confer on the issue. (*Id.* at Ex. 3.) MACOM's counsel later changed its position and agreed to confer on the issue. But even during this conference, MACOM was unable or unwilling to disclose its trade secrets with any degree of particularity. (*Id.* at ¶ 8.) How can the parties have a meaningful Rule 26 conference, if MACOM continues to hide the ball as to the basis for its allegations?

**III. CONCLUSION**

This Motion squarely implicates the policy rationales invoked by California and Federal Courts to require early identification of trade secrets before trade-secret plaintiffs may proceed with discovery. MACOM should not be allowed to continue to hide the identity of its trade secrets for months after filing suit.

MACOM has shown no interest in moving this case forward. It has delayed amending its deficient allegations for two months, rejected Litrinium's offer to submit the matter to a neutral expert, and refused outright to make a trade secret disclosure. MACOM has been more interested in advertising the fact that it filed a trade secret theft lawsuit, than in addressing the merits. It has been using its vague allegations in its deficient Complaint to try to scare customers away from doing business with Litrinium, a startup that has succeeded through its own resources and inventiveness, in making a

Exhibit 6, Page 92

better performing product. Rather than seek redress form the Court, MACOM's true purpose has been exposed as anti-competitive. The Court's intervention, and protection, is necessary, to avoid abuse of process and ensure fairness and a level playing field in this matter.

For the forgoing reasons, Litrinium requests that the Court grant its Motion and enter a protective order barring MACOM from obtaining discovery until it identifies its asserted trade secrets with reasonable particularity.

DATED: April 8, 2019                            Respectfully, Submitted,

                                                MASCHOFF BRENNAN

                                        By: */s/ Michael I. Katz*
                                                Michael I. Katz
                                                Charles S. Barquist
                                                Jared J. Braithwaite

                                                Attorneys for Defendant LITRINIUM, INC.

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SA CV 19-00220-JVS (JDEx) | Date | April 10, 2019 |
|----------|---------------------------|------|----------------|
| Title | M/A-COM Technology Solutions, Inc., et al., v. Litrinium, Inc., et al. | | |

Present: The Honorable   John D. Early

| Maria Barr | n/a |
|------------|-----|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| n/a | n/a |

**Proceedings:**        (In Chambers) Order re: Motion for Protective Order (Dkt. 28)

On April 8, 2019, defendant Litrinium, Inc. ("Defendant") filed a Motion for a Protective Order Barring Discovery by Plaintiffs M/A-COM Technology Solutions, Inc. and Mindspeed Technologies, S.A.S. ("Plaintiffs") Absent Identification of Trade Secrets, bearing a hearing date of May 6, 2019 at 1:30 p.m. before Judge Selna. Dkt. 28 ("Motion"). The Motion is supported by two Declarations from Defendant's counsel, with exhibits. Dkt. 28-1, 28-2.

The Motion seeks a protective order prohibiting Plaintiffs from commencing discovery until after they have identified the trade secret(s) at issue in this case with reasonable particularity, relying in part on California Code of Civil Procedure Section 2019.210, part of the California Uniform Trade Secret Act. Motion at 3-4.

As an initial matter, the motion is a discovery-related motion, seeking "a protective order barring [Plaintiffs] from obtaining discovery until [they] identify [their] asserted trade secrets with reasonable particular." Motion at iii. Per the Notice of Assignment, discovery-related motions should be noticed for hearing before the assigned magistrate judge. See Dkt. 7.

Further, Local Rules 37-1 through 37-4 set forth the preferred procedures for the filing of a discovery motion in this Court. Under Local Rule 37-1:

Prior to the filing of any motion relating to discovery pursuant to F. R. Civ. P. 26-37, counsel for the parties shall confer in a good faith effort to eliminate the necessity for hearing the motion or to eliminate as many of the disputes as possible. . ... Unless relieved by written order of the Court upon good cause shown, counsel for the opposing party shall confer with counsel for the moving party within ten (10) days after the moving party serves a letter requesting such a conference. The moving party's letter shall identify each issue and/or discovery request in dispute, shall state briefly

Exhibit 7, Page 95

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SA CV 19-00220-JVS (JDEx) | Date | April 10, 2019 |
|---|---|---|---|
| Title | M/A-COM Technology Solutions, Inc., et al., v. Litrinium, Inc., et al. | | |

with respect to each such issue/request the moving party's position (and provide any legal authority which the moving party believes is dispositive of the dispute as to that issue/request) and specify the terms of the discovery order to be sought.

L.R. 37-1. "If counsel are unable to settle their differences, they shall formulate a written stipulation, unless otherwise ordered by the Court. The stipulation shall be filed and served with the notice of motion." L.R. 37-2. The Local Rules set forth the required format for the joint stipulation, as well as the process by which it is to be prepared. Among other requirements, it is the obligation of the moving party to deliver to the opposing party the moving party's portion of the joint stipulation, together with all exhibits and declarations offered in support of the moving party's position. L.R. 37-2.2. The opposing party then must deliver the opposing party's portion of the joint stipulation to the moving party within seven days, after which the moving party adds the opposing party's portion and presents the stipulation for signature and filing. Id.

If a discovery motion is not accompanied by a joint stipulation of the parties, it must contain a declaration of counsel "establishing that the opposing counsel (a) failed to confer in a timely manner in accordance with L.R. 37-1; (b) failed to provide the opposing party's portion of the joint stipulation in accordance with L.R. 37-2.2; or (c) refused to sign and return the joint stipulation after the opposing party's portion was added." L.R. 37-2.4. If such a declaration accompanies the Motion, then the general Local Rules regarding motion practice, Local Rules 6-1, 7-9 and 7-10 apply to the Motion. "The Court will not consider any discovery motion in the absence of a joint stipulation or declaration from counsel for the moving party establishing" the foregoing. L.R. 37-2.4.

Courts may deny discovery motions for failure to comply with the Local Rules' requirements for such motions. See Pina v. Lewis, 717 F. App'x 739, 740 (9th Cir. 2018) (holding district court may properly deny "a motion to compel for failing to comply with local rules"); see also Tri-Valley CARES v. U.S. Dep't of Energy, 671 F.3d 1113, 1131 (9th Cir. 2012) ("Denial of a motion as the result of a failure to comply with local rules is well within a district court's discretion."); Lumber Liquidators, Inc. v. Sullivan, 2012 WL 4464867, at *4 (C.D. Cal. Aug. 31, 2012) (denying discovery motion for failure to comply with L.R. 37-2); So v. Land Base, LLC, 2009 WL 2407954, at *2 (C.D. Cal. Aug. 4, 2009) (same).

Here, the Motion relates to discovery. Pursuant to Local Rule 37-2.4, the Court "will not consider" the Motion unless it supported by either a joint stipulation or a compliant declaration from counsel establishing that opposing counsel (a) failed to confer in a timely manner in accordance with L.R. 37-1; (b) failed to provide the opposing party's portion of the joint stipulation; or (c) refused to sign and return the final joint stipulation.

Exhibit 7, Page 96

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | SA CV 19-00220-JVS (JDEx) | Date | April 10, 2019 |
|---|---|---|---|
| Title | M/A-COM Technology Solutions, Inc., et al., v. Litrinium, Inc., et al. | | |

      The Motion is not supported by a joint stipulation. Further, the Declarations of Counsel for Defendant submitted with the Motion do not attest that counsel for Plaintiffs failed to confer in a timely manner in accordance with Local Rule 37-1, failed to provide their clients' portion of a proposed joint stipulation, or refused to sign and return a completed joint stipulation.

      As a result, per Local Rule 37-2.4, the Court "will not consider" the Motion. This ruling is without prejudice to Defendant refiling a motion either with an appropriate joint stipulation under Local Rule 37-2 or as a Local Rule 6-1, 7-3 et. seq. regularly noticed motion, supported by a declaration from counsel establishing that opposing counsel: (a) failed to confer in a timely manner in accordance with L.R. 37-1; (b) failed to provide the opposing party's portion of the joint stipulation; or (c) refused to sign and return the final joint stipulation.

      The Court, having reviewed the correspondence between the parties submitted with the Motion, offers suggestions to counsel as they undertake any future required conferences in "good faith effort[s] to eliminate the necessity" for future motions or to "eliminate as many of the disputes as possible" under Local Rule 37-1. First, unnecessarily short deadlines for responses to meet and confer letters rarely promote the good faith resolution of disputes. See, e.g. Dkt. 28-2 at 10 (demanding a conference within the following three business days). Second, in citing to authority in support of one's position, care should be used in identifying precedent as "binding." See, e.g., Dkt. 28-2 at 12-13. Third, when the law governing a dispute has not been clarified by the Supreme Court or the Ninth Circuit, the parties would be well-served to avoiding sweeping assertions regarding the state of the law both in their meet and confer efforts and in their court filings, recognizing that such disputes often turn on the facts and circumstances at issue. See E. & J. Gallo Winery v. Instituut Voor Landouw-En Visserijonderzoek, 2018 WL 3062160, at *2 (E.D. Cal. June 19, 2018) ("'While the Ninth Circuit has not decided whether [Cal. Civ. Proc. Code] Section 2019.210 applies to actions in federal court, district courts within the circuit have reached differing conclusions on the issue.'") (quoting Social Apps, LLC v. Zynga, Inc., 2012 WL 2203063, at *1 (N.D. Cal. June 14, 2012) and citing Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc., 2007 WL 273949, at *2 (E.D. Cal. Jan. 29, 2007) (finding Section 2019.210 is a procedural provision and does not supersede the directly conflicting discovery requirements under Federal Rule of Civil Procedure 26); AtPac, Inc. v. Aptitude Solutions, Inc., 2010 WL 11571246, at *1 (E.D. Cal. Sept. 22, 2010) (concluding Section 2019.210 is inapplicable in federal trade secret actions); Hilderman v. Enea TekSci, Inc., 2010 WL 143440, at *2 (S.D. Cal. Jan. 8, 2010) (finding Section 2019.210 conflicts with Rule 26); Computer Economics, Inc. v. Gartner Grp., Inc., 50 F. Supp. 2d 980, 988 (S.D. Cal. 1999) (holding Section 2019.210 complements rather than conflicts with federal discovery rules); Gabriel Technologies Corp. v. Qualcomm Inc., 2012 WL 849167, at *2 (S.D. Cal. Mar. 13, 2012) (finding Section 2019.210 does not conflict with any federal rule and its application avoids undesirable forum shopping); Advante International Corp. v. Mintel Learning Technology, 2006 WL 3371576 (N.D. Cal. Nov. 21, 2006) (declining to decide applicability of Section 2019.210 in federal cases but using it as guide); Excelligence Learning Corp. v. Oriental Trading Co., Inc., 2004 WL 2452834 (N.D. Cal. June 14, 2004) (finding Section 2019.210 not binding, but applying it

Exhibit 7, Page 97

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SA CV 19-00220-JVS (JDEx) | Date | April 10, 2019 |
|---|---|---|---|
| Title | M/A-COM Technology Solutions, Inc., et al., v. Litrinium, Inc., et al. | | |

because there was no parallel trade secret discovery provision in federal discovery rules)); see also Dietz v. Bouldin, —— U.S. ——, 136 S. Ct. 1885, 1891 (2016) (holding "district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases,'" quoting Link v. Wabash R. Co., 370 U.S. 626, 630–631 (1962)); Crawford–El v. Britton, 523 U.S. 574, 599 (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery.").

For the foregoing reasons, the Motion (Dkt. 28) is DENIED, without prejudice.

IT IS SO ORDERED.

_____ : _____

Initials of Clerk:     mba

Exhibit 7, Page 98

# EXHIBIT 8

**MACOM Technology Solutions Inc.**
100 Chelmsford Street
Lowell, Massachusetts 01851
+1 978 656.2500
www.macom.com



Dear valued customer,

Thank you for your continued business with MACOM Technology Solutions Inc. ("MACOM"). I am writing this letter to keep you abreast of a legal proceeding recently instituted against Litrinium, Inc. (https://www.litrinium.com/) ("Litrinium").

On February 4, 2019, MACOM and its wholly owned subsidiary, Mindspeed Technologies, S.A.S, filed a lawsuit against Litrinium and former MACOM employee Jerome Garez in the United States District Court, Central District of California, Case No. 8:19-cv-220.

The complaint alleges that both Litrinium and Mr. Garez (collectively, "Defendants") violated the Federal Defense of Trade Secret Act, California's Uniform Trade Secret Act and California's Unfair Competition Law.  It further alleges that Mr. Garez breached his duties and obligations under his written employment agreement with MACOM.  As detailed in the complaint, MACOM conducted an investigation concerning the activities of its former employee, Mr. Garez, and the products being developed and marketed by his new employer, Litrinium.  Litrinium's headquarters are located in Orange County, California, where MACOM also operates a design center.

Public records indicate that former MACOM employee, Hasnain Bajwa, founded Litrinium in March 2016.  Mr. Bajwa appears to have initiated a recruitment of other MACOM employees who have recently joined Litrinium, and such activity appears to have continued in France with Mr. Garez engaging in recruiting efforts, on Mr. Bajwa's behalf, following Garez's departure from MACOM.  These individuals include, among others, Angus Lai and Sebastien Douyere.  MACOM is continuing to investigate the activities of all former MACOM employees who joined, or will join, Litrinium.

Importantly, for the legal claims asserted by MACOM, Messrs. Garez, Lai and Douyere were entrusted with proprietary and confidential technical and marketing data regarding MACOM's products and strategies.  The technology at-issue in the lawsuit concerns TIAs, including PAM-4 TIA, 28G Burst Mode TIA, 28G Gen1 TIA, 10G Gen2 TIA, 28G APD TIA single and quad versions and 28G PIN TIA single and quad versions.  MACOM believes that, at a minimum, Mr. Garez worked on Litrinium projects while still employed by MACOM and that Defendants misappropriated valuable design information to develop a competing line of products.

In light of your company's business relationship with MACOM, we suspect that Litrinium may approach you. If you are approached by anyone affiliated with Litrinium, we request that you promptly notify us and share whatever non-confidential product and marketing information you receive from Litrinium.  We believe it is critical that MACOM and its customers operate with the utmost transparency in respecting and enforcing each other's intellectual property rights. We are committed to working with our customers to ensure that they are not ensnared in legal actions that could jeopardize them because of intellectual property theft.  That said, MACOM is committed to protecting its intellectual property rights, including those rights as against parties who knowingly use and incorporate MACOM's proprietary and confidential information in their products, or aid and abet others who do so.

MACOM will keep you updated with regard to the status of the pending lawsuit as appropriate. In the meantime, if you have any questions, please do not hesitate to contact me.  Upon request, I would also be happy to provide you with a copy of the complaint.

Sincerely,

*John Donnelly*

John Donnelly

Associate General Counsel, MACOM

# EXHIBIT 9

# **Maschoff Brennan**

949-202-1900
100 Spectrum Center Drive, Suite 1200
Irvine, CA  92618
www.maschoffbrennan.com

Michael Katz
mkatz@mabr.com

**SENT VIA EMAIL AND U.S. MAIL**

March 12, 2019

Andrew P. Holland (aholland@thoits.com)
Erin M. Doyle (edoyle@thoits.com)
Mark V. Boennighausen (mboennighausen@thoits.com)
Misasha S. Graham (mgraham@thoits.com)
Thoits Law
400 Main Street, Suite 250
Los Altos, California 94022

Re:   ***M/A-COM Technology Solutions Inc. et al. v. Litrinium, Inc. et al.***
       **Case No. 8:19-cv-00220-JVS-JDE**

Dear Counsel:

We represent Litrinium in the lawsuit filed by your clients, M/A-COM and
Mindspeed, S.A.S.  We write to seek an early resolution of the lawsuit. Because the
Complaint is based on a falsehood, we believe that an early resolution is in the best
interest of all parties. The gist of M/A-COM's Complaint appears to be stated at
paragraph 15, *i.e.*, that "defendant Garez used Plaintiffs' resources and developed
confidential and proprietary design concepts while employed by Mindspeed S.A.S,
which were then incorporated into Litrinium products." The accusation is that Mr.
Garez gave Litrinium M/A-COM trade secrets with which Litrinium designed its
competing products. This allegation made by M/A-COM is easily disproved.

Litrinium's 28G TIAs were taped-out about 15 months before Mr. Garez joined
Litrinium and were designed without any involvement by or input from Mr. Garez.
M/A-COM's allegations in its Complaint were all made "on information and belief"
confirming its lack of genuine understanding or evidence.  For example, M/A-COM
alleges, on information and belief, that Mr. Garez was moonlighting for Litrinium
while working for Mindspeed S.A.S, or that he and Litrinium stole M/A-COM's trade
secrets.  These allegations are false, and frankly, defamatory.  To the extent M/A-

COM repeats these allegations to customers, or third parties outside the context of this litigation, be advised that Litrinium reserves its rights to take all legal measures to protect itself against the dissemination of these falsehoods in the market.

Litrinium independently developed its own proprietary TIA designs that bear no resemblance to those of M/A-COM. The Litrinium engineers who devised Litrinium's TIA design solutions never worked at M/A-COM, including any of its subsidiaries.  And no information was obtained from Mr. Garez or any work he performed while at Mindspeed S.A.S in developing Litrinium's solution. M/A-COM's Complaint, in short, includes many false allegations.

Litrinium is willing to submit its TIA designs to an independent expert for review, alongside M/A-COM's TIA designs. A qualified neutral expert can be selected in the next ten days to conduct this review under an appropriate non-disclosure agreement and terms to be agreed upon. The review itself can be completed in a day or two at most.  If M/A-COM's purpose, in filing this lawsuit, is to confirm that its alleged trade secret information has not been used by Litrinium, it should readily accept Litrinium's offer to have the issue resolved immediately by a neutral expert as proposed.

In considering this proposal, M/A-COM should be mindful that before filing a lawsuit in the United States District Court asserting claims for trade secret theft, M/A-COM is required to have a good faith basis for its allegations. It does not. If M/A-COM's purpose is to slander Litrinium in the market, using its error-filled Complaint as cover, this would be both an abuse of the legal process and highly problematic ultimately, for M/A-COM.

Litrinium has reason to believe that M/A-COM knows that its claims are false, but it has chosen nonetheless to file an anti-competitive lawsuit to injure Litrinium. Litrinium has become aware, for example, that Mr. Virk, M/A-COM's Senior Vice President and General Manager, told a M/A-COM employee, when that employee resigned, that if he finds out that employee is joining "Hasnain's company," then M/A-COM will file a lawsuit to slow the company's progress and to scare off investors. Hasnain is Hasnain Bajwa, the Chief Executive Officer of Litrinium. To be more precise, and here we still paraphrase, what Mr. Virk said was "[w]e are not shy

of suing, and if nothing else it will slow you down and investors will want their money back."

M/A-COM made good on Mr. Virk's threat. M/A-COM filed this lawsuit to coincide exactly with Litrinium's last financing round. Mr. Virk made clear M/A-COM's intent in filing its Complaint was to derail Litrinium's financing and slow down Litrinium's progress in the market. This is confirmed by the fact that, although Mr. Garez tendered his resignation in December 2017, and left M/A-COM in March 2018, M/A-COM waited an entire year before filing suit, timed to coincide with Litrinium's financing round.  Indeed, M/A-COM decided to act only after Litrinium began prevailing in head to head competition in the market.

Litrinium is also concerned that M/A-COM filed suit accusing Litrinium of trade secret theft to use the Complaint as a vehicle to smear Litrinium in the market.  We have reason to believe, for example, that M/A-COM personnel have been telling customers that Litrinium's TIAs have the same pinout as M/A-COM's or have warned customers not to do business with Litrinium because they stole M/A-COM property.  We are investigating these and other instances of misconduct by M/A-COM in the market.

Based on M/A-COM's bad faith filing of this lawsuit, Litrinium is likely to prevail in recovering its attorney's fees, as well as any damages caused to Litrinium and /or its investors due to M/A-COM's wrongful conduct. Litrinium will not hesitate to pursue such remedies should M/A-COM reject the offer to tender this issue to a neutral expert for resolution as proposed and rectify any misinformation or misconduct by M/A-COM in the market related to Litrinium.

To the extent the impetus for this lawsuit is the fact that Litrinium has hired a few M/A-COM employees, we note that the vast majority of Litrinium's hires are from companies other than M/A-COM, and the ones from M/A-COM were hired only after the 28G TIA was taped-out. As you know, in California and elsewhere, at will employees are free to resign from one company and accept work for another. Freedom of movement in the labor market is a basic right. In contrast, trying to prevent employees from exercising their freedom by threatening to sue them or by accusing them falsely of wrongdoing is unlawful. To be blunt, it is just plain wrong to

try to scare employees from pursuing the livelihood that they choose.  M/A-COM should want to avoid doing this kind of thing.

Litrinium strongly respects the intellectual property of others. Litrinium has no interest in competing in the market, other than fairly, on a level playing field, using its own resources and ingenuity. We would expect M/A-COM to want to uphold these same values. For this reason, Litrinium has made this proposal to resolve this lawsuit by giving M/A-COM a means to confirm that none of its allegedly confidential information was used to design Litrinium's TIAs.

Sincerely,

MASCHOFF BRENNAN

Michael Katz

# EXHIBIT 10

**Maschoff
Brennan**

949-202-1902
100 Spectrum Center Drive, Suite 1200
Irvine, California 92618
www.maschoffbrennan.com

Michael I Katz
mkatz@mabr.com

March 20, 2019

*Via E-Mail*

Andrew P. Holland
  aholland@thoits.com
Mark V. Boenninghausen
  mboenninghausen@thoits.com
Erin M. Doyle
  edoyle@thoits.com
Misasha S. Graham
  mgraham@thoits.com
Thoits Law
400 Main Street, Suite 250
Los Altos, California 94022

Re:    ***M/A-COM Technology Solutions Inc. et al v. Litrinium, Inc. et al.***
       **Case No. 8:19-cv-00220-JVS-JDE**

Dear Counsel:

We wrote on March 12, 2019 stating that your client M/A-COM's Complaint – and specifically its
allegations that Litrinium misappropriated any of M/A-COM's alleged trade secrets – was predicated
on an unverified and false assumption. We pointed out that, in fact, the tape out of Litrinium's 28G
TIA products occurred more than 14 months before Mr. Garez was ever hired by Litrinum. We
proposed to submit our clients' respective technologies for review by an independent expert in ten
days' time to resolve this dispute and avoid unnecessary litigation. We did so on the apparently
erroneous assumption that M/A-COM's genuine concern was that its alleged trade secrets have
been used. MACOM has yet to respond to my letter, even to state that it was taking this proposal
under consideration.

During this time, in fact, M/A-COM appears to have orchestrated an effort to blanket the market
(including both Litrinium customers and investors) with its unsubstantiated trade secret theft
accusations, in letters authored by its in-house counsel (Mr. John Donnelly) disseminated widely,
and in communications by its sales (e.g. Mr. Jimmy Lin - Taiwan, Mr. Peter Bai - China) and
executive management teams (e.g. Mr. Preet Virk – SVP & GM, Mr. Thomas Hwang – SVP WW
Sales, Mr. Gary Shah – VP & Business Line Manager) to companies in multiple countries and
continents. It is evident that M/A-Com is trying to implicitly threaten any entity who might
consider doing business with Litrinium that such entity may put itself in legal jeopardy due to
Litrinium's alleged theft, and at the same time seeking to accuse, and in doing so defame, Litrinium

of being an intellectual property thief, by repeating this allegation not just to persons at the point of sale, but to the engineering and management teams of these companies.

MACOM clearly is far more interested in making these (false) assertions in the marketplace to disrupt Litrinium's business, than it is in genuinely determining if any of its alleged trade secrets have been used.  Message received.

M/A-Com's conduct is not protected by the litigation privilege, and thus it is subject to being held to account for the damage that it is deliberately seeking to inflict on Litrinium.

Meanwhile, please advise by noon today (1) whether you will agree to submit this dispute to an expert for determination, as we have proposed, and (2) confirm that MACOM will refrain as of this date from making any further unsubstantiated representations in the market.

Sincerely,

MASCHOFF BRENNAN

Michael I. Katz

# EXHIBIT 11

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

### Applications

• APON
• BPON
• ATM/SONET

### Features

• Typical –34 dBm sensitivity, +6 dBm saturation at 622 Mb/s when used with 0.9 A/W InGaAs PIN.
  (Cpd ≤ 0.5 pF, BER $10^{-10}$)
• Typical differential transimpedance: 65 kΩ
• Fabricated in standard CMOS
• Differential output
• Standard +3.3 Volt supply
• Available in die form only
• Monitor output
• AGC provides dynamic range of 40 dB
• Internal or external bias for photodiode
• PIN or APD sensor
• Same pad layout and die size as M02013/14/15/16

The M02011 is a CMOS transimpedance amplifier with AGC. The AGC gives a wide dynamic range of 40 dB. The high transimpedance gain of 66 kΩ ensures good sensitivity.

For optimum system performance, the M02011 die should be mounted with a GaAs or InGaAs PIN photodetector inside a lensed TO-Can or other optical sub-assembly.

The M02011 can either bias the PIN diode from the internal regulator, or use an externally biased PIN diode.

A replica of the average photodiode current is available at the MON pad for photo-alignment and 'Loss of Signal' monitoring.

**Typical Applications Diagram**



---

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

## Ordering Information

| Part Number | Package | Operating Temperature |
|---|---|---|
| M02011-XX* | Waffle Pack | −40 °C to 95 °C |
| M02011-XX* | Expanded whole wafer on a ring | −40 °C to 95 °C |

*NOTE:*
*For full ordering number please contact sales

## Revision History

| Revision | Level | Date | Description |
|---|---|---|---|
| V5 | Released | May 2015 | Updated logos and page layout. No content changes. |
| D (V4) | Released | August 2007 | Production release. Revised Absolute Maximum Ratings Table, Table 1-1. |
| C (V3) | Released | May 2007 | Production release. Increased max operating temperature, updated specifications based on full device characterization and included information on assembly, $I_{MON}$ and using the device with externally biased detectors in the Applications Information section. |



**Top Level Diagram**



**Pad Configuration**

Die size ≈ 1090 x 880 μm

2

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                    Rev V5

# 1.0    Product Specification

## 1.1        Absolute Maximum Ratings

These are the absolute maximum ratings at or beyond which the IC can be expected to fail or be damaged. Reliable operation at these extremes for any length of time is not implied.

*Table 1-1.    Absolute Maximum Ratings*

| Symbol | Parameter | Rating | Units |
|--------|-----------|--------|-------|
| $V_{CC}$ | Power supply ($V_{CC}$-GND) | -0.4 to +4 | V |
| $T_A$ | Operating ambient | -40 to +95 | °C |
| $T_{STG}$ | Storage temperature | -65 to +150 | °C |
| $I_{IN}$ | PINA Input current | 8 [1, 2] | mA$_{PP}$ |
| $V_{PINA}$ | Maximum input voltage at PINA | -0.4 to +2.0 [2] | V |
| $I_{PINK}$ | Maximum average current sourced out of PINK | 10 | mA |
| $V_{PINK}$, $V_{Dout}$, $V_{DoutB}$, $V_{AGC}$, $V_{MON}$ | Maximum input voltage at PINK, Dout, DoutB, AGC and MON | -0.4 to Vcc +0.4 | V |
| $I_{Dout}$, $I_{DoutB}$ | Maximum average current sourced out of Dout and DoutB | 10 | mA |

**NOTES:**
1.    Equivalent to 4.9 mA average current.
2.    Do not exceed either the $I_{IN}$ or $V_{PINA}$ rating. PINA damage will result in performance degradation which is difficult to detect.

## 1.2        Recommended Operating Conditions

*Table 1-2.    Recommended Operating Conditions*

| Symbol | Parameter | Rating | Units |
|--------|-----------|--------|-------|
| $V_{CC}$ | Power supply ($V_{CC}$ – GND) | 3.3 ± 10% | V |
| $C_{PD}$ | Max. Photodiode capacitance ($V_r$ = 1.8 V), for 622 Mbps data rate | 1.0 | pF |
| $T_A$ | Operating ambient temperature | –40 to +95 | °C |

3

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                    Rev V5

## 1.3        DC Characteristics

*Table 1-3.        DC Characteristics*

| Symbol | Parameter | Min. | Typ. | Max. | Units |
|--------|-----------|------|------|------|-------|
| $V_B$ | Photodiode bias voltage (PINK – PINA) | 1.7 | 2.0 | 2.2 | V |
| $V_{CM}$ | Common mode output voltage | 0.7 | 1 | 1.3 | V |
| $I_{CC}$ | Supply current (no loads) | 20 | 28 | 35 | mA |
| $R_{LOAD}$ | Recommended differential output loading | 85 | 100 [1] | — | W |

**NOTE:**
1.   100Ω is the load presented by the limiting amplifier.

## 1.4        AC Characteristics

*Table 1-4.        AC Characteristics*

| Symbol | Parameter | Condition | Min. | Typ.[1] | Max. | Units |
|--------|-----------|-----------|------|---------|------|-------|
| $R_{OUT}$ | Output impedance (single ended) | | 30 | 50 | 70 | W |
| LFC | Low frequency cutoff [2] | | — | 13 | 17 | kHz |
| $V_D$ | Differential output voltage | 100Ω differential load | — | 250 | 450 | mV |
| DCD | Duty cycle distortion [3] | 622 Mbps | — | — | 80 | ps |
| DJ | Deterministic jitter (includes DCD) [3] | 622 Mbps, $2^{23} - 1$ PRBS | — | — | 120 | $ps_{PP}$ |
| PDJ | Pattern Dependant Jitter (at crossing point), with no DCD | 622 Mbps, $2^{23} - 1$ PRBS | — | — | 55 | $ps_{PP}$ |
| In, rms | Total input RMS noise | DC to 467 MHz (Bessel Filter), Cin = 0.5 pF | — | 50 | 60 | nA |
| | Total input RMS noise | DC to 467 MHz (Bessel Filter), Cin = 1 pF | — | 56 | 70 | nA |
| PIN_mean_min | Optical Sensitivity [4] | | −33 | −34 | — | dBm |
| Imon_off | Monitor Output Offset [5] | $V_{MON}$ = 0 to 2V | — | — | 1.3 | μA |
| Imon_ratio | Monitor Output Gain Ratio [5] | $V_{MON}$ = 0 to 2V | — | 0.7 | — | — |
| Imon_error | Monitor Output Accuracy [3, 5] | $V_{MON}$ = 0 to 2V | — | — | ±2 | dB |

**NOTES:**
1.   Die designed to operate over an ambient temperature range of −40°C to +85°C, $T_A$ and $V_{CC}$ range from 3.0 – 3.6V. Typical values are tested at $T_A$ = 25° C and $V_{CC}$ = 3.3V.
2.   Input −33 dBm, Extinction Ratio = 10, Temp = 25°C.
3.   Input current < 1 mA average.
4.   BER $10^{-10}$, PD capacitance = 0.5 pF, Responsivity 0.9 A/W, Extinction Ratio = 10, Temp = 25°C.
5.   Offset and slope adjustment necessary to achieve rated accuracy.

4

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                    Rev V5

## 1.5          Dynamic Characteristics

*Table 1-5.          Dynamic Characteristics*

| Symbol | Parameter | Min. | Typ. | Max. | Units |
|--------|-----------|------|------|------|-------|
| G | Transimpedance<br>• Single ended<br>• Differential | <br>26.5<br>53 | <br>32.5<br>65 | <br>38<br>76 | kΩ |
| BW | Bandwidth to −3 dB point @ −33 dBm, 0.9A/W, 0.5 pF PD | 450 | 600 | — | MHz |
| | Bandwidth to −3 dB point @ −33 dBm, 0.9A/W, 1 pF PD | — | 460 | — | |
| RC | AGC loop time constant | — | 2 | — | µs |
| $I_{AGC}$ | AGC threshold | — | 5 | — | µA$_{PP}$ |
| $I_{OVL}$ | Maximum functional input current | 3.6 [1] | — | — | mA |
| PSRR | Power supply rejection, f < 1 MHz | — | 22 | — | dB |

**NOTES:**
1.    Equivalent to +3.4 dBm input optical power at Extinction Ratio = 10, Responsivity = 1.0 A/W.

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 115

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**                              Rev V5

## 1.6        Typical Performance

$V_{CC}$ = 3.3V, Temperature = 25°C, $L_{IN}$ = 1 nH, unless otherwise stated.

*Figure 1-1.    Typical Performance Diagrams 1 of 3*



*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
http://www.macom.com/support

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

$V_{CC}$ = 3.3V, Temperature = 25°C, $L_{IN}$ = 1 nH, unless otherwise stated.

*Figure 1-2.    Typical Performance Diagrams 2 of 3*



*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

$V_{CC}$ = 3.3V, Temperature = 25°C, $L_{IN}$ = 1 nH, unless otherwise stated.

*Figure 1-3.*     *Typical Performance Diagrams 3 of 3*



*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 118

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**

Rev V5

# 2.0 Pin Definitions

*Table 2-1.* **Pad Description**

| Die Pad No | Name | Function |
|---|---|---|
| 1 | AGC | Monitor or force AGC voltage |
| 2 | $V_{CC}$ | Power pin. Connect to most positive supply |
| 3 | PINK | Common PIN input. Connect photo diode cathode here and a 470 pF capacitor to Gnd [1] |
| 4 | PINA | Active PIN input. Connect to photo diode anode |
| 5 | $V_{CC}$ | Power pin. Connect to most positive supply (only one $V_{CC}$ pad needs to be connected) |
| 6 | MON | Analog current source output. Current matched to average photodiode current |
| 7 | DOUT | Differential data output (goes low as light increases) |
| 8 | $\overline{DOUTGND}$ | Ground return for $\overline{DOUT}$ pad [2] |
| 9 | GND | Ground pin. Connect to the most negative supply [2] |
| 10 | GND | Ground pin. Connect to the most negative supply [2] |
| 11 | DOUTGND | Ground return for DOUT pad [2] |
| 12 | DOUT | Differential data output (goes high as light increases) |
| NA | Backside | Backside. Connect to the lowest potential, usually ground |

Notes:
1. Alternatively the photodiode cathode may be connected to a decoupled positive supply, e.g. $V_{CC}$.
2. All ground pads are common on the die. Only one ground pad needs to be connected to the TO-Can ground. However, connecting more than one ground pad to the TO-Can ground, particularly those across the die from each other can improve performance in noisy environments.

9

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

*Figure 2-1.    Bare Die Layout*



*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**

Rev V5

# 3.0   Functional Description

## 3.1      Overview

The M02011 is a CMOS transimpedance amplifier with AGC. The AGC gives a wide dynamic range of 40 dB. The high transimpedance gain of 66 k$\Omega$ ensures good sensitivity.

For optimum system performance, the M02011 die should be mounted with a GaAs or InGaAs PIN photodetector inside a lensed TO-Can or other optical sub-assembly.

The M02011 can either bias the PIN diode from the internal regulator, or use an externally biased PIN diode.

A replica of the average photodiode current is available at the MON pad for photo-alignment and 'Loss of Signal' (LOS) monitoring.

*Figure 3-1.     M02011 Block Diagram*



11

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                                                    **Rev V5**

# 3.2      General Description

### 3.2.1      TIA (Transimpedance Amplifier)

The transimpedance amplifier consists of a high gain single-ended CMOS amplifier (TIA), with a feedback resistor. The feedback creates a virtual earth low impedance at the input and virtually all of the input current passes through the feedback resistor, defining the voltage at the output. Advanced CMOS design techniques are employed to maintain the stability of this stage across all input conditions.

An on-chip low dropout linear regulator has been incorporated into the design to give excellent noise rejection up to several MHz. Higher frequency power supply noise is removed by the external 470 pF decoupling capacitor connected to PINK.

The circuit is designed for PIN photodiodes in the "grounded cathode" configuration, with the anode connected to the input of the TIA and the cathode connected to AC ground, such as the provided PINK terminal. Reverse DC bias is applied to reduce the photodiode capacitance. Avalanche photodiodes can be connected externally to a higher voltage.

### 3.2.2      AGC

The M02011 has been designed to operate over the input range of +6 dBm to –34 dBm. This represents a ratio of 1:10000 whereas the acceptable dynamic range of the output is only 1:30 which implies a compression of 333:1 in the transimpedance. The design uses a MOS transistor operating in the triode region as a "voltage controlled resistor" to achieve the transimpedance variation.

Another feature of the AGC is that it only operates on signals greater than –26 dBm (@0.9 A/W). This knee in the gain response is important when setting "signal detect" functions in the following post amplifier. It also aids in active photodiode alignment.

The AGC pad allows the AGC to be disabled during photodiode alignment by grounding the pad through a low impedance. The AGC control voltage can be monitored during normal operation at this pad by a high impedance (>10 M$\Omega$) circuit.

### 3.2.3      Output Stage

The signal from the TIA enters a phase splitter followed by a DC-shift stage and a pair of voltage follower outputs. These are designed to drive a differential (100$\Omega$) load. They are stable for driving capacitive loads, such as interstage filters. Each output has its own GND pad, all four GND pads on the chip should be connected for proper operation. Since the M02011 exhibits rapid roll-off (3 pole), simple external filtering is sufficient.

### 3.2.4      Monitor O/P

High impedance output sources a replica average photodiode current for monitoring purposes. This output is compatible with the DDMI Receive Power Specification (SFP-8472) and MACOM's range of DDMI controllers. Ensure that the voltage on $V_{MON}$ is in the range of 0 to 2V. Refer to Figure 4-1.

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 122

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                                    Rev V5

# 4.0    Applications Information

## 4.1          Recommended Pin Diode Connections

*Figure 4-1.     Suggested PIN Diode Connection Methods*



Note:

Selection of Rm depends on the maximum input current as detailed in Table 4-1.

---

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 123

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**                                      Rev V5

## 4.2        Monitor Calibration

To achieve the best monitor accuracy, both the slope and calibrated offset should be used. The offset calibration is achieved by measuring the dark current from the MON output. The calibrated monitor value is usually determined by y = mx + b or:

$I_{MON\_CALIBRATED}$ = (Slope * $I_{MON\_READING}$) + $I_{MON\_OFFSET}$

Where Slope = 1/Imon_ratio (Table 1-4) = 1/0.7 = 1.43 and
$I_{MON\_OFFSET}$ = $I_{INPUT@CAL}$ – ($I_{MON\_READING@CAL}$ * Slope)

## 4.3        Selecting the Monitor Resistor

As described earlier the high impedance monitor output sources a replica average photodiode current for monitoring purposes. If detected by converting the current to a voltage through an external resistor (Figure 4-1), ensure that the voltage on $V_{MON}$ is in the range of 0 to 2V. The table below provides suggested values for the monitor resistor.

*Table 4-1.    Selection of Rm for Maximum Input Current*

| $I_{IN}$ Max (mA) | Optical Power (dBm) | Rm (Ω) |
|---|---|---|
| 4 | +6 | 500 |
| 2 | +3 | 1000 |
| 1 | 0 | 2000 |
| 0.5 | –3 | 4000 |

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps                                                Rev V5

## 4.4        TO-Can Layout

*Figure 4-2.        Typical Layout Diagram with Photodiode Mounted on PINK Capacitor (5 pin TOCAN)*



**NOTES:**

Typical application inside of a five lead TO-Can.

Only one of the $V_{CC}$ pads and all of the GND pads need to be connected. The backside must be connected to the lowest potential, usually ground, with conductive epoxy or a similar die attach material. If a monitor output is not required then a four lead TO-Can may be used.

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 125

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**

Rev V5

*Figure 4-3.    Typical Layout Diagram with Photodiode Mounted on TOCAN base (5 pin TOCAN)*



*NOTE:*

Typical application inside of a five lead TO-Can.

Only one of the V$_{CC}$ pads and all of the GND pads need to be connected. The backside must be connected to the lowest potential, usually ground, with conductive epoxy or a similar die attach material. If a monitor output is not required then a four lead TO-Can may be used.

# 4.5      Treatment of PINK

PINK requires bypassing to ground with a capacitor when powering a photo diode. If PINK is not used to bias the photo diode, then it is not necessary to bypass an unused PINK.

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 126

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**

Rev V5

## 4.6        T0-Can Assembly Recommendations

*Figure 4-4.     TO-Can Assembly Diagram*



---

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 127

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**

Rev V5

## 4.6.1        Assembly

The M02011 is designed to work with a wirebond inductance of 1 nH ± 0.25 nH. Many existing TO-Can configurations will not allow wirebond lengths that short, since the PIN diode submount and the TIA die are more than 1 mm away in the vertical direction, due to the need to have the PIN diode in the correct focal plane. This can be remedied by raising up the TIA die with a conductive metal shim. This will effectively reduce the bond wire length. Refer to Figure 4-4 for details.

MACOM recommends ball bonding with a 1 mil (25.4 µm) gold wire. For performance reasons the PINA pad is smaller than the others and also has less via material connected to it. It therefore requires more care in setting of the bonding parameters. **For the same reason PINA has no ESD protection.**

In addition, please refer to the MACOM Product Bulletin (document number 0201x-PBD-002-A). Care must be taken when selecting chip capacitors, since they must have good low ESR characteristics up to 1.0 GHz. It is also important that the termination materials of the capacitor be compatible with the attach method used.

For example, Tin/Lead (Pb/Sn) solder finish capacitors are incompatible with silver-filled epoxies. Palladium/Silver (Pd/Ag) terminations are compatible with silver filled epoxies. Solder can be used only if the substrate thick-film inks are compatible with Pb/Sn solders.

## 4.6.2        Recommended Assembly Procedures

For ESD protection the following steps are recommended for TO-Can assembly:

- Ensure good humidity control in the environment (to help minimize ESD).
- Consider using additional ionization of the air (also helps minimize ESD).
- As a minimum, it is best to ensure that the body of the TO-Can header or the ground lead of the header is grounded through the wire-bonding fixture for the following steps. The wire bonder itself should also be grounded.

1. Wire bond the ground pad(s) of the die first.
2. Then wire bond the $V_{CC}$ pad to the TO-Can lead.
3. Then wire bond any other pads going to the TO-Can leads (such as DOUT, $\overline{DOUT}$ and possibly MON)
4. Next wire bond any capacitors inside the TO-Can.
5. Inside the TO-Can, wire bond PINK.
6. The final step is to wire bond PINA.

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

Exhibit 11, Page 128

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**

Rev V5

## 4.7    TIA Use with Externally Biased Detectors

In some applications, MACOM TIAs are used with detectors biased at a voltage greater than available from TIA PIN cathode supply. This works well if some basic cautions are observed. When turned off, the input to the TIA exhibits the following I/V characteristic:

*Figure 4-5.    TIA Use with Externally Biased Detectors, Powered Off*



19

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC
for Fiber Optic Networks up to 622 Mbps**                                    Rev V5

In the positive direction after about 700 mV, the impedance of the input is relatively high. After the TIA is turned on, the DC servo and AGC circuits attempt to null any input currents (up to the absolute maximum stated in Table 1-1) as shown by the I/V curve in Figure 4-6.

***Figure 4-6.    TIA Use with Externally Biased Detectors, Powered On***



It can be seen that any negative voltage below 200 mV is nulled and that any positive going voltage above the PINA standing voltage is nulled by the DC servo. The DC servo upper bandwidth varies from part to part, but is generally at least 30 kHz.

When externally biasing a detector such as an APD where the supply voltage of the APD exceeds that for PINA Table 1-1, care should be taken to power up the TIA first and to keep the TIA powered up until after the power supply voltage of the APD is removed. Failure to do this with the TIA unpowered may result in damage to the input FET gate at PINA. In some cases the damage may be very subtle, in that nearly normal operation may be experienced with the damage causing slight reductions in bandwidth and corresponding reductions in input sensitivity.

20

---

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

*For further information and support please visit:*
*http://www.macom.com/support*

# M02011



**CMOS Transimpedance Amplifier with AGC**
**for Fiber Optic Networks up to 622 Mbps**                                Rev V5

# 5.0   Die Specification

*Figure 5-1.    Bare Die Layout*



| Pad Number | Pad | X | Y |
|---|---|---|---|
| 1 | AGC | −329 | −76 |
| 2 [1] | V$_{CC}$ | −329 | −228 |
| 3 | PINK | −124 | −434 |
| 4 | PINA | 124 | −434 |
| 5 [1] | V$_{CC}$ | 329 | −228 |
| 6 | MON | 329 | −76 |
| 7 | $\overline{DOUT}$ | 329 | 76 |
| 8 [1] | $\overline{DOUTGND}$ | 329 | 228 |
| 9c [1, 2] | GND | 329 | 360 |
| 9b [1, 2] | GND | 255 | 434 |
| 9a [1, 2] | GND | 124 | 434 |
| 10a [1, 2] | GND | −124 | 434 |
| 10b [1, 2] | GND | −255 | 434 |
| 10c [1, 2] | GND | −329 | 360 |
| 11 [1] | DOUTGND | −329 | 228 |
| 12 | DOUT | −329 | 76 |

**Notes:**
Process technology: CMOS, Silicon Nitride passivation
Die thickness: 300 μm
Pad metallization: Aluminium
Die size: 880 μm x 1090
Pad opening: 86 μmsq.
Octagonal pad: 70 μm across flat PINA (70 μm x 70 μm)
Pad Centers in μm referenced to center of device
Connect backside bias to ground

*NOTES:*
1.   It is only necessary to bond one V$_{CC}$ pad and one GND pad. However, bonding one of each pad (if available) on each side of the die is encouraged for improved performance in noisy environments.
2.   Each location is an acceptable bonding location.

21

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
*Visit www.macom.com for additional data sheets and product information.*

# M02011



## CMOS Transimpedance Amplifier with AGC
## for Fiber Optic Networks up to 622 Mbps

Rev V5

M/A-COM Technology Solutions Inc. All rights reserved.

Information in this document is provided in connection with M/A-COM Technology Solutions Inc ("MACOM") products. These materials are provided by MACOM as a service to its customers and may be used for informational purposes only.   Except as provided in MACOM's Terms and Conditions of Sale for such products or in any separate agreement related to this document, MACOM assumes no liability whatsoever.  MACOM assumes no responsibility for errors or omissions in these materials. MACOM may make changes to specifications and product descriptions at any time, without notice. MACOM makes no commitment to update the information and shall have no responsibility whatsoever for conflicts or incompatibilities arising from future changes to its specifications and product descriptions.   No license, express or implied, by estoppel or otherwise, to any intellectual property rights is granted by this document.

THESE MATERIALS ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, RELATING TO SALE AND/OR USE OF MACOM PRODUCTS INCLUDING LIABILITY OR WARRANTIES RELATING TO FITNESS FOR A PARTICULAR PURPOSE, CONSEQUENTIAL OR INCIDENTAL DAMAGES, MERCHANTABILITY, OR INFRINGEMENT OF ANY PATENT, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY RIGHT. MACOM FURTHER DOES NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE INFORMATION, TEXT, GRAPHICS OR OTHER ITEMS CONTAINED WITHIN THESE MATERIALS. MACOM SHALL NOT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST REVENUES OR LOST PROFITS, WHICH MAY RESULT FROM THE USE OF THESE MATERIALS.

MACOM products are not intended for use in medical, lifesaving or life sustaining applications. MACOM customers using or selling MACOM products for use in such applications do so at their own risk and agree to fully indemnify MACOM for any damages resulting from such improper use or sale.

22

*M/A-COM Technology Solutions Inc. (MACOM) and its affiliates reserve the right to make changes to the product(s) or information contained herein without notice.*
Visit www.macom.com for additional data sheets and product information.

*For further information and support please visit:*
http://www.macom.com/support

Exhibit 11, Page 132

# EXHIBIT 12



# Optoelectronics & Photonics

Product
Selection
Guide



*Partners from RF to Light*

## Optoelectronics & Photonics
**Products and Technology to meet the high bandwidth and low latency requirements of Cloud Data Centers and 5G Optical Networks**

MACOM supports a large portfolio of electronic and lightwave components, lasers, and photodiodes for optical communications from long haul core networks to Cloud Data Center networks to FTTx access networks. The portfolio addresses the high performance analog interfaces between electrical and optical domains, providing solutions to meet the demanding size, power and signal integrity requirements of today's high speed networks—which are expanding to meet the continuously growing demand for data capacity. These products include high performance modulator drivers, transimpedance amplifiers, clock/data recovery circuits, APD, PIN photodiodes, FP and DFB lasers, Silicon Photonics, PAM4 PHYs and TOSAs and ROSAs: for datacenter, enterprise, and telecom optical systems operating up to 400 Gbps and beyond. For FTTx, MACOM has the broadest portfolio of lasers, laser drivers, limiting amplifiers, APD, PIN photodiodes, and TIAs covering systems from GPON, EPON to XG-PON.



Exhibit 12, Page 135



## Optoelectronics & Photonics

### Enabling bandwidth density in optical networks

---

**MACOM Products**

> CDRs
> Crosspoint Switches
> Gearbox
> Lasers
> Limiting Amplifiers

> L-PIC™ Silicon Photonics
> MACsec
> Modulator Drivers
> OTN−Framer and Mapper
> PAM-4 PHY

> Photodiodes
> Physical Media Devices
> PLC Mux/Demux
> PMDs
> TIAs
> TOSA/ROSA

**MACOM Technologies**

> SiPh
> InP

> SAEFT™
> CMOS

> GaAs
> SiGe

**MACOM Markets**







**FTTx/PON**　　　**Wireless Fronthaul/ Backhaul**　　　**Cloud Data Center**　　　**Metro**　　　**Long Haul**



MACOM Technologies and Products
in Optical & Photonic Content




# MACOM Optoelectronic & Photonic Technologies

**Creating innovative design solutions to solve complex challenges**

## Indium Phosphide (InP)

MACOM has assumed a key position in the market as a premier supplier of both photonic devices such as lasers, and optoelectronics products such as high speed modulator drivers, based on InP technology. *Key applications include laser diodes for silicon photonics, data centers, mobile backhaul, access networks and metro markets, and modulator drivers for 100G and 400G coherent networks, metro networks and data centers.*

## Self-Aligning Etched Facet (SAEFT™)

MACOM's lasers are attached to the silicon PIC using MACOM's patented Self-Aligning Etched Facet (SAEFT™) technology for precision assembly and alignment of lasers to silicon photonic waveguides. This self-aligning laser attach technology is enabled by MACOM's patented etched facet lasers and completely eliminates the costly manufacturing steps of actively aligning lasers, photomonitor diodes, and lenses in the production of TOSA products. MACOM's L-PIC™ transmitters are shipped with lasers already attached to the silicon photonic circuit.

## Silicon Photonics (SiPh)

Silicon-based Photonic Integrated Circuits (PICs) is an emerging technology that uses crystalline semiconductor wafers as the platform for the integration of active and passive photonic circuits to provide a complete TOSA or ROSA optical path on a single chip. MACOM's silicon PIC platform enables innovative solutions with the benefits of high-density, low-cost and performance scalability by integrating lasers, photodetectors, optical modulators, and multiplexers onto a single chip. Along with an optimized quad modulator driver and a PIC controller IC, this chipset solution has been developed for 100G CWDM4 and 400G PAM4 Datacom applications.

## CMOS

MACOM utilizes CMOS technology extensively for design in a range of applications from wireless infrastructure basestations to aerospace and defense, to include the IEEE 802.1AE MACsec Standard, which solves the security issues of Ethernet networks by providing confidentiality, authenticity and integrity of data. Enabling high-speed data transmission, typical products and applications include PAM-4 PHYs, MACsec, mobile phones, cellular basestations/wireless infrastructure, satellite radio, GPS and DAB, 2.4 GHz and 5.0 GHz WLAN, VSAT, CATV and broadband, commercial and military radar, and multi-market applications.

## Silicon Germanium (SiGe)

Building upon a long history in designing integrated circuits and subsystems for radar and mmW markets, MACOM leads the way in applying SiGe BiCMOS technology to both commercial and military needs. We see SiGe as a high value, differentiating technology which we will continue to leverage in MACOM's core product segments. *Key applications include high-speed optical network transceivers, basestations, wired broadband communications, high speed crosspoint switches and global positioning systems.*

## Gallium Arsenide (GaAs)

For over three decades, MACOM has been the world leader in the advancement of GaAs technology, producing state-of-the-art, high performance discrete devices, control components, mixed signal processing and converters, driver amplifiers, CATV amplifiers, LNAs and power amplifiers as single purpose and multi-function MMICs. *Key applications include wireless backhaul, industrial, scientific and medical, global positioning system, CATV and wired broadband, aerospace and defense, and satellite communications.*



Exhibit 12, Page 137



# MACOM EVMs and Reference Design Kits

## Enhance new product development, reduce costs and optimize time-to-market

In addition to the support of our world-class application team, MACOM offers a number of custom reference design kits, EVM and design guides which enhance the development of new products, reduce costs and optimize time-to-market.

MACOM EVMs provide customers with a vehicle to test product features, measure product peformance, and help design the product into their application. From backplanes to line cards and optical modules, MACOM reference design kits and EVMs are built to ease the evaluation of our latest solutions into the application environments of our customers and partners.

We package these offerings with our extensive GUI support as well. In addition to the EVM and the required software and user guide, schematics of circuit boards and modules, and supporting documents are provided.

From low-speed solutions to those operating at 100G and above, MACOM offers hardware expertise and design support to enable innovative, next-generation optical products in a wide variety of markets.

Contact the MACOM sales team to learn more.



5

Exhibit 12, Page 138

## GPON ONU BOSA-on-Board A

## 10 PON ONU/OLT B

## 25G Chipset: SFP28 SR/LR/ER C

## 100G Chipset: CWDM4 Solution D

## Optoelectronics & Photonics



### Wireless Fronthaul eCPRI Aggregation Solution E



### 100G SR4 VCSEL Chipsets F

### 200/400G SR4 VCSEL Chipset H



### 100G BASE-LR4/ER4 (QSFP28) I



Exhibit 12, Page 140

# Optoelectronics & Photonics



## 100G CWDMA4 Silicon Photonics (J)

TOSA

PIC CONTROLLER

4 x 28 Gb L-PIC™ 4 LASERS, MZM, 4:1 MUX

4 x 25 Gb CDR + DRIVER

4 x 26 Gb CAUI-4 ELECTRICAL

FIBER

4 x 28 Gb R-PIC™ 1:4 DEMUX, 4 x PIN PD

4 x 25 Gb TIA + CDR

PIC CONTROLLER

ROSA

Optional Chip-on-Board (COB) Capable
Silicon Photonic 100G CWDM4 MSA compliant (four 25G data lanes)
Chipset provides automated PIC calibration and monitoring
and Build in Self Test (BiST)

## 100G Single Lambda (K)

PIC CONTROLLER

1 x 53 Gb L-PIC™ 1 x LASER, MZM

1 x 53 Gb PAM-4 PHY

FIBER

1 x 56G PIN

1 x 53 Gb TIA

4 x 25 Gb NRZ CAUI-4 ELECTRICAL

Silicon Photonic 100GBASE-DR/FR ompliant
(single 53 Gbaud PAM-4 data lane)
Chipset provides automated PIC calibration and monitoring
and Build in Self Test (BiST)

## 400GBASE-FR4/LR4

### MACOM Silicon Photonics Based Solution (L)

TOSA

PIC CONTROLLER

4 x 53 Gb L-PIC™ 4 x LASERS, MZM, 4:1 MUX

4 x 53 Gb DRIVER

4 x 53 Gb PAM-4 PHY

8 x 26 Gb CAUI-4 ELECTRICAL

FIBER

4 x 53 Gb R-PIC™ 1:4 DEMUX, 4 x PIN PD

4 x 53 Gb TIA

PIC CONTROLLER

ROSA

### EML Based Solution (M)

EML TOSA 4 x WDM MUX/ LASERS

4 x 53 Gb DRIVER

4 x 28 Gb ANALOG CDR

4 x 28 Gb PAM-4 ELECTRICAL

FIBER

ROSA 4 x DEMUX/5G PIN

4 x 53 Gb TIA

Exhibit 12, Page 141

## Optoelectronics & Photonics



### Data Center Switch Interconnect Security Solution 



### Crosspoint Switches and Backplane Drivers



### 100/200/400/600G Long Haul/Metro/DCI Application Solutions



Exhibit 12, Page 142

# Optoelectronics & Photonics

## Lasers and Modulator Drivers

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Supply Voltage (V) | Power Consumption (W) | Channels (#) | Max Output Mod Current (mA) | Max Output Bias Current (mA) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|
| M02061 | 4.3 Gbps, 3.3 or 5V Laser Driver | A | 4.3 | 3.3, 5 | 0.115 | 1 | 2.5 | 100 | QFN |
| M02066 | Highly Integrated, Programmable Laser Driver for Short-reach SONET/SDH | A | 2.5 | 3.3 | 0.19 | 1 | 85 | 100 | BCC + 24L |
| M02067 | 2.1 Gbps, 3.3 V Laser Driver | A | 2.1 | 3.3 | 0.17 | 1 | 85 | 100 | QFN |
| M02068 | Highly Integrated, Programmable Laser Driver for Telecom Applications up to 622 Mbps | A | 1 | 3.3 | 0.14 | 1 | 85 | 100 | BCC + 24L |
| M02069 | Highly Integrated, Programmable VCSEL Driver for SFP/SFF Modules to 4.3 Gbps | A | 4.3 | 3.3, 5 | 0.095 | 1 | 45 | 50 | QFN |
| M02076 | Laser Driver/Limiting Amplifier + DDMI Controller and APD DC-DC Controller | A | 3.1 | 3.3 | 0.205 | 1 | 100 | 100 | 4 mm QFN |
| M02077 | Laser Driver/Limiting Amplifier | A | 3.1 | 3.3 | 0.205 | 1 | 100 | 100 | 4 mm QFN |
| M02090 | 2.5 Gbps, 3.3 V Burst-Mode Laser Driver/ Limiting Amplifier | A | 2.5 | 3.3 | 0.4785 | 1 | 100 | 80 | QFN |
| M02094 | Highly Integrated, Programmable VCSEL Driver for SFP/SFF Modules to 2.0 Gbps | A | 2 | 3.3, 5 | 0.1155, 0.175 | 1 | 45 | 50 | QFN |
| M02095 | 2.5 Gbps, 3.3/5 V Laser Driver/Limiting Amp | A | 1.2 | 3.3, 5 | 0.31 | 1 | 85 | 100 | 5 mm QFN |
| M02096 | 2.5 Gbps, 3.3/5 V Laser Driver/Limiting Amp | A | 4.3 | 3.3, 5 | 0.225 | 1 | 85 | 100 | 5 mm QFN |
| M02097 | 500 Mbps, 3.3/5 V LED Driver/Limiting Amp | A | 0.5 | 3.3, 5 | 0.12 | 1 | 120 | 10 | QFN |
| M02098 | Burst Mode Laser Driver/Limiting Amplifier | A | 2.5 | 3.3 | 0.28 | 1 | 100 | 80 | 5 mm QFN |
| M02099 | Burst Mode Laser Driver/Limiting Amplifier + DDMI Controller and APD DC-DC Controller | A | 3.1 | 3.3 | 0.225 | 1 | 100 | 100 | 4 mm QFN |
| M02100 | Burst Mode Laser Driver/Limiting Amplifier + DDMI Controller and APD DC-DC Controller & amp, EEPROM | A | 3.1 | 3.3 | 0.225 | 1 | 100 | 100 | 4 mm QFN |
| M02170 | 11.3 Gbps, 3.3 V Laser Driver | — | 11.3 | 3.3 | 0.1914 | 1 | 100 | 180 | 5 mm QFN |
| M02171 | 11.3 Gbps Dual Loop VCSEL Driver | — | 11.3 | 3.3 | 0.1782 | 1 | 25 | 25 | QFN |
| M02172 | 11.3 Gbps EML Driver | — | 11.3 | 3.3 | 0.2838 | 1 | 2.5 (V) | 180 | QFN |
| M02180 | Burst Mode Laser Driver/Limiting Amplifier + Rx CDR + DDMI Controller and APD DC-DC Controller & Amplifier; EEPROM | B | 12.5 | 3.3 | 0.584 | 1 | 100 | 100 | 4.5 mm QFN |
| M02193 | 12.5 Gbps Low Power Laser Driver and Limiting Amplifier with DC-DC Controller and EEPROM with Digital Diagnostics | — | 12.5 | 3.3 | 0.314 | 1 | 100 | 100 | 4.5 mm QFN |
| MALD-02101 | 3.1 Gbps Low Power Dual Closed Loop Burst Mode Laser Driver with Integrated Limiting Amplifier | A | 3.1 | 3.3 | 0.23 | 1 | 100 | 100 | 4 mm QFN |
| MALD-02102 | 3.1 Gbps Low Power Dual Closed Loop Burst Mode Laser Driver with Integrated Limiting Amplifier | A | 3.1 | 3.3 | 0.23 | 1 | 100 | 100 | 4 mm QFN |
| MALD-37030 | 28 Gbps Multi-Rate Laser Driver with LIA/CDR | C | 26.5 | 1.8, 3.3 | 0.689 | 1 | 76 | 100 | 5 x 6 mm LGA |
| MALD-37031 | 28 Gbps Multi-Rate Laser Driver with LIA/CDR | C | 28.1 | 1.8, 3.3 | 0.689 | 1 | 76 | 100 | 5 x 6 mm LGA |
| MALD-37345B | Quad 28G VCSEL Driver with Input Equalizer | F, G | 28 | 1.8, 3.3 | 0.5 | 4 | 0.1 ~ 12.8 | 4 ~ 15 | Die |
| MALD-02181 | 12.5G Burst Mode Laser and LIA+ DC-DC Controller, EEPROM and DDMI Controller | B | 12.5 | 3.3 | 0.327 | 1 | 100 | 100 | 4.5 mm QFN |
| MALD-02182 | 12.5G Burst Mode Laser and LIA+ DC-DC Controller and DDMI Controller | B | 12.5 | 3.3 | 0.327 | 1 | 100 | 100 | 4.5 mm QFN |
| MALD-02194 | 12.5G Burst Mode Laser and LIA+ DDMI Controller | — | 12.5 | 3.3 | 0.327 | 1 | 100 | 100 | 4.5 mm QFN |
| MALD-02195 | 12.5G DML Laser Driver and LIA+ DC-DC Controller and DDMI Controller | — | 12.5 | 3.3 | 0.327 | 1 | 100 | 100 | 4.5 mm QFN |

10    * Refer to Block Diagrams on pages 6-9

# Optoelectronics & Photonics



## Lasers and Modulator Drivers: Client Side

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Channels (#) | Min Input Voltage (mVpp) | Max Output Voltage (V) | Supply Voltage (V) | RF I/O Interface | Power Dissipation (W) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|---|
| MAOM-001201 | 11.3 Gbps Limiting EML Driver | — | 11.3 | 1 | 400 | 2.3 | 3.3 | Differential/ Differential | 0.45 | 3 x 3 QFN |
| MAOM-002200 | 28 Gbps Limiting EML Driver DC Coupled, Neg Supply | C | 28 | 1 | 500 | 2.5 | -5.2 | Differential/ Single-ended | 1.25 | 4 x 4 QFN |
| MAOM-002203 | 28 Gbps Limiting EML Driver Integrated Bias-T, Pos Supply | C | 28 | 1 | 500 | 2.5 | 4.3 | Differential/ Single-ended | 0.75 | 4 x 4 x 3 QFN |
| MAOM-002207 | 28 Gbps Limiting EML Driver Die | C | 28 | 1 | 500 | 2.5 | 4.3 | Differential/ Single-ended | 0.75 | Bumped Die |
| MAOM-003115 | 28 Gbps Linear EA Modulator Driver IC | C, H, I | 28 | 1 | 600 | 2 | 3.6 | Differential/ Single-ended | 0.75 | 4 x 4 x 2.3 QFN |
| MAOM-003419 | Quad Channel 28 Gbaud Linear Modulator Driver | P | 28 | 4 | 600 (max) | 2 | 3.3 | Differential/ Single-Ended | 0.46/ch | 6 x 9.1 x 1.33 SMD |
| MAOM-003401 | Quad Channel 28 Gbps Limiting EML Driver, Low Power | I | 28 | 4 | 700 | 2 | 3 | Differential/ Single-ended | 0.2/ch | 10 x 10 x 1.4 SMD |
| MAOM-02204A | Quad Channel 28 Gbps Limiting EML Driver | — | 28 | 4 | 500 | 2.5 | 4.3 | Differential/ Single-ended | 0.75/ch | 14 x 8 SMD |
| MAOM-002301-DIE | Single Channel 28 Gbps Direct, Modulated Laser Driver IC, Die | C, D, I | 28 | 1 | 700~1400 | — | 3 | Differential/ Single-Ended | 0.255 | Die |
| MAOM-002304-DIE | Quad Channel 28 Gbps Direct Modulated Laser Driver IC, Die | D, I | 28 | 4 | 700~1400 | — | 3 | Differential/ Single-Ended | 0.255/ch | Die |
| MAOM-005411 | Quad Channel 56 Gbaud Linear EML Driver | M | 53/56 | 4 | 1000 (max) | 1.8 | 9 | Differential/ Single-Ended | 0.3/ch | 7.2 x 7 x 1.4 SMD |

## Lasers and Modulator Drivers: Metro/Line Side

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Channels (#) | Min Input Voltage (mVpp) | Max Output Voltage (V) | Supply Voltage (V) | RF I/O Interface | Power Dissipation (W) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|---|
| MAOM-002105 | 32 Gbps Limiting MZ Modulator Driver | P | 32 | 1 | 350 | 8 | 6 | Single-ended/ Single-ended | 1.8 | 14.4 x 7 x 2.3 SMD |
| MAOM-003107 | Dual Channel 32 Gbps Limiting Modulator Driver IC | P | 32 | 2 | 400 | 8.2 | 7 | Single-Ended/ Single-ended | 2.4/ch | 16.1 x 10.6 x 3.4 SMD |
| MAOM-003108 | Dual Channel 32 Gbps Linear Modulator Driver, Diff Input | P | 32 | 2 | 200 | 6 | 6.5 | Differential/ Single-ended | 2/ch | 10 x 10 x 2.29 SMD |
| MAOM-003405 | Quad Channel 32 Gbps Limiting MZ Modulator Driver | P | 32 | 4 | 300 | 7 | 6.5 | Differential/ Single-ended | 0.95/ch @5 Vout | 13 x 19 x 2.46 SMD |
| MAOM-003407 | Quad Channel 32 Gbps Limiting MZ Modulator Driver | P | 32 | 4 | 300 | 6 | 6.5 | Differential/ Single-ended | 1.6/ch | 13 x 19 x 2.46 SMD |
| MAOM-03409D | 32 Gb/s Linear Differential Modulator Driver IC | P | 32 | 4 | 700 (max) | 4 | 3.6/4.5 | Differential/ Single-ended | — | 9.1 x 14 x 2.29 SMD |
| MAOM-003414 | Quad Channel 32 Gbps Linear Modulator Driver | P | 32 | 4 | 1000 (max) | 6 | 6 | Differential/ Single-ended | 1.9/ch | 27 x 29 x 6.4 GPPO/SMD |
| MAOM-003417 | Quad Channel 32 Gbps Linear Modulator Driver | P | 32 | 4 | 700 (max) | 4.5 | 3.3/5 | Differential/ Single-ended | 1.13/ch | 9.1 x 14 x 2.29 SMD |
| MAOM-003417B | Quad Channel 32 Gbps Linear Modulator Driver | P | 32 | 4 | 500 (max) | 4.5 | 3.3/5 | Differential/ Single-ended | 1.15/ch | 9.1 x 14 x 2.85 SMD |
| MAOM-003427 | Quad Channel 46 Gbaud Linear Modulator Driver | P | 46 | 4 | 700 (max) | 5 | 3.3/6 | Differential/ Single-ended | 1.8/ch | 13 x 19 x 2.46 SMD |
| MAOM-006416 | Quad Channel 64 Gbaud MZ Modulator Driver | P | 64 | 4 | 300 | 4.5 | 3.3/4.5 | Differential/ Single-ended | 1.1/ch | 9.1 x 14 x 2.29 SMD |

\* Refer to Block Diagrams on pages 6-9

# Optoelectronics & Photonics

## Lasers and Modulators: Metro/Line Side (continued)

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Channels (#) | Min Input Voltage (mVpp) | Max Output Voltage (V) | Supply Voltage (V) | RF I/O Interface | Power Dissipation (W) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|---|
| MAOM-006418 | Quad Channel 64 Gbaud Linear Modulator Driver | P | 64 | 4 | 300 | 4.5 | 3.3 / 4.5 | Differential/ Single-ended | 1.1/ch | 14 x 9.1 x 2.85 SMD |
| MAOM-03404A | 4 x 32 Gbps Differential Limiting MZ Modulator Driver | P | 32 | 4 | 300 | 5 | 3.3 / 4.5 | Differential/ Differential | 0.75/ch | 9.1 x 14 x 2.29 SMD |
| MAOM-03409B | 32 Gb/s Linear Differential Modulator Driver IC | P | 32 | 4 | 300 (max) | 4 | 3.6 / 4.5 | Differential/ Differential | — | 9.1 x 14 x 2.29 SMD |
| MAOM-03417L | Quad Channel Low Power Linear Modulator Driver | P | 32 | 4 | 700 (max) | 3.3 | 3.3 | Differential/ Single-ended | 0.6/ch | 9.1 x 14 x 2.29 SMD |
| MAOM-006408 | Quad Channel 64 Gbaud Linear Modulator Driver Die | P | 64 | 4 | 500 | 3 | — | Differential/ Differential | 0.4/ch | Die |
| MAOM-006412 | Quad Channel 64 Gbaud Linear Modulator Driver Die | P | 64 | 4 | 500 | 4 | — | Differential/ Differential | 0.5/ch | Die |
| MAOM-010567 | 10 Gbps Limiting MZ Modulator Driver | — | 10 | 1 | 250 | 8 | 5 | Single-ended/ Single-ended | 0.6/ch | 11.4 x 8.9 SMD |

## Transimpedance Amplifiers (TIA)

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Differential Transimpedance Gain (kOhms) | Small Signal Bandwidth (GHz) | Input Overload Current (mA) | Input Referred Noise (IRN, RMS nA) (nA) | Output Swing Voltage (mV) | Power Consumption (W) | Supply Voltage (V) |
|---|---|---|---|---|---|---|---|---|---|---|
| M02006 | 155 Mbps AGC Prep-Amplifier | — | 0.2 | 260 | 0.1 | 2.2 | 8 | 300 | 0.15 | 5 |
| M02007 | Low-noise Transimpedance Amplifier with AGC | — | 0.2 | 62 | 0.14 | 2.8 | 8 | 300 | 0.07 | 3.3 |
| M02009 | Low-noise Transimpedance Amplifier with AGC | — | 0.6 | 36 | 0.4 | 4.5 | 70 | 400 | 0.1 | 3.3 |
| M02011 | 622 Mbps AGC Pre-Amplifier | — | 0.6 | 65 | 0.6 | 4 | 50 | 140 | 0.095 | 3.3 |
| M02013 | 3.2 Gbps AGC Pre-Amplifier | — | 3.1 | 10 | 24 | 4 | 475 | 140 | 0.14 | 3.3 |
| M02014 | Transimpedance Amplifier (TIA) with Automatic Gain Control | — | 2.5 | 11 | 1.4 | 4 | 250 | 140 | 0.125 | 3.3 |
| M02015 | 2.5 Gbps AGC Pre-Amplifier | — | 2.5 | 9 | 1.4 | 4 | 290 | 140 | 0.096 | 3.3 |
| M02016 | 1.25 Gbps AGC Pre-Amplifier | — | 1.3 | 24 | 1 | 4 | 130 | 140 | 0.096 | 3.3 |
| M02020 | 4 Gbps CMOS Transimpedance Amplifier with AGC | — | 4.3 | 3.6 | 3.4 | 4 | 550 | 140 | 0.145 | 3.3 |
| M02024 | 2 Gbps AGC Ultra-high Sensitivity Pre-Amplifier | — | 2.5 | 51 | 1.27 | 4 | 180 | 110 | 0.13 | 3.3 |
| M02025 | 100 Mbps to 3.125 Gbps Multirate CMOS TIA with AGC | — | 3.2 | 20 | 1.45 | 4 | 120 | 50 | 0.14 | 3.3 |
| M02026 | 1.25 Gbps CMOS TIA with AGC | — | 1.2 | 112 | 1.05 | 4 | 120 | 210 | 0.13 | 3.3 |
| M02027 | 100 Mbps to 3.1 Gbps Multirate CMOS TIA with AGC | — | 3.1 | 42 | 1.5 | 4 | 91 | — | — | — |
| M02028 | 100 Mbps to 1.25 Gbps Multirate CMOS TIA with AGC | — | 1.2 | 24 | 0.13 | 4 | 80 | 50 | 0.14 | 3.3 |
| M02029 | 100 Mbps to 1.25 Gbps Multirate CMOS TIA with AGC | — | 3.1 | 10 | 1.85 | 4 | 1400 | — | — | — |
| M02035 | Burst Mode OLT TIA | B | 2.5 | 3.6 | 1.7 | 1.5 | 250 | — | — | — |
| M02036 | 2.5 Gbps Burst Mode GPON OLT TIA | B | 1.3 | 3.8 | 0.8 | 2.5 | 170 | — | — | — |
| M02038 | 1.3 Gbps Burst Mode CMOS TIA | B | 1.2 | 8.5 | 0.85 | 4 | 350 | 275 | 0.082 | 3.3 |

# Optoelectronics & Photonics



## Transimpedance Amplifiers (TIA) (continued)

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Differential Transimpedance Gain (kOhms) | Small Signal Bandwidth (GHz) | Input Overload Current (mA) | Input Referred Noise (IRN, RMS nA) (nA) | Output Swing Voltage (mV) | Power Consumption (W) | Supply Voltage (V) |
|---|---|---|---|---|---|---|---|---|---|---|
| M02129 | 8.5 Gbps to 10.3 Gbps TIA with AGC | — | 10.3 | 2 | 7.8 | 3 | 1200 | 200 | 0.115 | 3.3 |
| M02139 | 1 Gbps to 10.3 Gbps TIA with AGC and Rate Select | — | 10.3 | 2.5 | 7.5 | 2.5 | 1500 | 140 | 0.142 | 3.3 |
| M03002 | 28 Gbps Transimpedance Amplifier (TIA) | C, D, G, I | 28 | 2.9 | 22 | 3.5 | 1400 | — | — | — |
| M03100 | 28 Gbps Quad Channel Transimpedance Amplifier | D, I | 28 | 2.9 | 22 | 2.8 | 1400 | — | — | — |
| M03101 | 28 Gbps Quad Channel Transimpedance Amplifier | D, I | 28 | — | 21 | — | — | — | — | — |
| M03102 | 28 Gbps Quad Channel Transimpedance Amplifier | D, I | 28 | — | 21 | — | — | — | — | — |
| MATA-003806 | 28 Gbps Quad Channel Linear TIA for DP-QPSK Advanced Receivers | P | 32 | 10000 | 25 | 3 | 17 | — | — | — |
| MATA-005817 | 56 Gbaud Single Channel Linear TIA | K | 56 | 6 | 35 | 2 | 0 | — | — | — |
| MATA-02135 | 8.5/10/11.3 Gbps Limiting TIA | A, B | 11.3 | 3.4 | 8.2 | 3 | 850 | — | — | — |
| MATA-02238 | 10G EPON Burst Mode TIA with Rate Select | B | 10.3 | 6 | 9 | 1.6 | 1 | — | — | — |
| MATA-03003 | 28 Gbps Quad Channel Transimpedance Amplifier | C, D, G, I | 28 | 3.8 | 21 | 4 | 1400 | — | — | — |
| MATA-03013 | 28 Gbps Quad Channel Transimpedance Amplifier | C, D, G, I | 28 | 3.8 | 21 | 4 | 1400 | — | — | — |
| MATA-03802A | Dual Channel Linear TIA | P | 32 | 5 | 25 | 2 | — | — | — | — |
| MATA-38434 | Quad 4 x 28 Gbaud PAM-4 (56G) Linear TIA | H | 28 / 56 | 4 | 25 | 2 | 2.4 | *CONTACT MACOM* | | |
| MATA-03006 | 28G TIA with APD | I | 28 | 3.8 | 21 | 4 | 1400 | *CONTACT MACOM* | | |
| MATA-03819 | Quad 4x 28 Gbaud PAM-4 (56Gbit) Linear TIA 750 um | H, M | 28 | | | *CONTACT MACOM* | | | | | |
| MATA-03919 | Quad 4x28 Gbaud PAM-4 (56Gbith) Linear TIA 750 um | H, M | 28 | | | *CONTACT MACOM* | | | | | |
| MATA-03820 | Quad 4x28 Gbaud PAM-4 (56G) Linear TIA | H, M | 28 | | | *CONTACT MACOM* | | | | | |
| MATA-03920 | Quad 4x28 Gbaud PAM-4 (56G) Linear TIA | H, M | 28 | | | *CONTACT MACOM* | | | | | |
| MATA-38134 | Quad 4x28 Gbaud PAM-4 (56Gbit) Linear TIA | H, M | 28/53 | | | *CONTACT MACOM* | | | | | |
| MATA-03103 | 28G Quad Channel TIA, 750um pitch for PIN | D, I | 21 | | | *CONTACT MACOM* | | | | | |
| MATA-03106 | 28G Quad Channel TIA, 750um pitch for APD | D, I | 21 | | | *CONTACT MACOM* | | | | | |

* Refer to Block Diagrams on pages 6-9

Exhibit 12, Page 146

# Optoelectronics & Photonics

## Clock & Data Recovery

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Supply Voltage (V) | Power Consumption (W) | Channels (#) | Package Type and Size |
|---|---|---|---|---|---|---|---|
| M21012 | 42 Mbps to 3.2 Gbps Quad Multirate CDR | — | 3.2 | 1.8 – 3.3 | 0.76 | 4 x 4 | 10 mm 72-pin QFN |
| M21050 | High-Performance Duplex Quad (octal) Multirate Clock and Data Recovery | — | 3.2 | 1.8 - 2.5 | 1 | 8 x 8 | 10 mm 72-pin QFN |
| M37045 | Four Channel 25G / 28G CDR with Integrated Input Equalizer | D, I | 24 | 3.3 and 1.8 | — | 4 | 3 x 2 mm Die |
| M37046 | Quad 24G / 26G TIA / LA with Integrated CDR | D, I | 28.1 | 1.8 | 0.1 | 4 | 4 x 4.5 mm CSP |
| M37047 | Four Channel 25G / 28G CDR with Integrated EML Driver | F | 28 | 1.8 & amp; 3.3 | 0.3 | 4 | 4 x 4.5 mm CSP |
| M37049 | Four Channel 25G / 28G CDR with Integrated Input Equalizer | F | 28 | 1.8 | 0.1 | 4 | 4 x 4.5 mm CSP |
| MALD-37059 | Four Channel 25G / 28G CDR with Integrated DML Driver | D, F, I | | Contact MACOM | | | |
| MALD-37045 | Four Channel 25G / 28G CDR with Integrated VCSEL Driver | D, F, I | 28.1 | 1.8 & amp; 3.3 | — | 4 | Die  2 x 3 mm |
| MATA-37145 | Four Channel 25G / 28G CDR with Integrated VCSEL Driver | D, F, I | 28.1 | — | — | 4 | Die  2 x 3 mm |
| MALD-37445 | Quad 25G / 26G CDR/VCSEL Driver with Input Equalizer | D, F, I | 24 | 3.3 and 1.8 | — | 4 | Die  3 x 2 mm |
| MALD-37645 | Multirate 28G VCSEL Driver / CDR with Input Equalizer | F, G | 28 | 1.8 | 0.26 | 1 | Die 2.3 x 1.4 mm |
| MAOM-37051A | Quad 25G / 28G CDR with Integrated Equalization and EML Driver | F, G | 28 | 1.8 | 275 | 4 | 7 x 11 mm SMT |
| MAOM-03757 | Quad 25G / 28G CDR with Integrated Equalization and Amplifier; EML Driver | F, G | 28 | 4 | 600 | 2 | — |
| MAOM-37447A | Quad 25G / 28G CDR with Adaptive Equalization and EML Driver | I | 25.7 | 1.8 | — | 4 | 4 x 4.5 mm CSP |
| MAOM-38051 | Quad 4 x 28 Gbaud PAM-4 (56 Gbit CDR) Die for wirebonding | I | | Contact MACOM | | | Die |
| MAOM-38053 | Quad 4 x 28 Gbaud PAM-4 (56 Gbit CDR) Die for wirebonding | I | | Contact MACOM | | | Die |
| MASC-37028 | Multirate, Dual 28 Gbps CDR with Integrated Laser Driver | C | 28 | 1.8 / 3.3 | — | 2 | 5 mm LGA |
| MASC-37029 | Multirate, Dual 28 Gbps CDR with Integrated Laser Driver | C | 26.5 | 1.8 / 3.3 | — | 2 | 5 mm LGA |
| MASC-37048 | Four Channel 25G/28G CDR with Input Equalizer | D, I | 28 | 1.8 | 0.1 | 4 | 4 x 4.5 mm CSP |
| MASC-37053A | Quad 25G / 28G CDR with Adaptive Equalization and PCML Driver | J | 25.8 | — | — | 4 | 4 x 4.5 mm CSP |
| MASC-37446A | Four Channel 25G / 28G CDR with Integrated Limiting Amplifier | D, F, G, I | 28.1 | 1.8 | 0.1 | 4 | 4 x 4.5 mm CSP |
| MASC-37448A | Four Channel 25G/28G CDR with Input Equalizer | D, F, G, I | 28 | 1.8 | 0.1 | 4 | 4 x 4.5 mm CSP |
| MATA-37044 | Four Channel 25G / 28G CDR with Integrated TIA | D, J, F, G, I | 28.1 | 1.8 & amp; 3.3 | — | 4 | Die  2 x 3 mm |
| MATA-37144 | Four Channel 25G / 28G CDR with Integrated TIA | D, J, F, G, I | 28.1 | — | — | — | Die  2 x 3 mm |
| MATA-37244 | Four Channel 25G / 28G CDR with Integrated TIA / Limiting Amplifier | D, J, F, G, I | 28 | 1.8 & amp; 3.3 | — | 4 | Die  2 x 3 mm |
| MATA-37442 | Quad 24G / 26G TIA / LA with Integrated CDR | FG | 24 | 3.3 and 1.8 | — | 4 | Die  3 x 2 mm |
| MATA-37444 | Quad 24G / 26G TIA / LA with Integrated CDR | FG | 24 | 3.3 and 1.8 | — | 4 | Die  3 x 2 mm |
| MATA-37644 | Multirate 28G CDR with TIA / LA Integrated | FG | 28 | 1.8 | 0.26 | 1 | Die  2.3 x 1.4 mm |

* Refer to Block Diagrams on pages 6-9

Exhibit 12, Page 147

# Optoelectronics & Photonics



## Optical Post Amplifiers

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Supply Voltage (V) | Power Consumption (W) | Channels (#) | Input Sensitivity (mVpp)(mV) | Output Swing Voltage (V) | Package Type and Size |
|---|---|---|---|---|---|---|---|---|---|
| M02040 | 2.1 Gbps, 3.3 or 5 V Post-Amplifier | — | 2.1 | 3.3, 5 | 0.17 | 1 | 2 | 400 | 3 mm QFN |
| M02044 | 622 Mbps Post-Amplifier | — | 0.6 | 3.3, 5 | 0.1 | 1 | 2.5 | — | 5 x 6.2 mm QSOP |
| M02046 | 1.25Gbps, 3.3 or 5 V Post-Amplifier | — | 1.3 | 3.3, 5 | 0.2 | 1 | 2.8 | 800 | 5 x 6.2 mm QSOP |
| M02050 | Integrated High-Gain Limiting Amplifier | A | 2.5 | 3.3 | 0.18 | 1 | 3.5 | 800 | 3 mm QFN |
| M02140 | 12.5 Gbps Low Power 3.3 V Post-Amplifier | C | 12.5 | 3.3 | 0.185 | 1 | 8 | 800 | 4 mm QFN |
| M02142 | 11.3 Gbps Limiting Amplifier | B, C | 11.3 | 3.3 | 0.191 | 1 | 3 | 680 | 3 mm QFN |
| M02049 | 4.3 Gbps Limiting Amplifier | — | 6.144 | 3.3, 5 | 0.09 | 1 | 2.6 | 400 | 3 mm QFN |

## LED / Laser Drivers for Display

| Part Number | Description | Current Per Channel (A) | Max Current (A) | Channels (#) | Programmable Internal PWM Generator (Y/N) | Input Integrated PMIC (Y/N) | Automatic Power Control (Y/N) | Electronic Laser Despeckle (Y/N) |
|---|---|---|---|---|---|---|---|---|
| M08886 | High-Performance RGB LED/Laser Driver with Despeckle Technology for LCD/LCoS/TI DLP¬Æ Projection Displays | 2A | 4A | 3 | Yes | No | Yes | Yes |
| M08888 | High-Performance 2A RGB LED/Laser Driver for LCD/LCoS/TI DLP¬Æ Projection Displays | 2A | 6A | 3 | Yes | No | Yes | No |
| M08889 | High-Performance 2A RGB LED/Laser Driver with Integrated Buck-Boost Converter for LCD/LCoS/TI DLP¬Æ Projection Displays | 2A | 2A | 3 | Yes | Yes | Yes | No |
| M08890 | 3-Channel 2A LED/Laser Driver for Panel Based Projectors | 2A | 6A | 3 | Yes | No | No | No |
| M08898 | 4-Channel 2A LED/Laser Driver for Panel Based Projectors | 2A | 8A | 4 | Yes | No | No | No |
| M08980 | LED Driver and PMIC and Stepper Motor Driver for TI DLP¬Æ Displays | 1.2A | 1.2A | 3 | No | Yes | No | No |
| M09000 | LED Driver and PMIC for TI DLP¬Æ Displays in QFN Package | 1.2A | 1.2A | 3 | No | Yes | No | No |
| M09001 | LED Driver and PMIC for TI DLP¬Æ Displays | 1.2A | 1.2A | 3 | No | Yes | No | No |

## Silicon Photonics

| Part Number | Description | Reach (Km) | Max Data Rate (Gbps) | Channels (#) | Temperature Range (°) | Package Type |
|---|---|---|---|---|---|---|
| MAOP-L284CN | 100G CWDMA L-PIC™ with Integrated Laser, Modulators, and MUX | 2 | 100 | 4x 28 Gbps | 0 to 80 | Die |
| * MAOP-R284CN | 100G CWDM4 R-PIC™ Receiver with Monolithic Demux and Photodiodes | 2 | 100 | 4 x 28 Gbps | 0 to 80 | Die |
| * MAOP-L561PP | 100G Single Lambda L-PIC™ with Integrated Laser and Modulator | 2 | 100 | 1 x 100 Gbps | 0 to 80 | Die |
| * MAOP-L564CP | 400G CWDM4 PAM-4 L-PIC™ Integrated Laser, Modulators, and MUX | 2 | 400 | 4 x 100 Gbps | 0 to 80 | Die |
| * MAOP-L101PN | 10G XG-PON L-PIC™ with Integrated Laser and Modulator | 20 | 10 | 1 x 10 Gbps | 0 to 80 | Die |
| * 157D-10G-xT6xx | 10G XG-PON TOSA with MAOP-L101PN L-PIC™ and Micro-TEC in TO-Can coaxial package | 20 | 10 | 1 x 10 Gbps | 0 to 70 | TO-Can |

* In development, sampling late 2018

# Photonic Devices

## 2.5G Fabry-Perot Lasers

| Part Number | Description and Applications | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 131F-02I-KCT11 | Die, Laser, 2.5G FP NFF, Chip on Tape Applications: SDH, PON, Access, Optical Ethernet | A | 2.5 | 1310 | -40 to 85 | Die  265 x 250 x 100 |
| 131F-02I-LCT11 | Die, Laser, 2.5G FP, Chip on Tape Applications: PON, Access, Optical Ethernet | A | 2.5 | 1310 | -40 to 85 | Die  250 x 250 x 100 |

## 10G Fabry-Perot Lasers

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 131F-10I-LCT11-S | 10G Hi-BW 1310 nm FP LD Applications: Optical Ethernet, Fibre Channel | A | 10 | 1310 | -40 to 85 | Die  250 x 250 x 100 |
| 131F-10I-LT5K1C-S | 10G Hi-BW 1310 nm FP TO-Can Applications: Telecom, Optical Ethernet, Wireless | A | 10 | 1310 | -40 to 85 | TO-Can  TO-56 |

## 2.5G Distributed Feedback Lasers

| Part Number | Description and Applications | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 127D-02I-VT5AB | 1270 nm Edge Emitting Narrow Farfield DFB Laser Applications: NG-PON | A, B | 2.5 | 1270 | -40 to 85 | Aspherical lens cap (FL+7.5 mm) in hermetic TO-56 package |
| 127D-02I-VCT11 | 1270 nm Edge Emitting Narrow Farfield DFB Laser Applications: NG-PON | A, B | 2.5 | 1270 | -40 to 85 | Die  265 x 250 x 100 |
| 131D-02E-VCT11-50x | Die, Laser, 2.5G DFB NFF, Small Size, Chip on Tape Applications: PON, Access, Optical Ethernet, SDH | A, B | 2.5 | 1310 | -20 to 85 | Die  265 x 250 x 100 |
| 131D-02E-VT5TB-50x | TO, Laser, 2.5G DFB NFF, 2 mm Ball Lens (6.6 mm FL), Pinout Type B Applications: PON, Access, Optical Ethernet, SDH | A, B | 2.5 | 1310 | -20 to 85 | TO-Can  TO-56 |

## 10G Distributed Feedback Lasers

| Part Number | Description and Applications | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 127D-10G-LCT11-504 | 10G Hi-BW 1270 nm CWDM DFB LD (WL -3.5/+2.5nm) Applications: Data Center, 40G QSFP Module, Optical Ethernet, Fibre Channel | B | 10 | 1270 | -5 to 85 | Die  250 x 300 x 100 |
| 127D-10G-LT5AC-504 | 10G Hi-BW 1270 nm DFB TO-Can Applications: Mobile Fronthaul/Backhaul, Optical Ethernet | B | 10 | 1270 | -5 to 85 | TO-Can  TO-56 |
| 127D-10I-LT5AC-504 | TO, Laser, 10G DFB, 1270 ±10 nm, Asph Lens, Pinout Type C Applications: Mobile Fronthaul/Backhaul, Optical Ethernet | B, E | 0 | 1270 | -40 to 85 | TO-Can  TO-56 |
| 129D-10G-LCT11-504 | Die, Laser, 10G DFB, 1290 -3.5 nm/+2.5 nm, Chip on Tape Applications: Data Center, 40G QSFP Module, Optical Ethernet, Fibre Channel | B | 10 | 1290 | -5 to 85 | Die  250 x 300 x 100 |
| 131D-10G-LCT11-504 | 10G Hi-BW 1310 nm CWDM DFB LD (WL -3.5 /+2.5 nm) Applications: Data Center, 40G QSFP Module, Optical Ethernet, Fibre Channel | B | 10 | 1310 | -5 to 85 | Die  250 x 300 x 100 |

* Refer to Block Diagrams on pages 6-9

Exhibit 12, Page 149

# Photonic Devices



## 10G Distributed Feedback Lasers (continued)

| Part Number | Description and Applications | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 131D-10G-LT5RC-S | TO, Laser, 10G DFB, 2 mm Ball Lens, WL= ±10 nm, Pinout Type C. Applications: Optical Ethernet, Fibre Channel, SFP Module, Mobile (4G LTE), Data Center | B | 10 | 1310 | -5 to 85 | TO-Can   TO-56 |
| 131D-10I-LT5RC-504 | TO, Laser, 10G DFB, 2 mm Ball Lens, WL= ±10 nm, Pinout Type C. Applications: Optical Ethernet, Fibre Channel, SFP Module, Mobile (4G LTE), Data Center | B, E | 10 | 1310 | -40 to 85 | Die   250 x 300 x 100 |
| 133D-10G-LCT11-504 | Die, Laser, 10G DFB, 1330 -3.5 nm /+2.5 nm, Chip on Tape. Applications: Data Center, 40G QSFP Module, Optical Ethernet, Fibre Channel | B | 10 | 1330 | -5 to 85 | Die   250 x 300 x 100 |
| 133D-10G-LT5AC-S | 10G Hi-BW 1330 nm DFB TO-Can. Applications: Mobile Fronthaul/Backhaul, Optical Ethernet | B, E | 10 | 1330 | -5 to 85 | TO-Can   TO-56 |
| 133D-10I-LT5AC-504 | TO, Laser, 10G DFB, 1330 ±10 nm, Asph Lens, Pinout Type C. Applications: Mobile Fronthaul/Backhaul, Optical Ethernet | B, E | 10 | 1330 | -40 to 85 | TO-Can   TO-56 |

## 25G Distributed Feedback Lasers

| Part Number | Description and Applications | Block Diagram Key* | Max Data Rate (Gbps) | Wavelength (nm) | Temp Options (°C) | Package Type and Size (um) |
|---|---|---|---|---|---|---|
| 127D-25G-LCT11 | CWDM Edge Emitting DFB Laser. Applications: Optical Ethernet 25 Gbps/100 Gbps, Data Center, CWDM | C, D | 25 | 1271 | -5 to 85 | Die  250 x 250 x 100 |
| 1295-25B-LCT11-S3 | Die, laser, 25G DFB, 1300.05 ± 1 nm, Chip on Tape. Applications: Data Center, 100G Base-LR4 | C, I | 25 | 1295 | 0 to 85 | Die  250 x 250 x 100 |
| 129D-25G-LCT11 | CWDM Edge Emitting DFB Laser. Applications: Optical Ethernet 25 Gbps/100 Gbps, Data Center, CWDM | C, D | 25 | 1291 | -5 to 85 | Die  250 x 250 x 100 |
| 1300-25B-LCT11-S3 | Die, Laser, 25G DFB, 1300.05 ± 1 nm, Chip on Tape. Applications: Data Center, 100G Base-LR4 | C, I | 25 | 1300 | 0 to 85 | Die  250 x 250 x 100 |
| 1304-25B-LCT11-S3 | Die, Laser, 25G DFB, 1304.58 ± 1 nm, Chip on Tape. Applications: Data Center, 100G Base-LR4 | C, I | 25 | 1304 | 0 to 85 | Die  250 x 250 x 100 |
| 1309-25B-LCT11-S3 | Die, Laser, 25G DFB, 1309.14 ± 1 nm, Chip on Tape. Applications: Data Center, 100G Base-LR4 | C, I | 25 | 1309 | 0 to 85 | Die  250 x 250 x 100 |
| 131D-25G-LCT11 | CWDM Edge Emitting DFB Laser. Applications: Optical Ethernet 25 Gbps/100 Gbps, Data Center, CWDM | C, D | 25 | 1311 | -5 to 85 | Die  250 x 250 x 100 |
| 131D-25G-LCT11-502 | Laser, DE, 25G, DFB, 1310 nm, WL= +/-15 nm, CT. Applications: Optical Ethernet 25 Gbps/100 Gbps, Data Center, CWDM | C, D | 25 | 1310 | -5 to 85 | Die   250 x 250 x 100 |
| 131D-25G-LT5TC | 1310 nm Edge Emitting DFB Laser in TO-56 Package 25 Gbps. Applications: SFP28 | C | 25 | 1310 | -5 to 85 | TO-56   5.6 mm dia. |
| 133D-25G-LCT11 | CWDM Edge Emitting DFB Laser. Applications: Optical Ethernet 25 Gbps/100 Gbps, Data Center, CWDM | C, D | 25 | 1331 | -5 to 85 | Die  250 x 250 x 100 |

* Refer to Block Diagrams on pages 6-9

Exhibit 12, Page 150

# Photonic Devices

## Photodiodes: APD

| Part Number | Description and Applications | Block Diagram Key* | Model | Bandwidth (GHz) | Wavelength (nm) | Responsivity (A/W) | Sensitivity (dBm) | Capacitance (fF) | Package Type |
|---|---|---|---|---|---|---|---|---|---|
| 32420-01 | 10G APD, Backside Illuminated | B | APD10B | 12 | 1250–1650 | 0.8 | -28.5 | 105 | CoC |
| 32420-02 | Applications: NG-PON | | APD10B-ES | 10 | 1250–1650 | 0.8 | -29.5 | 90 | CoC |
| 32422-01FG | | | APD10B | 12 | 1250–1650 | 0.8 | -28.5 | 105 | Die |
| 32422-02FG | | | APD10B-ES | 12 | 1250–1650 | 0.8 | -28.5 | 90 | Die |
| | | | | | | | | | |
| 32391-03-PPR | 28G APD, Backside Illuminated, | C, I | APD28A | 20 | 1250–1650 | 0.8 | -20 | 50 | Die |
| 32392-03-PPR | integrated lens option | | APD28A | 20 | 1250–1650 | 0.8 | -20 | 50 | Die |
| 32411-03-PPR | Applications: 25G or 100G ER4 | | APD28A | 20 | 1250–1650 | 0.8 | -20 | 50 | CoC |
| 32411-04-PPR | | | APD28A | 20 | 1250–1650 | 0.8 | -20 | 50 | CoC |
| 32412-03-PPR | | | APD28A | 20 | 1250–1650 | 0.8 | -20 | 50 | CoC |

## Photodiodes: PIN

| Part Number | Description and Applications | Block Diagram Key* | Model | Bandwidth (GHz) | Wavelength (nm) | Responsivity (A/W) | Sensitivity (dBm) | Capacitance (fF) | Package Type |
|---|---|---|---|---|---|---|---|---|---|
| 32436-04-PPR | 28G PIN Backside Illuminated, | C, I | BSP28B | 25 | 1200–1650 | 0.88 | — | 95 | Die |
| 32438-04-PPR | integrated lens option | | BSP28B | 25 | 1200–1650 | 0.88 | — | 95 | CoC |
| | Applications: 25G or 100G LR4 | | | | | | | | |
| | | | | | | | | | |
| 32436-01-PPR | 56G PIN, Backside Illuminated, | K, L, M | BSP56B | 30 | 1200–1650 | 0.8 | — | 50 | Die |
| 32438-01-PPR | integrated lens option | | BSP56B | 30 | 1200–1650 | 0.8 | — | 50 | CoC |
| | Applications: 100G PAM-4 | | | | | | | | |

## Planar Lightwave Circuits: CWDM MUX/DEMUX

| Part Number | Description and Applications | Block Diagram Key* | Channels (#) | Passband (PB) (nm) | Center Wavelength Accuracy ($\Delta\lambda$) (nm) | Channel Spacing (CS) (nm) | 1 dB Bandwidth (nm) | Pitch (um) | Chip Size (mm) |
|---|---|---|---|---|---|---|---|---|---|
| A0410-DXX | 4 X 10 Gbps CWDM AWG Chip DEMUX Applications: Datacom 40G CWDM4 | D | 4 | +/- 6.5 | +/-1 | 20 | 13 | 250 | 2.5 x 10 |
| A0410-MXX | 4 X 10 Gbps CWDM AWG Chip MUX Applications: Datacom 40G CWDM4 | D | 4 | — | +/-1 | 20 | 11 | 1100 | 4 x 10 |
| A0425-DXX | 4 X 25 Gbps CWDM AWG Chip DEMUX Applications: Datacom 100G CWDM4 | D | 4 | +/- 6.5 | +/-1 | 20 | 13 | 750 | 4 x 10 |
| A0425-MXX | 4 X 25 Gbps CWDM AWG Chip MUX Applications: Datacom 100G CWDM4 | D | 4 | — | +/-1 | 20 | 11 | 1100 | 4 x 10 |

## Planar Lightwave Circuits: LANWDM MUX/DEMUX

| Part Number | Description and Applications | Block Diagram Key* | Channels (#) | Passband (PB) | Center Wavelength Accuracy ($\Delta\lambda$) | Channel Spacing (CS) (nm) | 1 dB Bandwidth (nm) | Pitch (um) | Package Size (mm) |
|---|---|---|---|---|---|---|---|---|---|
| A0425-DLX | 4 X 25 Gbps LANWDM AWG Chip DEMUX Applications: Datacom 100G LR4 | I | 4 | +/-1 | +/- 0.5 | 4.5 | 2.8 | 750 | 4 x 10 |
| A0425-MLX | 4 X 25 Gbps LANWDM AWG Chip MUX Applications: Datacom 100G LR4 | I | 4 | — | +/- 0.5 | 4.5 | 2.2 | 1100 | 4 x 9.5 |

18    * Refer to Block Diagrams on pages 6-9

# Network Connectivity



## OTN: Framer/Mapper/FEC

| Part Number | Description | Max Data Rate (Gbps) | Switch Matrix Size I/O Matrix | Supply Voltage (V) | Channels (#) | Embedded CDR (Y/N) | Embedded SerDes (Y/N) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|
| S10123 | 10G OTN Framer/Mapper/FEC | 11.3 | 1 x 1 | 2.5, 1.8, 1.2 | 1 | Yes | Yes | 19 mm 324-pin FCBGA |
| S10124 | 10G OTN Framer/Mapper/FEC | 11.3 | 1 x 2 | 2.5, 1.8, 1.2 | 1 | Yes | Yes | 25 mm 576-pin FCBGA |
| S10126 | 10G OTN Framer/Mapper/FEC | 11.3 | 1 x 1 | 2.5, 1.8, 1.2 | 1 | Yes | Yes | 19 mm 324-pin FCBGA |
| S12312 | 24 x 10G/40G/100G OTN & MACsec | 11.2 | 24 x 24 | 1.8, 1.5, 1.2, 0.9 | 24 | Yes | Yes | 42.5 mm 1680-pin FCBGA |
| S12411 | 12 x 10G/40G/100G OTN & MACsec | 28 | 12 x 12 | 1.8, 1.5, 1.2, 0.9 | 12 | Yes | Yes | 29 mm 783-pin FCBGA |
| S12412 | 24 x 10G/40G/100G OTN & MACsec | 27.96 | 24 x 24 | 1.8, 1.5, 1.2, 0.9 | 24 | Yes | Yes | 42.5mm 1680-pin FCBGA |
| S20101 | PQ20T: 2 x 10G OTN Framer/Mapper/FEC | 11.19 | 2 x 2 | 2.5, 1.2, 0.9 | 4 | Yes | Yes | 35 mm 1155-pin  FCBGA |
| S40101 | PQ40T:4 x 10G/40G OTN Framer/Mapper/FEC | 11.19 | 4 x 4 | 2.5, 1.2, 0.9 | 4 | Yes | Yes | 35 mm 1155-pin  FCBGA |
| S50101 | PQ50: 5 x 10G/40G OTN Framer/Mapper/FEC | 11.19 | 5 x 5 | 2.5, 1.2, 0.9 | 5 | Yes | Yes | 35 mm 1155-pin  FCBGA |
| S60101 | PQ60T: 6 x 10G/40G OTN Framer/Mapper/FEC | 11.19 | 6 x 6 | 2.5, 1.2, 0.9 | 6 | Yes | Yes | 35 mm 1155-pin  FCBGA |

## Ethernet MACsec PHY

Block Diagram Key*

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Switch Matrix Size I/O Matrix | Supply Voltage (V) | Channels (#) | Embedded CDR (Y/N) | Embedded SerDes (Y/N) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|
| S12611 | 12 x 10G/40G/100G MACsec | N | 27.96 | 12 x 12 | 1.8, 1.5, 1.2, 0.9 | 12 | Yes | Yes | 29 mm 783-pin FCBGA |
| S12612 | 12 x 10G/40G/100G OTN & MACsec | N | 27.96 | 24 x 24 | 1.8, 1.5, 1.2, 0.9 | 24 | Yes | Yes | 42.5 mm 1680-pin FCBGA |
| S20020 | 100G/50G/40G/50G/25G/ 10G MACsec, 512SA | N | 26.56 | 8 x 8 | 1.8, 0.9 | 8 | Yes | Yes | 17 mm 256-pin HFCBGA |

## Ethernet PHY

| Part Number | Description | Block Diagram Key* | Max Data Rate (Gbps) | Switch Matrix Size I/O Matrix | Supply Voltage (V) | Channels (#) | Embedded CDR (Y/N) | Embedded SerDes (Y/N) | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|---|---|
| MATP-10025A | PRISM: 1 x 53 Gbaud PAM-4 PHY with FEC and Integrated Laser Driver | K | 106.25 | 1 x 1 | 1.8, 1.0, 0.75 | 1 | Yes | Yes | 10 mm 177-pin HFCBGA |
| MATP-40050A | PRISM4: 4 x 53 Gbaud PAM-4 PHY for 400G Optical Modules | L | 106.25 | 4 x 4 | 1.8, 1.0, 0.75 | 4 | Yes | Yes | 11 mm 441-pin HFCBGA |
| QT2025 | 10GE Serial to XAUI PHY for 10GBASE-LRM, LR, SR, 10G BASE-KR | — | 10.52 | 1 x 1 | 1.8, 1.2 | 1 | Yes | Yes | 13 mm 144-pin PBGA |
| QT2225 | Dual 10GE Serial-to-XAUI PHY for SFP+ and Serial Backplane | — | 10.52 | 2 x 2 | 1.8, 1.2 | 2 | Yes | Yes | 23 mm 484-pin BGA |
| S28010 | 100 Gbps Gearbox with CAUI-10 to CAUI-4 | E | 27.96 | 1 x 1 | 2.5, 1.2, 0.9 | 1 | Yes | Yes | 17 mm 248-pin HFCBGA |
| S28110 | 100 Gbps Gearbox with CAUI-10 Retimer Mode | E | 27.96 | 10 x 10 | 2.5, 1.2, 0.9 | 10 | Yes | Yes | 19 mm 324-pin HFCBGA |
| S28115 | 100 Gbps Multi-Link Gearbox | E | 25.78 | 10 x 10 | 2.5, 1.2, 0.9 | 10 | Yes | Yes | 19 mm 324-pin HFCBGA |

## Embedded Processors

| Part Number | Description | Clock Frequency (GHz) | DDR3 + ECC | 10/100/100 Ethernet | Typical Power (W) | USB 2.0 with PHY | Package Type and Size (mm) |
|---|---|---|---|---|---|---|---|
| APM86190 | Single Core Power™ Processor | 800 MHz–1.2 GHz | 64b/32b | 2 GbE:  2 RGMII | Single Core 5.49 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86290 | Dual Core Power™ Processor | 800 MHz–1.2 GHz | 64b/32b | 2 GbE: 2 RGMII | Dual Core 7.06 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86391 | Single Core Power™ Processor | 600 MHz–1 GHz | 32b | 2 GbE: 2 RGMII | Single Core 4.09 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86392 | Dual Core Power™ Processor | 600 MHz–1 GHz | 32b | 2 GbE: 2 RGMII | Dual Core 5 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86691 | Single Core Power™ Processor | 800 MHz–1.2 GHz | 64b/32b | 4 GbE: 2 RGMII, up to 4 SGMII | Single Core  5.49 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86692 | Dual Core Power™ Processor | 800 MHz–1.2 GHz | 64b/32b | 4 GbE: 2 RGMII, up to 4 SGMII | Dual Core 7.06 W @ 1 GHz | 3 | 27 x 27 FC-PBGA |
| APM86491 | Single Core Power™ Processor | 800 MHz–1 GHz | 16b/32b | 2 GbE:  2 RGMII | 3.65 W @ 1 GHz | 2 (USB 3.0) | 19 x 19 WB-PBGA |
| APM86791 | Single Core Power™ Processor | 800 MHz–1 GHz | 16b/32b | 4 GbE: 2 RGMII, 2 SGMII | 3.65 W @ 1 GHz | 2 | 9 x 19 WB-PBGA |

* Refer to Block Diagrams on pages 6-9

# High Speed Optical Receivers

## Test & Measurement Receivers

| Part Number | Description | Type | Bandwidth (GHz) | Wavelength (nM) | Sensitivity (dBm) | Responsivity (A/W) | Gain (V/W) |
|---|---|---|---|---|---|---|---|
| 11059-02 | AD-40APDir-FC | APD Instrument | 12 | 1250 – 1650 | -27 | — | 3500 |
| 11058-02P | AD-40xr-FC | XR Instrument | 12 | 700 – 1650 | -19 | — | 400 |
| 11001-03 | D-15-FC | VIS-ir Instrument | 30 | 400 – 1700 | — | 0.2 | — |
| 11212-01P | D-32xr-FC | XR Instrument | 28 | 800 -1650 | — | 0.77 | — |
| 11057-02 | D-8ir-FC | IR Instrument | 50 | 950 – 1650 | — | 0.7 | — |
| 11012-05P | DG-15ir-FC | IR Instrument | 20 | 950 – 1650 | — | 0.6 | — |
| 11206-01 | DG-32xr-FC | XR Instrument | 28 | 800 – 1650 | — | 0.77 | — |
| 11204-01 | DGM-32xr-FC | XR Photodetector | 28 | 800 – 1600 | — | 0.77 | — |
| 11204-05 | DGM-32xr-DMD | XR Photodetector | 28 | 800 – 1600 | — | 0.77 | — |
| 11204-06 | DGM-32xr-SC | XR Photodetector | 28 | 800 – 1600 | — | 0.77 | — |
| 11069-02 | P-18A/3K/Z50/FC | IR Photodetector | 19 | 1200 – 1650 | — | 0.9 | — |
| 11112-04 | P-40HPA/8V/Z50/AC/SC | IR Photodetector | 40 | 1200 – 1650 | — | 0.65 | — |
| 11113-04 | P-40HPA/8V/Z50/DC/SC | IR Photodetector | 40 | 1200 – 1650 | — | 0.65 | — |
| 11113-05 | P-40HPA/8V/Z50/DC/FC | IR Photodetector | 40 | 1200 – 1650 | — | 0.65 | — |
| 11088-05 | P-50A/8V/Z50/DC/FC | IR Photodetector | 50 | 1200 – 1650 | — | 0.5 | — |
| 11238-01 | P-50C/8V/Z50/DC/FC | IR Photodetector | 50 | 1200 – 1650 | — | 0.7 | — |
| 11241-01P | P-70A/8V/Z50/FC | IR Photodetector | 70 | 1200 – 1650 | — | 0.5 | — |
| 11104-05 | PT-10SFA/17LP/DC/SC | IR Photodetector | 8.5 | 1200 – 1650 | -20 | 1 | 700 |
| 11044-16 | PT-12B/8SMA/TDC/FC | XR Photodetector | 9.5 | 750 – 1650 | -20 | 0.55 | 450 |
| 11232-01 | PT-28E/12XLMD/AC/FC | IR Photodetector | 30 | 1200 – 1650 | — | 0.78 | 1900 |
| 11245-01-PPR | PT-28F/8XLMD/DC/FC/SM | IR Photodetector | 30 | 1200 – 1650 | — | 0.75 | 95 |
| 11237-01P-PPR | PT-28F/10GDPPO/DC/FC | XR Photodetector | 30 | 1200 – 1650 | — | 0.75 | 95 |
| 11174-04 | PT-40G/8LDGPPO/AC/LC/B1 | IR Photodetector | 35 | 1200 – 1650 | -11 | 0.65 | 4200 |
| 11174-05 | PT-40G/8XLMD/AC/LC | IR Photodetector | 35 | 1200 – 1650 | -11 | 0.65 | 4200 |
| 11174-06 | PT-40G/8XLMD/AC/FC/B1 | IR Photodetector | 35 | 1200 – 1650 | -11 | 0.65 | 4200 |
| 11174-07 | PT-40G/8XLMD/AC/FC | IR Photodetector | 35 | 1200 – 1650 | -11 | 0.65 | 4200 |
| 11243-01 | PT-50A/8V/DC/FC | IR Photodetector | 50 | 1200 – 1650 | — | 0.55 | 105 |
| 11000-03 | PX-D7-FC | VIS-ir Instrument | 60 | 400 – 900 | — | 0.03 | — |

## Transmission Receivers

| Part Number | Description | Type | Bandwidth (GHz) | Wavelength (nM) | Sensitivity (dBm) | Responsivity (A/W) | Gain (V/W) |
|---|---|---|---|---|---|---|---|
| 11218-02 | AT-10D/5MMLC/8FPC | APD ROSA | 8.5 | 1200 – 1600 | -28.5 | 0.8 | 25000 |
| 11153-02 | AT-10SFA/17LP/AC/MM/FCs | APD Receiver | 8.5 | 1250 – 1650 | -28 | 0.8 | 1240 |
| 11233-01 | AT-10SFH/17LP/AC/MM/FC | APD Receiver | 10.5 | 1250 – 1650 | -28.5 | 0.7 | 12000 |
| 11219-03 | AT-2.5A/5MMLC/8FPC | APD ROSA | 2 | 1200 – 1600 | -35 | 0.7 | — |
| 11215-01P | AT-2.5SFB/17LP/AC/MM/FC | APD Receiver | 1.7 | 1250 – 1650 | -33 | 0.7 | 7100 |
| 11226-01 | AT-2.5SFB/ER/17LP/AC/MM/FC | APD Receiver | 1.7 | 1250 – 1650 | -3.4 | 0.7 | 14000 |
| 11132-03 | PT-15SFA/17LP/AC/LC | PIN Receiver | 12.5 | 1200 – 1650 | -16.5 | 0.75 | 700 |

20

# Package Guide



## Photonics

Die 

TO-Can   TO56, TO46 

L-PIC™ Silicon Photonic Die 

## Ethernet PHYs and OTN Framers

PQX    S28010 

Yahara    S28110 

ES200    S28115 

X240    QT2225 

MATP-10025/6
MATP-40050/1    QT2025 

## Optoelectronics

4 x 4.5 mm CSP
3 mm QFN
4 mm QFN
5 mm QFN
10 mm 72-pin QFN



Surface Mount Devices (SMD)

  

Modules



## Crosspoint Switches

3 mm QFN
4 mm 24-pin QFN
6 mm 10-pin QFN
10 mm 72-pin QFN
12 mm 88-pin QFN

17 mm 252-pin BGA
19 mm 324-pin BGA
21 mm 484-pin / 1924-pin BGA
23 mm 484-pin / 1924-pin BGA
23 mm 404-pin PBGA
27 mm 676-pin BGA
34 mm PBGA
35 mm 1156-pin BGA
35 mm 676-pin TEPBGA
35 mm 1936-pin FCBGA
50 mm 2389-pin BGA





## ROSA & TOSA (Optical Sub Assemblies)



Exhibit 12, Page 154



*Partners from RF to Light*

Additional product information
can be found on our website at:
**www.macom.com**

Contact our worldwide sales
offices, authorized representatives,
and industry-leading distributors
to request samples, test boards,
and application support. All contacts
are listed on our website at:
**www.macom.com/purchases**

**MACOM Technology Solutions Inc.**
100 Chelmsford Street
Lowell, Massachusetts 01851

North America
800.366.2266

Europe
+353.21.244.6400

India
+91.80.43537383

China (Shanghai)
+86.21.6042.8200

www.macom.com
MTS-L-072018

# EXHIBIT 13

Case 8:19-cv-00220-JVS-JDE   Document 45   Filed 03/29/19   Page 147 of 167   Page ID #:919

US005343160A

# United States Patent [19]

## Taylor

[11] Patent Number: 5,343,160

[45] Date of Patent: Aug. 30, 1994

[54] **FULLY BALANCED TRANSIMPEDANCE AMPLIFIER WITH LOW NOISE AND WIDE BANDWIDTH**

[75] Inventor: **Stewart S. Taylor**, Beaverton, Oreg.

[73] Assignee: **TriQuint Semiconductor, Inc.**, Beaverton, Oreg.

[21] Appl. No.: **964,173**

[22] Filed: **Oct. 21, 1992**

[51] Int. Cl.$^5$ ........................... H03F 1/14; H03F 3/08
[52] U.S. Cl. ...................................... 330/9; 330/295; 330/308
[58] Field of Search ............... 330/9, 124 R, 129, 253, 330/282, 295, 308

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,808,942 | 2/1989 | Milkovic | 330/9 |
| 5,095,286 | 3/1992 | Cole et al. | 330/308 |

*Primary Examiner*—Steven Mottola

*Attorney, Agent, or Firm*—Skjerven, Morrill, MacPherson, Franklin & Friel

[57] **ABSTRACT**

A circuit is provided that solves the problem of implementing a fully balanced (differential) transimpedance amplifier with low-noise and wide bandwidth. This is accomplished by direct coupling the feedback resistors from the outputs of the amplifier to the inputs without the use of a blocking capacitor. The low frequency response is thereby improved and the problems created by a DC bias resistor that degrades the noise performance and, in some case, restricts the dynamic range (caused by pulse width distortion for large signals) are eliminated. The amplifier achieves higher voltage gain than prior designs and also results in lower noise and wider bandwidth. The differential nature of the amplifier provides good power supply rejection. While the preferred embodiment is particularly well-suited to GaAs MESFET technology, the invention can also be applied to silicon bipolar and MOS technology.

**42 Claims, 5 Drawing Sheets**



Exhibit 13, Page 157



Figure 1
(Prior Art)

Exhibit 13, Page 158



# Figure 2



Figure 3

**U.S. Patent**          Aug. 30, 1994          Sheet 4 of 5          **5,343,160**



Figure 4

**U.S. Patent**   Aug. 30, 1994   Sheet 5 of 5   **5,343,160**



Figure 5

5,343,160

1

# FULLY BALANCED TRANSIMPEDANCE AMPLIFIER WITH LOW NOISE AND WIDE BANDWIDTH

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to amplifier circuits and more particularly to differential transimpedance amplifier circuits.

### 2. Description of the Relevant Art

Fully balanced or differential transimpedance amplifiers are utilized in a variety of applications where it is desirable to convert a current-varying signal into a voltage-varying signal. One such application is within optical receiver systems where the transimpedance amplifier is used to convert the current-varying output signal of a photodetector into a voltage signal that is processed by other circuitry. Although fully balanced or differential transimpedance amplifiers are typically associated with favorable power supply rejection characteristics, they are also often characterized with a relatively low voltage gain, a large low-cutoff frequency, poor noise performance, limited dynamic range, and/or a low bandwidth.

A typical differential transimpedance amplifier circuit for an optical receiver system is shown in FIG. 1. The amplifier includes a differential pair of transistors 10 and 11 and source follower transistors 13 and 14 connected through level shifting diodes 16 and 17. Feedback resistors 19 and 20 couple output voltages $V_{01}$ and $V_{02}$ to the gate inputs of transistors 10 and 11 to broadband the amplifier (i.e. increase the bandwidth) and stabilize the DC bias point. One terminal of a photodetector 22 (typically a metal-semiconductor-metal (MSM) detector) is DC coupled to the gate of transistor 10 while a second terminal is AC coupled to the gate of transistor 11 with a blocking capacitor 23. This coupling allows the photocurrent from photodetector 22 to circulate partially through resistors 19 and 20 to produce a balanced differential output voltage- Noise on power supply $V_{DD}$ is partially common-mode and is partly rejected by the next differential stage- Bias resistor 25 establishes the DC voltage at the second terminal of photodetector 22 to provide the required bias voltage.

The amplifier circuit of FIG. 1 is differential and thus provides a moderate amount of power supply rejection. However, the amplifier has a relatively low voltage gain, a relatively large low-cutoff frequency, poor noise performance, limited dynamic range, and/or low bandwidth. The voltage gain is low because the voltage drop across the load resistors 27 and 28 is small- The low-cutoff frequency is high because the on-chip capacitor 23 is small. The noise performance is poor because the voltage gain of the input stage is low (more proportional noise contribution from resistors 19, 20, 27 and 28, and the second stage) and because bias resistor 25 is usually small. To achieve high bandwidth, resistors 19 and 20 must be small because of the low voltage gain. This degrades noise performance as mentioned previously. If resistors 19 and 20 are chosen to be large for good noise performance, the bandwidth will be low because of the low voltage gain.

A differential transimpedance amplifier that rejects power supply noise, that has a relatively large voltage gain (to improve both the noise performance and bandwidth), that has a small low-frequency cutoff, and that

2

has a means for establishing the DC bias potential across the input photodetector without the use of a bias resistor (which degrades noise performance and limits dynamic range) is therefore desirable.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a circuit is provided that solves the problem of implementing a fully balanced (differential) transimpedance amplifier with low-noise and wide bandwidth. This is accomplished by direct coupling the feedback resistors from the outputs of the amplifier to the inputs without the use of a blocking capacitor. Supplemental voltage offset means establishes the correct DC bias voltage across the photodetector. The low frequency response is thereby improved and the problems created by a DC bias resistor that degrades the noise performance and, in some cases, restricts the dynamic range (caused by pulse-width distortion for large signals) are eliminated. An amplifier in accordance with the invention achieves higher voltage gain than prior designs and also results in lower noise and wider bandwidth. The differential nature of the amplifier provides good power supply rejection. While the preferred embodiment is particularly well-suited to GaAs (gallium arsenide) MESFET technology, the invention can also be applied to other compound semiconductor technologies, as well as silicon bipolar and MOS technologies.

These and other advantages are achieved with the present invention, in accordance with which a balanced transimpedance amplifier circuit comprises first and second amplifier circuits for amplifying signals at first and second input lines, a first capacitor coupled between the first input line and the first amplifier, and a second capacitor coupled between the second input line and the second amplifier circuit. The balanced transimpedance amplifier circuit further comprises a first feedback network coupled between the first amplifier circuit and the first input line, a second feedback network coupled between the second amplifier circuit and the second input line, and first and second voltage offset means coupled in series with the first and second feedback networks, respectively.

The invention will be more readily understood with reference to the drawings and the detailed description. As will be appreciated by one skilled in the art, the invention is applicable to differential transimpedance amplifiers in general and is not limited to the specific embodiment disclosed.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram illustrating a typical differential transimpedance amplifier circuit used within an optical receiver system.

FIG. 2 is a block diagram illustrating a first embodiment of a transimpedance amplifier circuit in accordance with the present invention.

FIG. 3 is a block diagram illustrating a second embodiment of a transimpedance amplifier circuit in accordance with the present invention.

FIG. 4 is a block diagram illustrating a third embodiment of a transimpedance amplifier circuit in accordance with the present invention.

FIG. 5 is a schematic diagram of a specific implementation of a transimpedance amplifier circuit according to the invention.

5,343,160

**3**

### DETAILED DESCRIPTION

The following includes a detailed description of the best presently contemplated mode for carrying out the invention. The description is intended to be merely illustrative of the invention and should not be taken in a limiting sense.

Referring first to FIG. 2, a block diagram is shown of a transimpedance amplifier circuit according to the present invention. In this embodiment, the transimpedance amplifier circuit is incorporated within an optical receiver system and thus includes a photodetector 118 that receives modulated optical signals from a transmitter. The transimpedance amplifier circuit includes two identical amplifiers 100 and 101 each with a voltage gain of −A. Two independent voltage offset means 105 and 106 couple the output signal of each amplifier 100 and 101 to separate feedback networks 110 and 111 and provide shifted DC voltage levels of $V_1$ and $V_2$, respectively. The voltage offset means 105 and 106 could be implemented using transistors, diodes, resistors or other level shifting circuits well known to those skilled in the art. In addition, feedback networks 110 and 111 are each shown with a single feedback resistor 120 and 121, respectively, although other feedback configurations could be used, such as the incorporation of a capacitor $C_F$ (shown in dashed lines) connected in parallel with the associated feedback resistor. Furthermore, a variety of automatic gain control (AGC) circuitry for extending the dynamic range by attenuating large signals could be added or incorporated within the feedback networks without departing from the spirit of the present invention.

The transimpedance amplifier circuit also includes two capacitors 115 and 116 which couple the output signals of photodetector 118 to the input nodes of amplifiers 100 and 101. The feedback resistors 120 and 121 couple each output line of photodetector 118 to each independent offset means 105 and 106 at the output lines of the amplifier. This arrangement allows the DC potential at nodes X and Y to be set independently to establish the necessary bias voltage across photodetector 118 without using a biasing resistor or a blocking capacitor as exemplified in the circuit of FIG. 1. Coupling capacitors 115 and 116 allow the input potentials of the amplifiers 100 and 101 to be set independently (usually at a value close to the negative supply) of the output potentials. This results in an amplifier with improved voltage gain characteristics since more voltage can be provided across the load resistors. Higher voltage gain produces increased bandwidth since this is a feedback amplifier. Higher voltage gain also reduces noise because the noise in the load resistor is smaller when the voltage gain is high and because a larger feedback resistor can be used for a given bandwidth. The mean-squared noise current from the feedback resistor is inversely related to the feedback resistor value. While coupling capacitors 115 and 116 pose a low frequency limit on the circuit, they are connected within the feedback loop and can have substantially smaller values than the blocking capacitor exemplified in FIG. 1. Equivalently, for a given value of the coupling capacitor, the low frequency bandwidth is lower for the circuit of FIG. 2 than for that of FIG. 1.

The amplifier circuit of FIG. 2 can be designed to operate with a single 5 volt power supply with excellent performance. Performance can be enhanced if a +/−5 volt power supply is used since more voltage gain can

**4**

be obtained per stage. Since the amplifier is differential in nature, power supply noise is substantially rejected.

Referring next to FIG. 3, a block diagram is shown of a second embodiment of a transimpedance amplifier circuit in accordance with the present invention. The embodiment of FIG. 3 is formed with a two-stage amplifier network. Circuit blocks corresponding to those of FIG. 2 are numbered identically. The embodiment of FIG. 3 includes a differential amplifier stage 330 having input nodes coupled to the respective output nodes of amplifiers 100 and 101. A non-inverting output line of differential amplifier stage 330 is coupled to voltage offset means 105 and an inverting output line of differential amplifier stage 330 is coupled to voltage offset means 106. An MSM photodetector 310 is shown connected to coupling capacitors 115 and 116. Amplifiers 100 and 101 are single-ended to produce maximum voltage gain and minimum noise. Differential amplifier stage 330 allows a two-stage design for high gain and high stability.

The transimpedance amplifier circuit of FIG. 3 is also shown with automatic gain control blocks 340 and 341 connected to feedback networks 110 and 111 and amplifiers 100 and 101. The automatic gain control block 340 includes diodes 345 and 346 and a resistor 347. Similarly, the automatic gain control block 341 includes diodes 360 and 361 and a resistor 362. It is noted that the automatic gain control blocks 340 and 341 are each variable impedance devices that provide for the automatic gain control function.

DC current absorbing means 349 and 369 are further connected to the transimpedance amplifier circuit to absorb or remove the DC current from photodetector 318 under large signal conditions. Specific circuitry forming the DC current absorbing means 349 and 369 is known to those skilled in the art and is disclosed, for example, in U.S. Pat. No. 5,030,925 issued Jul. 9, 1991 to Stewart S. Taylor. This patent is incorporated herein by reference in its entirety.

FIG. 4 shows an alternative embodiment for implementing the automatic gain control function within the transimpedance amplifier circuit. The automatic gain control blocks 340 and 341 shown in FIG. 4 are connected to the output lines of photodetector 318 instead of the input nodes of amplifiers 100 and 101. Each automatic gain control block 340 and 341 includes a field effect transistor 400 and 401, respectively, having an impedance that is controlled by an associated amplitude feedback AGC control circuit 402 or 403.

Referring finally to FIG. 5, a preferred embodiment of a transimpedance amplifier circuit in accordance with the invention is shown that operates from a single 5 volt supply. The embodiment of FIG. 5 is a two-stage transimpedance amplifier circuit that conforms generally to the block diagram of FIG. 4 without the incorporation of AGC circuiting. The transimpedance amplifier circuit includes two single-ended input amplifiers that form a first stage and a differential amplifier that forms a second stage common to both input amplifiers. A transistor 210 and a resistor 211 form one input amplifier while transistor 213 and resistor 214 form the other input amplifier. Capacitors 216 and 217 couple the input signal to each input amplifier. The second stage consists of a differential pair of transistors 220 and 221 and load resistors 222 and 223. Transistors 225, 226 and 227 and diodes 230, 231 and 232 provide proper bias to transistors 220 and 221 with common-mode feedback. This biasing is necessary in some cases to lower the common-

5,343,160

<table>
<tr><td>5</td><td>6</td></tr>
</table>

mode gain of transistors 220 and 221 since there is an undesired positive common-mode feedback loop around the entire amplifier. Transistors 225 and 226 and diodes 230–232 are biased with current from transistor 235. Transistors 210 and 213 are biased with common-mode feedback from transistors 220, 221, 237, diodes 238 and 239, and resistors 241 and 242. Biasing current is provided by resistors 245 and 247 and transistor 246. Resistors 241 and 242 and capacitors 216 and 217 are chosen consistent with the low frequency cutoff of the circuit and with the size limitations of the integrated circuit. Resistors 241 and 242 should be much larger than feedback resistors 260 and 261 to ensure good noise performance. The photodetector (MSM in this case) is modeled by current source 250 and capacitor 251. The voltage offset means are implemented with source follower transistors 255 and 256 and level-shifting diodes 257, 258 and 259. Transistors 256 and 285 provide bias current to level-shifting diodes 257–259. Feedback resistors 260 and 261 couple the offset output signals back to the inputs of the photodetector. The output can be taken from the sources or gates of transistors 255 and 256, or from the offset means diodes 257, 258 and 259.

The circuit of FIG. 5 is an illustration of a specific implementation of a transimpedance amplifier circuit according to the invention. Numerous modifications and variations will become apparent to those skilled in the art once the above disclosure is fully appreciated. It is to be understood that the above detailed description of the preferred embodiment is intended to be merely illustrative of the spirit and scope of the invention and should not be taken in a limiting sense. The scope of the claimed invention is better defined with reference to the following claims.

I claim:

1. A balanced transimpedance amplifier circuit comprising:

a first amplifier circuit for amplifying a first signal at a first input line;

a second amplifier circuit for amplifying a second signal at a second input line;

a first capacitor coupled between said first input line and an input node of said first amplifier circuit;

a second capacitor coupled between said second input line and an input node of said second amplifier circuit;

a first feedback network coupled between an output line of said first amplifier circuit and said first input line;

a second feedback network coupled between an output line of said second amplifier circuit and said second input line;

a first voltage offset means coupled in series with said first feedback network; and

a second voltage offset means coupled in series with said second feedback network.

2. The balanced transimpedance amplifier circuit as recited in claim 1 further comprising:

a first automatic gain control circuit coupled to said first amplifier circuit; and

a second automatic gain control circuit coupled to said second amplifier circuit.

3. The balanced transimpedance amplifier circuit as recited in claim 1 further comprising:

a first automatic gain control circuit coupled to said first feedback network; and

a second automatic gain control circuit coupled to said second feedback network.

4. The balanced transimpedance amplifier circuit as recited in claim 2 wherein said first automatic gain control circuit includes a variable impedance device.

5. The balanced transimpedance amplifier circuit as recited in claim 3 wherein said first automatic gain control circuit includes a variable impedance device.

6. The balanced transimpedance amplifier circuit as recited in claim 4 wherein said variable impedance device includes first and second diodes coupled in parallel.

7. The balanced transimpedance amplifier circuit as recited in claim 5 wherein said variable impedance device includes first and second diodes coupled in parallel.

8. The balanced transimpedance amplifier circuit as recited in claim 4 wherein said variable impedance device includes a transistor.

9. The balanced transimpedance amplifier circuit as recited in claim 5 wherein said variable impedance device includes a transistor.

10. The balanced transimpedance amplifier circuit as recited in claim 2 wherein said first automatic gain control circuit is coupled to an input node of said first amplifier circuit.

11. The balanced transimpedance amplifier circuit as recited in claim 3 wherein said first automatic gain control circuit is connected in parallel with said first feedback network.

12. The balanced transimpedance amplifier circuit as recited in claim 1 further comprising a photodetector coupled to said first and second input lines.

13. The balanced transimpedance amplifier circuit as recited in claim 12 wherein said photodetector is a metal-semiconductor-metal detector.

14. The balanced transimpedance amplifier circuit as recited in claim 13 wherein said photodetector and said first and second amplifier circuits are fabricated on a single gallium arsenide integrated circuit chip.

15. The balanced transimpedance amplifier circuit as recited in claim 1 wherein said first and second amplifier circuits are single-ended amplifiers.

16. The balanced transimpedance amplifier circuit as recited in claim 1 wherein said first amplifier circuit is biased with a DC common-mode feedback loop.

17. The balanced transimpedance amplifier circuit as recited in claim 1 wherein said first amplifier circuit includes a transistor having a control terminal coupled to said first capacitor and a second terminal connected to a first power supply terminal.

18. The balanced transimpedance amplifier circuit as recited in claim 17 further comprising a load resistor connected between a third terminal of said first transistor and a second power supply terminal.

19. The balanced transimpedance amplifier circuit as recited in claim 18 wherein said transistor is a field-effect transistor.

20. The balanced transimpedance amplifier circuit as recited in claim 18 wherein a voltage drop across said transistor summed with a voltage drop across said load resistor equals a difference in the voltage levels between said first and second power supply terminals.

21. The balanced transimpedance amplifier circuit as recited in claim 1 wherein said first voltage offset means is connected to the output line of said first amplifier circuit and to said first feedback network, and wherein said second voltage offset means is connected to the output line of said second amplifier circuit and to said second feedback network.

22. A balanced transimpedance amplifier circuit comprising:

5,343,160

**7**

a first amplifier stage including a first amplifier circuit for amplifying a first signal at a first input line and a second amplifier circuit for amplifying a second signal at a second input line;

a second amplifier stage including a differential amplifier circuit having a first input node coupled to an output node of said first amplifier circuit and having a second input node coupled to an output node of said second amplifier circuit;

a first capacitor coupled between said first input line and an input node of said first amplifier circuit;

a second capacitor coupled between said second input line and an input node of said second amplifier circuit;

a first feedback network coupled between a first output line of said differential amplifier circuit and said first input line;

a second feedback network coupled between a second output line of said differential amplifier circuit and said second input line;

a first voltage offset means coupled in series with said first feedback network; and

a second voltage offset means coupled in series with said second feedback network.

23. The balanced transimpedance amplifier circuit as recited in claim 22 further comprising:

a first automatic gain control circuit coupled to said first amplifier circuit; and

a second automatic gain control circuit coupled to said second amplifier circuit.

24. The balanced transimpedance amplifier circuit as recited in claim 22 further comprising:

a first automatic gain control circuit coupled to said first feedback network; and

a second automatic gain control circuit coupled to said second feedback network.

25. The balanced transimpedance amplifier circuit as recited in claim 23 wherein said first automatic gain control circuit includes a variable impedance device.

26. The balanced transimpedance amplifier circuit as recited in claim 24 wherein said first automatic gain control circuit includes a variable impedance device.

27. The balanced transimpedance amplifier circuit as recited in claim 25 wherein said variable impedance device includes first and second diodes coupled in parallel.

28. The balanced transimpedance amplifier circuit as recited in claim 26 wherein said variable impedance device includes first and second diodes coupled in parallel.

29. The balanced transimpedance amplifier circuit as recited in claim 25 wherein said variable impedance device includes a transistor.

30. The balanced transimpedance amplifier circuit as recited in claim 26 wherein said variable impedance device includes a transistor.

31. The balanced transimpedance amplifier circuit as recited in claim 22 further comprising a photodetector coupled to said first and second input lines.

32. The balanced transimpedance amplifier circuit as recited in claim 31 wherein said photodetector is a metal-semiconductor-metal detector.

33. The balanced transimpedance amplifier circuit as recited in claim 32 wherein said photodetector and said first and second amplifier circuits are fabricated on a single gallium arsenide integrated circuit chip.

34. The balanced transimpedance amplifier circuit as recited in claim 22 wherein said first and second amplifier circuits are single-ended amplifiers.

35. The balanced transimpedance amplifier circuit as recited in claim 22 wherein said first input node of said

**8**

differential amplifier circuit is a non-inverting input terminal and wherein said second input node of said differential amplifier circuit is an inverting input terminal.

36. The balanced transimpedance amplifier circuit as recited in claim 22 wherein said first output line of said differential amplifier circuit is a non-inverting output terminal and wherein said second output line of said differential amplifier circuit is an inverting output terminal.

37. The balanced transimpedance amplifier circuit as recited in claim 22 wherein said first amplifier circuit includes:

a transistor having a control terminal coupled to said first capacitor and a second terminal connected to a first power supply terminal; and

a load resistor connected between a third terminal of said transistor and a second power supply terminal.

38. The balanced transimpedance amplifier circuit as recited in claim 37 wherein a voltage drop across said transistor summed with a voltage drop across said load resistor equals a difference in the voltage levels between said first and second power supply terminals.

39. The balanced transimpedance amplifier circuit as recited in claim 22 wherein said first voltage offset means is connected to the first output line of said differential amplifier circuit and to said first feedback network, and wherein said second voltage offset means is connected to the second output line of said differential amplifier circuit and to said second feedback network.

40. A method for biasing a balanced transimpedance amplifier circuit, said transimpedance amplifier circuit including a first and a second amplifier circuit for amplifying signals at a first and a second input line, respectively, a first feedback network coupled between a first output line of said transimpedance amplifier circuit and said first input line, and a second feedback network coupled between a second output line of said transimpedance amplifier circuit and said second input line, said method comprising the steps of:

DC level shifting a first signal at said first output line;

DC level shifting a second signal at said second output line;

providing said first DC level shifted signal to said first input line through said first feedback network;

providing said second DC level shifted signal to said second input line through said second feedback network;

AC coupling said first input line to an input node of said first amplifier circuit; and

AC coupling said second input line to an input node of said second amplifier circuit;

whereby a bias voltage across said first and second input lines is established independent of the voltage levels at the input nodes of said first and second amplifier circuits.

41. The method for biasing a balanced transimpedance amplifier circuit as recited in claim 40 further comprising the step of controlling the gain of said transimpedance amplifier circuit.

42. The method for biasing a balanced transimpedance amplifier circuit as recited in claim 40 further comprising the steps of:

providing an output signal of said first amplifier circuit to an input node of a differential amplifier circuit; and

providing an output signal from said second amplifier circuit to a second input node of said differential amplifier circuit.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

```
PATENT NO.    :   5,343,160
DATED         :   August 30, 1994
INVENTOR(S)   :   Stewart S. Taylor
```

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

```
Column 3, line 20, delete "-" and insert --.--.

Column 4, line 8, delete "-" and insert --.--.
```

Signed and Sealed this

Twenty-first Day of March, 1995

*Attest:*

**BRUCE LEHMAN**

*Attesting Officer*          *Commissioner of Patents and Trademarks*